THOMAS McCARGO v. THE NEW ORLEANS INSURANCE COMPANY.

Where a policy of insurance recites that the " insurers shall not be liable for *muti-ny*," the mutiny is but an excepted risk. So, where the language of the policy is "*warranted* free from *insurrection*," it does not create a technical warranty, but only exempts the insurers from liability on account of losses which may be sustained in consequence of an insurrection or mutiny. In common parlance, there is little or no difference between mutiny and insurrection; and the word *warranted* is often used where there is no warranty in fact.

A vessel on the high seas, in time of peace, engaged in a lawful voyage, is under the exclusive jurisdiction of the State to which her flag belongs; as much so, as if constituting a part of its own domain. If forced by any unavoidable cause into a port of a friendly power, she loses none of the rights appertaining to her on the high seas, but herself and cargo, and the persons on board, with their property and all the rights incident to their personal relations, as established by the laws of the State to which they belong, are placed under the protection which the laws of nations extend to the unfortunate under such circumstances. Although the jurisdiction of the nation over the vessel belonging to it is not wholly exclusive; and though, for any unlawful acts committed, while in such a situation, by the master, crew, or owners, she and they may be responsible to the laws of the place, yet the local law does not supersede the laws of the country to which the vessel belongs, so far as relates to the rights, duties and obligations of those on board.

Where slaves shipped from one port of the United States to another, rise upon the officers of the vessel, and take her into a British port, they will be considered still as slaves, though in a state of insurrection. *Per Curiam:* They did not cease to be the property of their owners, though in a state of insurrection, and though the right of property could not be asserted in a British court, nor enjoyed within the exclusive influence of British laws.

The *last* cause of a loss is not necessarily the *proximate* cause.

All the consequences naturally flowing from a peril insured against, or incident thereto, are properly attributable to the peril itself.

Where the insurers of a cargo of slaves are exempted, by the policy, from the risk of insurrection, and the slaves take possession of the vessel by force, turn her from her course, and enter a British port, where they escape, the insurrection must be considered as the cause of the breaking up of the voyage, and the insurers will not be liable.

In principle there is no difference between a successful insurrection of slaves, who form themselves the subject of the insurance, and a capture by an enemy, which, *prima facie*, amounts to a total loss.

APPEAL from the Commercial Court of New Orleans, *Watts*, J.

The petitioner alleges that the defendants are indebted to him in the sum of $20,800, with interest thereon, at five per cent a year, from judicial demand, for this; That defendants did, by a

policy dated at New Orleans, the 16th November, 1841, in consideration of the premium then and there paid to them, insure from Norfolk to New Orleans, certain slaves belonging to him, (twenty-six in number,) valued at $800 each, shipped on the brig Creole, beginning the adventure from and immediately after the placing of the slaves on board of the Creole at Norfolk, and continuing it until they should be safely landed at New Orleans. It is averred that the defendants took upon themselves all the perils of pirates, takings at sea, arrests, restraints, and detainments of all kings, princes, or people of what nation soever, all risks of foreign influence, and all other perils, losses and misfortunes that had or might thereafter arise to the hurt, detriment, or damage of the said slaves, as will appear from the policy annexed to the petition; that plaintiff was at the time of the execution of the policy, and still is the owner of the slaves; that about the 30th of October, 1841, the Creole sailed from Norfolk on her voyage, with the twenty-six slaves on board; that she was staunch, and well manned and provided for the voyage; that she had proceeded in the prosecution of her voyage to a point about one hundred and thirty miles north-north-east of the *Hole-in-the-Wall*, " when by reason of an affray and disobedience of about nineteen slaves on board, all of which were other than those described in the said list, (for the insurance on whom this suit was brought), the said vessel proceeded to the port of Nassau, in the Island of New Providence, within the dominions of Her Majesty, the Queen of Great Britain and Ireland, when, between the 10th and 18th of November, both inclusive, the public authorities and other agents of Her Majesty aforesaid interfered with said slaves, captured, seized, detained and emancipated them, whereby the said slaves were all totally lost by the risks insured against in said policy, to wit, foreign interference and pirates, the takings at sea, arrests, restraints, and detainments of all kings, princes, or people of what nation, condition, or quality soever, and all other risks, and all other perils, losses and misfortunes that then had, or might thereafter come to the hurt, detriment or damage of the said slaves, or any part thereof."

It is further averred, that said slaves were not lost by their

own elopement, insurrection, or natural death; that since the said loss the plaintiff duly informed the defendants thereof; *that* he has made the preliminary proof required by said policy; has made to the defendants a full and entire abandonment of said slaves; and demands payment of the value thereof, as fixed by the policy for the total loss of said slaves. The petition concludes with a prayer for general relief, &c.

A list of the names of the slaves, their ages, color, height, and sex, was annexed to the petition.

The answer denied generally all the allegations in the petition, except that of the execution of the policy. It denied specially that the plaintiff had complied with the warranties with which he was bound to comply.

The proposal for insurance, offered in evidence by the plaintiff, states that: "Insurance is wanted against all risks, and chiefly against foreign interference on twenty-six negroes, at $800 each, on board the brig Creole, Henshaw, at and from Norfolk to New Orleans—warranted by the assured free from elopement, insurrection, or natural death."

The policy introduced in evidence recites that: "Thomas McCargo, on account of whom it may concern, does make insurance, and cause to be insured, lost or not lost, at and from Norfolk to New Orleans, upon all kinds of lawful goods and merchandize, laden or to be laden on board the good brig Creole, whereof is master for this voyage Henshaw, or whoever else shall go for master in the said vessel, or by whatever other name or names the said vessel or the master is or shall be named or called, beginning the adventure upon the said goods and merchandize from and immediately following the loading thereof on board of the said vessel at Norfolk aforesaid, and so shall continue and endure until the said goods and merchandize shall be safely landed at New Orleans aforesaid. And it shall and may be lawful for the said vessel, in her voyage, to proceed and and sail to, touch and stay at any ports or places, if thereunto obliged by stress of weather or other unavoidable accident, without prejudice to this insurance," &c.

"Touching the adventures and perils which the New Orleans Insurance Company of New Orleans is contented to bear and take upon itself in this voyage, they are of the sea, men of war,

fires, enemies, pirates, rovers, thieves, jettison, letters of mart and counter-mart, surprizals, takings at sea, arrests, restraints, and detainments of all kings, princes, or people, of what nation, condition, or quality soever, barratry of the master and mariners, and all other perils, losses, and misfortunes that have or shall come to the hurt, detriment, or damage of the said goods and merchandize, or any part thereof. And in case of any loss or misfortune it shall be lawful and necessary to and for the assured, his factors, servants, and assigns, to sue, labor and travel for, in and about the defence, safeguard and recovery of the said goods and merchandize, or any part thereof, without prejudice to this insurance, to the charges whereof the said Insurance Company will contribute according to the rate and quantity of the sum herein insured, having been paid the consideration for this assurance by the assured or his assigns, at and after the rate of two per cent; and in case of loss the assured to abate two per cent, and such loss to be paid in thirty days after proof of loss and adjustment thereof, and proof of interest in the said shipment, the amount of the note given for the premium, if unpaid, being first deducted," &c.

" Twenty thousand eight hundred dollars value on twenty-six negroes, at $800 each; and this policy covers all risks, and provides chiefly against that of foreign interference; but warranted by the assured free from elopement, insurrection and natural death."

The premium was admitted to have been paid.

The abandonment was offered in evidence by the plaintiff, and the defendants admitted that they had received it within a day or two after its date, (8 December, 1841). The record states that the abandonment was offered and received merely to show that an abandonment was tendered by the plaintiff to the defendants. The bill of lading for the slaves was also introduced by the plaintiff.

The concurrent testimony of all the witnesses established the facts that the insurrection was successful, and that, under the orders of the insurgents, the brig, when she reached the Hole-in-the-Wall, was turned from her course towards New Orleans, and taken into Nassau, in the Island of New Providence.

*Gifford,* a witness for the plaintiff, testified* that he left Richmond on the 17th October, in the brig Creole, as chief mate—has been following the sea for thirteen years. On looking at the bill of lading he recognizes the names of some of the negroes mentioned therein—Madison Washington, Elijah Morris, Pompey Garrison, and Andrew Jackson as the slaves of the plaintiff, and of the number put on board by him; the other negroes, to about the number stated in the first bill of lading, were called and considered as the slaves of the plaintiff. Mr. Hewell was on board acting as agent of plaintiff; we took on board the greater part of the slaves on the 20th, and one or two more a day, till the 25th; on the 25th we left Richmond. The captain left the brig in the river on the 27th, and proceeded to Norfolk by the steamboat. The Creole was detained in Hampton Roads one day, when we took in the balance of the slaves. The tobacco was taken in at Richmond. The Creole left Hampton Roads on the 31st of October; we got to sea on that day. The Creole was well manned, and prepared with every thing for carrying slaves; she was twelve or fourteen months old. After putting to sea the negro women were put in the after hold of the vessel, and the men in the fore hold; between these were stored the cargo of boxes of manufactured tobacco. Hewell and Merritt together attended to the negroes. As far as he knows every precaution was taken to prevent insubordination on the part of the negroes. The men were allowed to come on deck night and day if they wished. From the time of leaving Richmond until the night of the riot the negroes behaved as well as they could behave; saw nothing like insubordination among the slaves until that time. The night of this riot we hove to about eight o'clock off Abaco; it was deponent's first watch on deck, and was on deck with three of the seamen—Blinn Curtis, Henry Speck, and Jack Lecompts. Between nine and half-past, Elijah Morris came to deponent on deck, and told him that one of the negro men had gone down to the hold where the women were. Deponent called Merritt, one of the agents on board, who was in the cabin asleep. Merritt came out with deponent, bringing with him a lamp and match; Merritt went in the hold and lit the lamp; deponent staid on deck on the hatch, to see if

* This testimony, and that of the other witnesses, was taken under commissions. When about to be introduced, defendants' counsel stated that the depositions contained much hearsay, and other illegal evidence, such as statements of the contents of notes, letters, &c., not produced, which was so blended with what was legal, that it could not be separated without great delay, when it was agreed that the judge should instruct the jury that they must consider so much of the evidence as is hearsay, or refers to the contents of letters, notes, or written instruments not produced, as rejected by the court.

any one did not come out. Merritt, by lighting the lamp, enabled us to see Madison Washington, a slave of the plaintiff, in the hold among the women. Merritt asked Madison what he was doing there, who gave no reply, as deponent heard. He then asked of him if he knew the consequences of being down there; he replied that he did, and sprang for the hatchway to come on deck. As he got on the steps to come up, Merritt seized him by the legs and deponent by the shoulders, but being a powerful man he soon got away from us. As Madison got on top of the hatchway he shoved deponent back from him. Deponent told him to stop; he replied that he could not stay there, he must go on deck. It was the rule to whip the negro men if they went into the hold with the women, and these were the consequences of which Merritt spoke when he addressed Madison as above. When deponent and Merritt took hold of Madison, he believes, from the appearance and manner of Madison, that he thought they took hold of him to punish him. When he pushed deponent off, he appeared much excited, and, being a powerful man, easily disengaged himself from deponent. Instantly after Madison disengaged himself, a pistol was fired at deponent, the ball grazing the back part of his head. Deponent then went to the cabin to call all hands, the cabin passengers, &c. He awaked the captain, passengers, and second mate below, but before he got below, Madison, or Elijah Morris, from his voice, and some four or five others followed him as he went to the cabin. Madison called to the rest, to come on; as they had commenced, they must go through with it. The captain jumped out and seized his bowie knife, as he understood, and Mr. Hewell, a musket. We all started then on deck and met the negroes near the cabin door. The fight then commenced; Hewell fired the musket, and soon after it was fired the negroes wrenched it from him. Hewell, he thinks, then seized a handspike, and fought with that about a minute, when it was also taken from him; he was then stabbed in a number of places, and staggered back in the cabin, and it was the last that deponent saw of him; presumes he was stabbed with the captain's bowie knife, by Madison or Ben Blacksmith. Deponent received several blows from the negroes with sticks or clubs; his clothes were cut across the breast with a large knife, which he thinks was used for the purpose of cutting meat. This knife of the cook's was usually left in the galley, where it could be picked up by any one; the handspikes were left forward by the windlass, where they could be picked up by any one passing in that direction. There were three or four pistol discharges the night of the riot; thinks he heard three or four discharges of fire-arms besides the musket; the pistols in pos-

session of the negroes were large sized pocket pistols. After arriving at Nassau, three of the knives of the seamen were found in the possession of the negroes; cannot say whether these knives were taken during the scuffle or not. Saw one of the seamen, Blinn Curtis, knocked down at the door of the cabin by one of the negroes, and fall into the cabin. At that time deponent retreated to the main top, and captain Ensor followed him soon after to the maintop, and on getting there, told deponent that he was badly stabbed and was dying. Deponent could then hear the threats of the negroes to kill all hands. Heard Madison Washington telling the rest to kill every white man, and not to let one escape. Three or four of the negroes then went aft to kill the Frenchman at the wheel. Madison Washington told them not to hurt him, he was a Frenchman, and could not speak a word of English. They then searched the vessel fore and aft, to see if they could find any more white people. They threw water down the sky-light, and put the lights out in the cabin. They then stationed men in different parts of the vessel to look out for us; the orders were to kill us. They then made one of the sailors bring in the lantern from the bowsprit, being there to prevent vessels from running into us. They took this lantern and went into the cabin to search it. He supposes that about a minute after they brought Mr. Hewell on deck, they cut his head off as near as they could with a knife (he was then dead); and the one who cut his head off, stated—"we will separate the old son of a bitch somehow." They then threw him overboard from a port-hole. They then remained still for some time, only passing about the deck occasionally, with a lantern. By this time it was probably one or two o'clock at night; saw nothing more until five o'clock, A. M.; could hear the negroes talking below in the cabin, but not what they said. At five o'clock, A. M., they saw deponent in the main top, and called him down, and said if he did not come down they would shoot him; they then had a loaded musket in their hands. Deponent stepped on deck and said: "I am here now, you can do with me what you please." One of them held the musket to his breast. Another told him he must take them to Abaco, or some other English island, or they would shoot him, and put him overboard. They asked deponent then where captain Ensor was? He replied, "in the main top;" the witness having fastened him there during the night to prevent him from falling out, as the vessel was rolling heavily. Deponent said that the captain was helpless from his wounds, and asked the privilege to bring him on deck. One of them replied, "damn him, let him stay there till daylight, and we will then finish him." They then had some talk among themselves

for a few minutes, and then told deponent to bring the captain down—we then brought him on deck, and laid him on a mattrass on the quarter deck. The negroes then took him and put him in the fore hold—some four or five of them, under the direction of Madison and Elijah Morris. They then put Mr. Ensor and Mr. Stevens, second mate, also in the hold—they then put the grating on and locked it, and put negroes to watch it. It was then about 6 A. M., and they remained in the hold till about five in the evening, except Stevens, who was let out at 11 o'clock A. M. Blacksmith then remarked that they would leave them there till night, and then put them overboard. After this affray the nineteen who were identified and put in prison at Nassau, were the negroes who took possession of the brig. These nineteen kept strict orders over the rest of the negroes, exercising the same sway over the rest of the negroes that they did over the whites, threatening to whip them if they disobeyed their orders. They appointed another cook for the negroes, Madison having been the former cook. The nineteen took possession of the vessel, stationed in different parts of the vessel. None but the nineteen came into the cabin ; this was their head quarters ; they drank the liquor out of the cabin ; heard them invite none of the other negroes into the cabin. Ben Blacksmith had the captain's bowie knife in the morning; Elijah Morris had then a knife also : this was just before we made sail. There was in the cabin when they took him to explain the chart to them, the four negroes—Ben Blacksmith, Elijah Morris, D. Ruffin and Madison Washington. Neither D. Ruffin nor Madison, at that time, had knives or any weapons with them. Deponent explained the chart, and showed them about where we were. They said they wished to go to Abaco ; at sunrise we made sail. They forbid the white persons from talking together ; Elijah Morris saying, if he saw them talk together, he would throw them overboard. Blacksmith, Morris, Ruffin and Madison were appointed by the rest of the nineteen as the managers. They gave all the orders with the exception of working the vessel, which they ordered deponent to do, they not understanding it. They were in all parts of the vessel, keeping the others in subjection, &c. D. Ruffin watched the compass, to see that we did not alter our course. ' Madison and Elijah Morris together threatened death if we should decieve them, or change the direction of the vessel. When Ruffin saw deponent and Merritt writing on the slate the altitude, the ship's time, he ordered it to be rubbed out, being afraid that we should communicate with each other in that way. Two of these four managers had knives which they kept out the whole time after the affray, and several others of the nineteen had

knives and pistols, (three pistols,) all of which they threw over-
board, excepting one pistol, at the mouth of Nassau harbor;
they were thrown overboard to prevent their being seen. Ma-
dison Washington came aft and told them all to give their arms
to him, to have them thrown overboard, so that none might be
seen when they arrived at Nassau. One pistol was all that
was left when they arrived, besides the musket belonging to
deponent. Mr. Hewell's knife was afterwards found where they
had put it in the fire, in their cooking apartment, to destroy it.
All the rest of the negroes were kept under by the nineteen, till
we arrived at Nassau, where we arrived on Tuesday morning,
the 9th November. On our arrival a black pilot came on board
about one mile outside of the light house; this was one of the
regularly authorized pilots there. When they came on board
they mingled with the negroes, all being black. As the pilot
was bringing the vessel to in the harbor, the quarantine officer
came along side with his boat. Deponent jumped into his boat,
and told him the cause of our coming in there, and asked him
to put deponent on shore and to watch the vessel, and to let
them have no communication with the shore till he returned.
He then accompanied deponent to the American Consul. The
officer watched the vessel, and deponent and the Consul went to
see the Governor of Nassau, and saw him at his house, and stated
the case to him. The Consul then asked protection to guard
the vessel till something could be done. Deponent related to
the Governor all the facts as they occurred, which the Governor
wrote down. The Consul asked him if he would send some
soldiers on board to guard the vessel, cargo, and passengers and
crew, till something could be done, which was done. The Go-
vernor sent a company of Africans with a white officer; twen-
ty-two privates, he thinks there were, together with a black
corporal and sergeant. The officer in command was called
captain Mins. These soldiers when they came on board, put
the men forward and the women aft; they then tied Ben Black-
smith, Madison Washington, D. Ruffin and Elijah Morris, and
confined them in the long boat on deck, where they were kept
until the slaves were liberated. The guard remained on board,
being changed every morning at nine o'clock, officers and sol-
diers. They took and kept entire possession of the vessel. It was
the day after the arrival at Nassau, that the magistrates came
on board, and took deponent's, Merritt's, and Stevens, the 2nd
mate's, depositions. The next day they came off and took the
deposition of one or two of the crew. On Friday morning, they
came off again, and finished the depositions. Previous to their
coming off that morning, the civil authorities had hired what
boats they could find in the harbor, and manned them with ne-

groes; and these negroes in the boats were armed with clubs. There were then, he presumes, 1500 negroes on shore; the shore was then lined with negroes and some few whites. The American Consul asked the Governor to protect the vessel, until he could send to Indian Key for a man-of-war to come and take the vessel, &c., and bring them to New Orleans. The Consul informed deponent that he had made this request; deponent did not hear it made. The interviews between the Consul and the Governor took place at the Government House, on Friday morning. The Consul then asked deponent if he would take charge of the Creole and the rest of the slaves, excepting the nineteen, and bring them to New Orleans. The Consul then stated that he had applied to the Governor to take out the nineteen, and to put such arms on board as were necessary, and to get the crew out of the other American vessels that were there, which the Governor (as the Consul told deponent,) refused to do. Deponent then came on board in company with Captain Woodside, and found there the Attorney General of the Island, with three or four magistrates, the same who had taken the depositions previously; the boats were then all around the vessel, being a regular musquito fleet, numbering some fifty or sixty boats. There was also a large sloop towed from the shore, and anchored near the brig, manned with about a dozen negroes, all armed with bludgeons. The soldiers, twenty-four blacks, with their white officers, were then on board of the Creole. After the depositions were finished, the magistrates then picked out the nineteen who were identified, and put them under the custody of the guards—the African soldiers on the quarter deck. The boats lying about were under the orders of the Attorney General and the magistrates, and the blacks appeared to be under the direction of the black pilot. He appeared to be captain over the blacks, and all were waiting the orders of the Attorney General and the magistrates. The general talk on shore was that the civil authorities on shore had hired all the boats, &c. to take possession of the Creole and liberate the slaves on board. The soldiers on board had muskets; the officers and soldiers were in full British uniform; sentries were placed about the brig by the officers having command on board. No one excepting deponent and the crew, the consul and civil authorities, were allowed to come on board the Creole. The negroes of the Island had been allowed to come on board the day we arrived, and allowed to mingle with the slaves on board. Deponent asked the British officer on board to prevent the negroes of the Island from coming on board and talking with the slaves. They were not allowed to come on board any more, from that time till the slaves were liberated. The English offi-

cers had control over the vessel. Each day that the guard came on board, they were drawn up on the quarter deck by the officers, and loaded their muskets with powder and balls, and fixed their bayonets.    Each company had four rounds of cartridges ; soldiers all well disciplined. When the Attorney General and the magistrates came on board, the military company were all under arms.   After they had possession of the nineteen, the Attorney General and the magistrate, a Baptist preacher, (he believes he was,) and one or two other white men who accompanied the magistrate and preacher on board, stepped to the quarter deck: one of the magistrates told the second mate and some of the men if they had any money or clothes, they had better lock them up, as he did not know, but the cabin would be robbed by the negroes. They were freightened, and each one went to secure his own clothing and effects.   One of the passengers put on four pair of pantaloons, another put on two suits.    They locked their trunks and put them in the state rooms, and took care of every thing they had.   Then the Attorney General stepped on the forward part of the quarter deck and addressed himself to the negroes : " My friends," said he, " you have all been detained on board of " the Creole in the port of Nassau a short time to know who " was most engaged in the murder of Mr. Hewell, and attempt- " ing to kill the captain, mate and crew.    We have ascer- " tained that, and identified nineteen : and the rest of you are " all free and at liberty to go ashore, and go where you please."ₐ Witness then said to him :  " We have been once nearly killed " by these slaves, and we see from your people that they intend " to show fight, and we want to be protected, vessel, crew and " cargo.   I protest against any of these boats coming alongside " of the brig, or the slaves going on shore from the brig."   He answered: " You had better not object to it ; you had better let " them go quietly ashore ; if you object, I am afraid there will " be blood shed."   He then spoke to the nineteen on the quarter deck, and said : " Here are nineteen of you that are identified " as being engaged in this affray, and you will be lodged in " prison till we can communicate to England to know whether " you will be tried here or elsewhere."   The Attorney General then made a signal for the musquito fleet to come alongside, by raising his hand.   He and one of the magistrates then got into his boat and shoved off from the brig a short distance.   On the signal being given, the boats made a general rush alongside of the brig, shouting and huzzaing ; two of the magistrates and the Baptist minister remaining on board.   Witness asked them not to allow any of the negroes to come out of the boats on board of the brig.   The magistrate told them not to come on board, and told the slaves on board to get over the side into the

boats, and one of the magistrates stood in the gangway and helped them over the side into the boats. After all had got into the boats, except the five who remained on board and came to New Orleans, the whole fleet shoved off a little way from the brig, gave three cheers, and went ashore. The Attorney General and officers, after the negroes from the brig got into the boats, shook hands with the negroes, congratulating them on their liberation. The Attorney General and one of the magistrates were lying with their boats at a a small distance, witnessing the proceedings, whilst the negroes were getting out of the brig into the boats. About five minutes before the signal was given by the Attorney General for the fleet to approach, the black pilot who was in his boat, cried out to the magistrates who were on board : " I wish you would hurry there. You have " had your time, and we want ours." During this time the officers and company remained under arms on board. A half an hour after the negroes went ashore, the boat was sent from the barracks alongside of the brig, took out the prisoners and guards, took them ashore, and the nineteen were marched to prison. The brig lay about 150 yards from the wharf. When they first anchored it was in the outer roads about a mile from the shore ; they lay there two days, and by order of the harbor master were warped up to within about 150 yards of the wharf. On the day they arrived at Nassau, Captain Woodside, master of the barque Louisa, of Portland, came on board the Creole with the American Consul. Captain Woodside proposed to come on board himself, bring part of his crew and the second mate. He offered to assist in taking charge of the vessel, and to help to master the slaves, and take the vessel to Indian Key, where they could have got aid from the revenue cutter or a man-of-war of the United States. They knew there was one there, as there is always one stationed there. The American Consul then proposed to get the crew of the brig Congress of New York, then lying dismasted at Nassau, to assist in taking the vessel to Indian Key with the slaves on board. Witness agreed to this, and agreed to take charge of the vessel, which was requested of him by the American Consul. The Consul and witness went ashore to purchase arms. Those who had them in Nassau refused to sell them. They knew witness, as did every body in Nassau, in 24 hours. When witness walked in the streets, the inhabitants, both whites and negroes, would say : " There goes one of the " damned pirates and slavers." After trying to purchase arms, the Consul and witness continued every day to have interviews with Captain Woodside till the slaves were sent ashore. The force was to come on board when wanted; and when they could not buy any arms it was agreed, that they should have

three muskets and three cutlasses from the brig Congress. There were no arms on board the Louisa, except a pair of horse-pistols, which Captain Woodside was to bring on board. It was intended whenever the nineteen slaves should be taken out of the brig, that witness and the aid he was to receive, should take possession of the brig and remaining slaves, and bring them to Indian Key, for which purpose their force would have been sufficient. On Friday, the day that the slaves were liberated, witness was on shore with the American Consul, when he saw Captain Woodside with his force in the boat and the arms they had procured from the brig Congress, go from the Congress to the Creole. Witness saw her stop and lay off a few minutes, when she approached the Creole and then went to the shore, and Captain Woodside landed, and the boat then went back to the Congress and put out the arms. Witness was then ashore with the American Consul on a visit to the Governor. Captain Woodside repeated to them that he had been to the brig, and that the British officer in command would not let them come on board. This was about two hours before the slaves were liberated. If Captain Woodside and his men had been permitted, they would have been in sufficient force to take the brig to Indian Key, with the remaining slaves. Witness thinks Captain Woodside as determined a man as he ever saw in his life. All the sailors in port, those of the Louisa and Congress, were all anxious to come on board, and assist in rescuing the brig, and carrying her and the slaves to Indian Key. They were all Americans, who took a deep interest in rescuing the negroes from the island, and bringing them to Indian Key on the coast of Florida. If there had been no interference of the English authorities, the negroes would have been brought to New Orleans certainly. That interference has caused the loss of the negroes. The affray would not have prevented the negroes from being brought to New Orleans, had it not been for the interference of the authorities. The negroes had no arms at Nassau, (they had been thrown overboard,) and might have been easily overcome, and there was nothing in the way of our bringing the negroes to New Orleans except the British authorities. Captain Ensor and deponent, and all of the crew except three, are Americans; one of the three was a Portuguese, one a Dutchman, and the other a Frenchman. Saw nothing in the conduct of the others than the nineteen, that seemed to manifest any disposition to take part in the affray. None but the nineteen went on the quarter deck after the affray, except such as were sent there by the nineteen on some business. The others went into the hold as usual, and continued doing in all respects just as they did before the affray. After the negroes were liberated, some of them

wished to come to New Orleans, but said they were afraid to come through fear of being killed by the other negroes.

Witness and the others on board of the Creole were afraid of their lives. It is deponent's opinion that the Governor knew all the transactions at Nassau, from the time of our arrival there until we sailed. This opinion is derived from what he saw there—from the actions of the magistrates, the interview with the Governor, and the talk of the people on shore. The authorities and the people there appeared to be acting in concert. The officer in command put on board the second day, Captain Fitzgerald, stated in the evening on deck, (while his arms were round a mulatto girl,) to the negroes, that they were all fools not to have killed all hands when they had a chance, and run the vessel on shore, and then they would have all been free without any further trouble. When the magistrates came on board they did not appear to be under the direction of the military officer on board. When the magistrates and the Attorney General were on board, and the slaves were liberated, then the military officers appeared to be under the directions of the Attorney General. After the slaves were liberated on Friday, on Saturday or Monday, the Attorney General wrote a letter to Captain Ensor; the American Consul has the letter. Deponent received the letter; the purport of it was, that the slaves had all been to him and made oath that they had left their baggage on board, and that they wanted it, and asking that he would intercede in their behalf in getting it. Deponent answered the letter; stating that there was no baggage on board belonging to the slaves, that he knew of; and if they had any, it belonged to their owners; that they were slaves, and whatever they left on board belonged to their owners; and that he should deliver nothing without a permit from the Custom-House, and an order from the American Consul. Witness received the letter as master of the Creole, as it was addressed to Captain Ensor, as master. The Attorney General then got a permit from the Custom House, and sent an officer on board, and ordered deponent to land the baggage in the brig's boat. This permit was sent by an order of a Custom-House officer. Deponent refused to do it, saying he would not land any thing in the brig's boat, saying that they must get their own boat if they wanted the baggage brought on shore. The Custom-House officer then got a boat from the shore, a barge, which he thinks belongs to the Custom-House, and carried all the baggage of the negroes ashore, and a bale of blankets which had never been opened. The next day (Tuesday, 16th,) deponent wanted to sell a few barrels of provisions to pay our expenses in lying there, (having more provisions than we wanted for the remainder of the voyage.) The pro-

visions consisted of beef, pork and navy bread. Deponent applied at the Custom-House, to the collector of customs, for the privilege of entering them, but he refused to let us do so, unless we entered the slaves on the Creole as passengers; refusing to allow them to be entered as slaves. Deponent refused to enter them as passengers. It is never necessary to enter more of the cargo than you wish to dispose of; could see no other object in their refusal than to get us to enter the slaves as passengers. In the letter of the Attorney General above spoken of, the negroes were spoken of as passengers. Deponent saw the slaves about Nassau for four or five days after they were liberated; conversed with several of them whom witness met in the streets every day; all the slaves whom he conversed with expressed a willingness to come to New Orleans, but stated they were afraid of the inhabitants of the island. A mulatto girl belonging to plaintiff, and another girl called Pinckey, wished to be smuggled on board in order to come to New Orleans. This he could not do, in consequence of the brig lying so near the barracks, where a sentry was kept all the time. We were lying within half a gun shot of the barracks, just at the mouth of the fort. The threats of the people on shore, that the slaves should not go away, and if any of them should be attempted to be taken away by us, that they would sink the vessel, with other circumstances above mentioned, deterred us from smuggling any slaves on board. There was a vessel put up for Jamaica the day after the slaves were liberated; an advertisement to that effect appeared in the paper published at Nassau, and passage was free for such as would go. There are two papers published at Nassau, the Royal Gazette and the Royal Observer. Deponent was told by the American Consul, and Mr. Stark, agent for the Baltimore and Boston Insurance Companies, he believes, that this vessel was put up by the authorities at Nassau, to carry the slaves who came on board the Creole to Jamaica, and such was the general understanding among all whom he conversed with on shore. That vessel had not sailed at the time deponent left Nassau. Deponent left the Thursday after the negroes were liberated; they were liberated on Friday; on Wednesday previous to the day of sailing, cleared from the Custom-House. On clearing deponent had to make oath that he would bring away no British subjects from the island, under the penalty of $2,000 and twelve months' imprisonment; such an oath is usual there; has never taken such an oath elsewhere. Deponent considered that this oath applied to the slaves, whom the authorities considered as English subjects, he presumes. Five of the slaves came to New Orleans with deponent; these five never went ashore. The ne-

McCargo v. The New Orleans Insurance Company.

groes from on shore, after the others were liberated, tried to get them ashore, but we forbid them. The black pilot, for one, took great interest in getting them on shore. The oath that deponent took only applied to bringing off British subjects from the island; did not in any way consider it to apply to these five, because they had never been on shore It was part of the arrangement that the chief mate and second mate and four of the men of the Congress, Captain Woodside, his second mate and three of his men, and more if necessary, were to come on board and assist in bringing all the slaves to Indian Key. The Captain of the Congress had left his vessel, and gone home to New York. Deponent left one of his crew at Nassau; forgets his name; he was called Charles on board. We took on board, at Nassau, two American seamen to come to New Orleans, named Peter and Mike; these were under the hands of the Consul when we arrived there. We also brought on the second mate of the Congress as our second mate; the two shipped at Nassau have left New Orleans; all the other seamen, excepting the one left at Nassau and Jack Lecompts, the Frenchman, are still with deponent. The American Consul told deponent that the day before the Creole sailed, he had made application to the Governor to send the slaves, identified with the affray, to New Orleans for trial, which the Governor refused to do. We were detained one day in waiting for the Governor's answer. In the morning of the arrival of the Creole, in a conversation between deponent, the Governor and the American Consul, the Governor stated as soon as the slaves got their foot on the island, they would be free. Two of the five slaves who came with us to Orleans, and had remained in the cabin, on the voyage from Richmond to Nassau, appeared to be crying, and did not know what to do. One of them was a woman, perhaps thirty years of age, named Rachel Glover; the other, Mary, a mulatto girl, about thirteen years of age; the other two women had been in the hold all the voyage, and remained in the hold until all the others had left the vessel, saying that they did not wish such freedom as there was there; they preferred coming to their masters. The boy, making the fifth, was the son of one of the women in the cabin.

When the Creole left Nassau, the Captain was still sick and helpless. In coming from Richmond, they passed by Norfolk, leaving it 12 miles to the right in going to sea. Thirty-two or thirty-three of the slaves on board were taken on board in Hampton Roads from Norfolk, the brig lying at anchor at the time. When the negroes came on board no examination was made to see if they had any arms in their packs; never examined the packs of negroes, nor has ever known it to be done to

see if they had any arms in their packs; saw no pistols on the voyage until the affray; if any pistols or weapon of any kind had been seen in possession of the negroes, they would not have been permitted to retain them. The brig was seaworthy in every respect when she left the port. When the Attorney General addressed the slaves as above stated, he appeared to be the chief commander of the whole concern, acting as next to the Governor. The Attorney General and one magistrate together put the 19 under the charge of the military, on the Friday when the slaves were liberated. They advertised in the papers a vessel for Jamaica for *emigrant passengers;* and applied to no other class of persons. Defendant is now mate of the Creole. The log-book was kept by deponent up to the liberation of the slaves at Nassau, and, from that time till our arrival at New Orleans, by Mr. Stevens. When deponent joined the vessel, the cargo was on board; and he asked the Captain how many slaves he expected to have on board; he replied, from 150 to 200. Deponent made the entry of 150 on the log-book, and let it remain so. In clearing the vessel at Nassau, the oath above alluded to was made before the collector of that port. Before the Attorney General made his address to the negroes at the time of their liberation, he called up all the negroes to listen to what he had to say. They thought they had all the slaves up. The five spoken of they could not see; two were in the cabin with the little boy, and the other two were in the hold. Deponent did not see himself these five, and thought they were all up with the others, except those in the cabin. All the negroes who sailed from Richmond and Norfolk were carried to Nassau, except those killed in the affray, who were thrown overboard. Saw none of the three negroes he speaks of above as being killed, but others told him they were killed; and on our arrival at Nassau, when the names of all the negroes were registered, there were three of them missing; whether they died in the fight he only knows from hearsay, but does not know that three were missing when the slaves were registered at Nassau.

On his cross examination, *Gifford* stated that he did not hear the names of any of the magistrates. The one who assisted the negroes over the gangway was a large portly man with black whiskers, a full blooded toping Englishman, dressed in light clothes. Knows that the nineteen who were arrested and put in prison at Nassau, were engaged after the insurrection in controlling and managing every thing on board. Deponent is not aware that any other negroes were brought out in the Creole, but those mentioned in the different bills of lading; was only mate of the vessel, and in that capacity had an opportunity of knowing. When the vessel got to sea, was told

that there were 135 slaves on board, all told, and he believes this to have been the true number. Witness thinks about two-thirds, or nearly so, were males. Witness never applied after the insurrection to the rest of the slaves to assist the officers against the nineteen; his reason was, that four of these nineteen slaves were always stationed on the quarter deck of the brig, armed with knives and a pistol, and one forward in the gangway with a musket and bayonet. They thus guarded witness on the quarter deck, and kept him there so that he had no opportunity of communicating with the others. The guard was kept by the nineteen in turn, they relieving each other; neither witness, nor any one in existence, could have got back possession of the vessel after the nineteen had possession; nor could it have been done by stratagem, for no communication was allowed. The negroes had made up their minds, as witness understood, to kill all the whites as soon as they made land, and, of course, he would have done all he could to save his life, if he had any chance. They even took away his penknife. No combination was entered into between the witness and the white seamen, because they could not do any thing, being without arms of any kind, and no more than one seaman at a time was ever allowed to come on the quarter deck to take the wheel. Witness states it to be his belief, that under the circumstances in which they were placed, it was utterly impossible for him and the white seamen who remained on board, to regain the control or possession of the vessel; that there was no one moment, between the insurrection of the negroes and the time they reached Nassau, when they could, by any possibility, have regained control of the vessel from the nineteen. On the night of the insurrection the vessel had been hove to, and she remained so all night, even after the negroes had obtained control of her; but the next morning they put her head to the south, south-west; this was the same direction which was necessary to be pursued, whether they were bound to Nassau or New Orleans, as they had to make Abaco first. During this time it was the witness who gave the orders for steering. The true direction from the point where the insurrection occurred to Nassau, was S. S. W., and as they had commenced running on that course and were bound for Nassau, it was not subsequently changed. If the vessel had been under witness control in the prosecution of her voyage to New Orleans, they would have abandoned the S. S. W. course at the Hole-in-the-Wall, and then would have steered a course about W. by N. for Stirrup Key. From the moment of passing the Hole-in-the-Wall, the vessel continued in a S. S. W. course for Nassau. This course was pursued because D. Ruffin and George Portlock, who both un-

derstood the compass, relieved each other in watching the compass, each in turn lying down armed, close by the binnacle, where they could see the compass, and threatening instant death if the course was changed. The officers and crew of the Creole, from the moment that the insurrection occurred, were in a situation in which they could do nothing under Heaven, by which they could have brought the vessel to New Orleans. Witness not only abandoned all hope of ever getting to New Orleans from the moment the insurrection occurred, but had abandoned all hope of ever setting his foot on shore, as the negroes declared that as soon as they got near the land, they would kill all the whites on board, but the Frenchman, and run the vessel ashore themselves. Witness being asked whether the negroes on board would have been compelled to go ashore, if they had desired to remain on the vessel, answers, that he supposes they went ashore through fear; that the magistrate said to them, "now get over the side of the vessel," and they got into the boats. Witness' impression was, that if the negroes in the vessel had not got into the boats, the negroes in the boats would have come on board and taken possession of the vessel. Witness being asked whether, in his opinion, if these nineteen men, who had control of the vessel, could have been got rid of by some chance or accident, the officers and crew of the brig could have regained control of her, and brought her to New Orleans, answers—that he does not know ; that this idea never entered into his mind; that he would not have known whom to trust, not knowing whether these nineteen had been appointed by the others as chiefs, or whether they had assumed the command themselves. Never explained to any body in the island that he was going to bring away the five slaves that remained on board, except to the Consul. Never saw any of the Creole negroes after their examination in the boats that came around the Creole ; supposes that they were deterred from coming by the negroes on shore. Deponent pointed out of those, the nineteen that he has mentioned; Mr. Stevens pointed out some, Merritt, McCargo also, and some of the crew. Part of them were pointed out as being engaged in the affray, and a part from their conduct subsequent to the affray, and their taking part in the management of the vessel the next day. The rest were not kept under any restraint by the nineteen after the affray, only they were not allowed to come aft, except to pump out the vessel ; could not tell what their opinion was ; had no conversation with them, but saw nothing in their deportment that would induce him to believe they would assist him in re-taking the vessel. Believes it was Elijah Morris who fired the first pistol; does not know who fired the second pistol. Saw the Attorney

General give the signal for the musquito fleet to approach. It may have been given by some of the magistrates, but did not see it.

*Gifford*, being recalled by plaintiff, states that from any thing he saw he could not tell whether if the nineteen had been got out of the way after the affray, they could have brought the vessel to New Orleans. Saw nothing and noticed nothing that showed that the others would not be submissive inasmuch as he was guarded himself, and had as much as he could do to notice those who guarded him. Saw nothing to induce him to believe that the others were engaged with the nineteen in the riot.

Cross examined: says that he saw nothing in the conduct of the other negroes that could induce him to believe that they would join him in bringing the vessel to New Orleans, being so much engrossed by his own situation and the guards around him, that he noticed nothing else. The moment the negroes left the vessel, the Attorney General, with one of the magistrates, was in the Attorney General's boat, lying a short distance from the brig. Previous to his going into the boat, he had made a signal by beckoning his hand for the boat to approach.

The evidence introduced in this case is too volumnious to be embodied in the report. The witnesses for the plaintiff corroborated, in thema in, the evidence of Gifford. As to the address of the British Attorney General, the testimony is contradictory. *Leidner*, a Prussian by birth, a passenger on the Creole, introduced by the plaintiff, deposed: " That he heard one of the English officers, he believes it was the English Consul, say to the slaves on the Creole: ' Friends, come all on deck,' and they all came on deck, and looked at him, and he then said to them, 'You are all free, and you may go where you please now, and if you want to go ashore, there are the boats.' At the same he said, 'Come alongside with your boats;' and he was then speaking to the negroes in the boats around the Creole."

*Merritt*, a witness for the plaintiff, who had charge of the negroes on the Creole, testified that when the taking of the depositions was concluded, " the Attorney General ordered all who had been identified as taking part in the mutiny, to come on the poop. The soldiers took them by the shoulders and led them to the poop. The soldiers then removed from their former station, and came to the poop, and formed in a line on the poop. The Attorney General then addressed the negroes who were innocent, and said to them: "My friends, we have detained you here for

a short time, on purpose of finding out who was engaged in the mutiny and murder on board of the Creole. There have been 19 identified as taking the most active part, which we shall detain until we get further orders from Her Majesty's government. The rest of you are free, and at liberty to go on shore, and wherever you please." He then addressed the mutineers : "Men, there are 19 of you, which have been identified being engaged in the mutiny and murder of Mr. John Hewell, and attempted to murder the Captain and others on board, for which we shall confine you in prison, in order to have time to communicate to the British government, to ascertain whether you will be tried here or elsewhere." One of the magistrates then made a signal for the boats to come alongside, beckoning with his hand. This magistrate was Burnside, who took the most active part in taking the depositions. On this signal being given, the boats came alongside as quickly as they could get their anchors up, &c. When they got alongside, they wanted to come, on board, and the magistrate, Burnside, told the negroes not to come on board, but to take the negroes quietly down from the Creole, and assist them on shore. The Attorney General then, accompanied by one of the magistrates, got into his boat, and left the Creole's side ; they rowed off a short distance from the vessel, and laid on their oars. The negroes in the boats from the shore then called to the slaves on board of the Creole, to come to them, and they assisted them down in the boats. Some of the women slaves were conducted to the steps of the gangway of the Creole by one of the magistrates, and assisted over the side by him into the boat. The magistrate was Burnside. :

" After the Attorney General had finished, deponent was standing by his side, and requested him to state to the negroes that all who thought proper to proceed on the voyage could do so. The Attorney General would not do so, and stated, in effect, that he would not make any such remark. Then deponent said : 'Men and women, all of you who think proper to proceed on the voyage to New Orleans, have the privilege of doing so on board of the Creole." They said nothing to this, as he heard. He supposed they paid some attention to him.

" Witness said nothing to the negroes similar in import to what was said by the Attorney General. The Attorney General said that they might go on shore, and witness said that they might go on board. The Attorney General did not say to the negroes, ' that they were no longer under the restraint of the military guard, or any such words at all.' If he had said these words, witness would have heard him, for witness was standing as close to him as he could, without touching him. It is not true, 'that the slaves left the brig in consequence of what wit-

ness told them;' but five staid in consequence of what witness told them. It is not true that witness stated to the slaves, 'that they were perfectly at liberty to go on shore.' "

This witness denied that he told the slaves " that it was not the wish of any person to detain them on board against their wills," or " that if they wished to leave the vessel they could do so ;" or that he asked " the officer in command whether he had any orders to withdraw the guard, and requested him to notify them of his intention, if such should be the case, as they were afraid to remain with the people, without protection."

*Stevens*, the second mate of the Creole, confirmed generally the testimony of Gifford. He testified that " he did not remember exactly the words the Attorney General made use of to the slaves ; but the amount of it was, that those who were not engaged in the murder were free, and might go where they pleased. That, at a signal given by one of the British officers on board, the negroes came rushing up in their boats with a loud noise ; and that one of the magistrates stood in the gangway, and helped the slaves over the sides."

*Curtis*, a seaman on the Creole, deposed, on behalf of the plaintiff, that " when the Attorney General finished, he said to the negroes, that they were free, and the negroes then made a break over the side of the boat. That the magistrates were present, and aiding in getting the negroes into the boats."

*Foxwell*, another seaman, testified, " that the negroes were sent on shore by a man who seemed to be a British officer. He told them that they could go ashore ; that they were all free. He said this loud enough for the negroes in the boats to hear him. The negroes lay all around the vessel in their boats, saying to the officer on board to bear a hand and get through, that they wanted to come on board. They obeyed the officers. The negroes on board the brig rushed out of the brig into the boats. The moment that the boats got alongside, one or two of the British officers stood at the gang-way, and helped two or three of the negroes to get into the boats."

*Theophilus J. D. McCargo*, a passenger on the Creole, introduced by the plaintiff, testified, " that the Attorney General stood on the quarter deck, and called the slaves who had not been concerned in the mutiny up to him. They stood on the main deck, and he said, ' My friends, you have been detained a short time on board of the vessel to find out those engaged in the murder of Mr. Hewell, and attempting to kill the Captain and others, and that nineteen had been identified, and that all the rest of you are free and at liberty to go on shore, and where you

please.' He spoke to the mutineers, and said that they would have to remain in prison till they could communicate with the English government, to know if they were to be tried there or elsewhere. Deponent then saw one of the magistrates beckoning with his hand to the boats, to come alongside. Deponent heard Mr. Gifford say to the Attorney General, that he protested against the boats coming alongside, or the negroes going on shore. The boats immediately came alongside of the vessel. The magistrates told the people in the boats not to come on board, but ordered the slaves to pass out of the brig into the boats, and assisted some of them over the side. They all left the vessel but five, who secreted themselves in the hold and cabin. The Attorney General left the vessel in his boat, and lay a little way off, looking on."

*John F. Bacon,* on behalf of the plaintiff, testified that the brig Creole arrived at Nassau early in the morning of the ninth of November, 1841. That he visited said vessel during the morning of the ninth of November, 1841, at the request of Gifford, mate of said vessel, which was after he had had an interview with the Governor, with the mate; and he visited the vessel in the capacity of American Consul. On first visiting said vessel, on the morning of ninth of November, 1841, I found two or three white citizens, several Custom-House officers, a colored pilot and his colored crew on board, a large number of the male and female slaves on the forward deck of the vessel apparently in a very quiet state; Mr. Gifford having been previously requested by me to go on board and take charge of the vessel, and keep the American colors set, I found him in charge; and Dr. Chipman, the surgeon dressing the wounds of the Captain, (he having been previously requested by me to go on board). After the wounds of the Captain had been dressed, and after the arrival of a guard of colored troops, consisting (as I believe) of twenty colored privates, sergeant and corporal, under command of Lieutenant Mends, a white officer, and after having introduced to Lieutenant Mends, immediately on his coming on board, Mr. Gifford, as the officer then in command of the vessel, and who was to be obeyed as such, and after having been informed by Lieutenant Mends, on my making the enquiry of him, that his orders were to permit no colored passengers (as he called the slaves) to leave the vessel, and no colored persons to come on board, except by authority from the Governor or American Consul, and that no white persons would be prohibited from going on shore, nor any persons that I might wish to send on board, I returned with the Captain in my boat, with two of the wounded sailors. I had my carriage on shore, in which, with difficulty, Captain Ensor was placed, and conveyed him to lodgings.

Immediately on the mate's informing me of the situation of the vessel, I repaired with him to the government house and obtained an interview with the Governor, Sir Francis Cockburn, and stated to him the circumstances, and requested him to take measures to prevent the slaves from coming or escaping on shore, and that an investigation might also be made so as to identify the murderers and have them secured. The Governor said he did not think he was authorized to interfere with the slaves in any manner, but he felt inclined under the circumstances to comply with my request, so far as to identifying and securing the murderers, but that, as to the rest of the slaves, they must be considered and treated as passengers. While in conversation with the Governor, a report was made to him by the harbormaster, that the brig Creole had arrived with one hundred and thirty-five *passengers;* the Governor called my attention to it, from the fact that they were styled *passengers* in the report. The Governor then took down a statement from the mate in writing for the purpose, as I understood, of consulting with the Attorney General, for whom he despatched a messenger while I was present; he also requested me to make my application in writing, promising to inform me of the result of his determination as soon as he had consulted with the Attorney General. We then left the government house, and I despatched a note simply requesting him not to suffer the slaves on board to land, until a further investigation was made. I did not enlarge this request at this time, for fear of jeoparding his compliance, for I well knew, both from the conversation I had with the Governor at this time, and from the opinions of many of the officers of the government, and also of private individuals, which I had frequently heard expressed, that it would be deemed a violation of the laws of Great Britain, in any manner to molest or prevent slaves from obtaining their freedom, if once within the jurisdiction of the Colony, no matter in what manner they might arrive or be brought within their jurisdiction, and therefore that a request in writing to forward the vessel on her destination with the residue of the slaves on board, would have been deemed inadmissible. A copy of the said note or communication is hereto annexed, marked A.* After writing said note, calling at the house of the surgeon with a request for him to go on board, and also making preparations to receive the captain and wounded men on shore, I proceeded to go on board, and on my way, received a note from the Colonial Secretary, informing me

---

* The different documents referred to by the witness, will be found in a note at the end of his evidence.

that the Governor had instructed him to say that he had ordered a military party on board the brig, a copy of which note is annexed, marked B.  I then repaired on board, Captain Woodside accompanying me at my request.  Soon after my return from the vessel, I received a verbal message from the Governor, requesting me to attend the Governor and Council, then in session, on the subject of the slaves.  On my attending, the Governor said he had sent for me to inform me of the course that himself and Council had determined to pursue, and which he proceeded to read to me from a paper before him, and hoped I would be satisfied with it, to which I replied that I was satisfied with the troops being sent on board and an investigation being directed, but declined a further acquiescence at that time.  I also desired a copy of their deliberations, which was furnished me in the course of the day, which is hereto annexed, marked C. I soon after repaired on board in company with Robert Duncome, and J. J. Burnside, a Justice of the Peace.  Robert Duncome was Police Magistrate, and commenced the examination of the officers and men, which was continued that day until near night.  The examination was continued the next day by the said Robert Duncome and Lieutenant Elwyn, a Justice of the Peace.  Burnside did not attend on that day.  The examination continued all day, and was postponed until Friday morning, the 12th November, 1841, in consequence of the illness of the captain and one of the men, it being deemed proper by the magistrates that at this stage of the examination, the captain should be next examined.  On Friday morning, about nine o'clock, Mr. Duncome called at my office at the American Consulate, and informed me that he was soon going on board for the purpose of having the persons implicated identified, by having them brought before the witnesses for that purpose, and then having them and the troops brought ashore.  I replied to Mr. Duncome: " How is this, you know well that we were, by agreement, to go on to-day with the examination of the captain and the man on shore;" and I then mentioned the fact to Mr. Duncome, or had done it the day previous, that the captain knew which slave had murdered Mr. Hewell, and I considered him a very important witness.  Mr. Duncome then remarked, " it was by authority"; and I said, " of the Governor?" to which he nodded assent, and immediately rode away.  This conversation took place while he was on horseback.  The object of Mr. Duncome in giving me the above notice was, as he said, that I might accompany him on board; and he mentioned the time when they would leave, which I think was ten o'clock. Soon after this, in proceeding down the principal street on my way to my dwelling house, and towards the place where the

vessel lay, I was enquired of by a respectable white inhabitant, if I knew "that the slaves on board the Creole were to be rescued and brought on shore by the blacks of the island to-day ?" This being the first intimation I had of any such design, I answered, " No." He assured me that it was a fact. From thence I proceeded to the Vendue House, a sort of Exchange for the town, where I saw two respectable white inhabitants of the town, who appeared much interested in looking towards the direction of the vessel, on which I enquired, "what was going on ?" One of the gentlemen remarked : " Do you see that launch"—pointing towards the vessel and to a launch apparently about half way between us and the vessel. I replied that "I did." I cannot now distinctly recollect the exact words that passed between us, but it was in substance, that *that* launch belonged to one of the parties present, and that the slaves were to be liberated by the blacks by means of boats. I then proceeded on my way to breakfast ; after which I repaired to the Police Office for the purpose of going on board with the magistrates, to identify the criminals; and on going towards the boat to embark for that purpose, I was also informed by several persons that an attempt was to be made to liberate the slaves by force. I also received a note from a respectable white person, stating that the black servants in the service of said person had gone to assist in liberating the slaves on board the Creole, and that the arrangement had been made with said servants during the night previous for that purpose. I also noticed in going down to the boat, a number of females as well as males, on the front upper piazzas, with spy glasses directed towards the brig. On arriving at the boat, and when I was about embarking, I was informed that an attempt had already been made to board the vessel by black persons in boats around her. I also saw quite a number of boats near and about the vessel. Mr. John Pinder who was present, and about entering the boat, heard this remark, and was also informed that there was a large collection of persons on the shore opposite where the vessel lay, on which he remarked : "I will not go on board, but will walk down that way,"—meaning towards where the persons had collected. I also decided not to go on board, but to return immediately, and communicate to the Governor, the fact of the mob on shore, and the attempt to board the vessel. I returned immediately to my office where I found Mr. Gifford waiting for me, who informed me of there being a large collection of boats around the brig, filled with blacks, armed with clubs, and using threatening language and gestures, and that the crew were greatly intimidated, and he wished to know what I intended to do. I informed him, I had then come to the office for the pur-

pose of communicating the facts to the Governor, and soliciting his interference to protect the vessel and slaves. I then immediately despatched a note to the Governor, a copy of which is hereto annexed, marked D. I also informed Mr. Gifford, that in consequence of the unwarrantable breaking off of the investigation, the arrangement in reference to putting men on board had not been completed because I supposed, the examination would have occupied two days longer, but I would still endeavor to get some men on board, and desired him to return with his boat's crew immediately, and I would inform him of the result of the application to the Governor for the protection of the vessel and slaves. I immediately sent for Mr. Creasy, the mate of the brig Congress, and then in command of said brig, the captain having gone to the United States, and requested him to go on board the brig Creole with four of his best men, and report that they were sent by the American Consul. He accordingly proceeded towards the brig Creole with four sailors, whom I saw embark from the Congress, taking with them several muskets, she laying but a short distance from my office. I saw her on the way to the Creole, until my view was interrupted by intervening vessels ; after some time he returned and reported to me that on going alongside he was refused admission on board by one of the magistrates, Mr. Burnside, on which he informed the magistrate that he was from the American Consul, and that they also threatened to fire into his boat if he attempted to come on board. The boat used on this occasion belonged to the barque Louisa, the boat of the brig Congress having been washed away from the davits, by the gale which compelled her to put into Nassau in distress. The people continued collecting on shore, and the excitement increasing, when I received an answer to my note to the Governor, a copy of which is hereto annexed, marked E. At the same time I was informed by the messenger from the Governor, that the Council was then in session, and that they would soon wish to see me. In about a half an hour a messenger requested my attendance before the Governor and Council. I accordingly attended.

On attending, the Governor informed me, that on receiving my note he had convened the Council. (In relating the conversation that took place between the Governor and myself, I may not give the precise language used, but the substance, except in reference to his directions to the Attorney General, which is given in his precise words.) That I was, no doubt, aware there was much excitement about the brig Creole and the people on board, and also that many exaggerated accounts were in circulation, that there was a large collection of colored people, but that he did not think that they had or would commit any acts of

violence, such as I had charged them with or seemed to antici-
pate. I replied, that at all events, the officers and crew of the
brig were very much alarmed for their own safety and that of
the slaves on board, and, I thought, not without just reason. He
then introduced the subject of the slaves being *passengers*, and
contended strenuously that he so considered them, and the
Council agreed with him that they must be treated as passen-
gers; while I contended that they were slaves, and, under the
circumstances, as much a portion of the cargo as the tobacco
on board, and, as proof that my position was correct, referred
him to the manifest of the slaves, which I had in my possession.
He further stated, that he had just been informed that I had at-
tempted to send on board the brig a large amount of arms and
ammunition, with some men. On which, I stated to him the
facts, as above detailed, and, also, that they had been refused
admission on board; I also stated, that I much regretted that the
examination of witnesses could not have proceeded further, as
Captain Ensor could identify the person who murdered Mr.
Hewell, and could also identify more who were engaged in the
affray than any other individual; on which the Governor made
a suggestion, that the people on board might be made to pass
before the Captain at his lodging, but he immediately corrected
himself, and said that would not do, for the moment they placed
their feet on shore, he would have no more right to molest or
control them than other person: he further said, the Council
had decided to send the Attorney General on board the brig,
with such persons as he might select, and suggested that the
Provost Marshal should be one, for the purpose of preventing
any violence being committed by the persons around the vessel,
to have those implicated in the murder, and troops removed on
shore, and then to see that no obstruction was given to the pas-
sengers (as he designated the slaves) landing; and, immedi-
ately thereon, repeated these directions to the Attorney Gener-
al, and requested him to proceed immediately on board. I left
without making any remark by which my acquiescence could
be in any way inferred and found Mr. Gifford and Capt. Wood-
side waiting at the Custom-House dock, immediately opposite to
the Council room, and informed them of the determination of
the Council, stating, that I did not see that any thing more
could be done on our part to prevent the liberation of the slaves,
as their liberation, I was satisfied, had been determined on since
their first arrival in port; but I desired Mr. Gifford immediately
to repair on board the brig and protest against every act of the
Attorney General and those with him, that would have a tenden-
cy to deprive him of the control of the slaves. I also requested
Captain Woodside to accompany him, and they left in their boat

about the same time that the Attorney General and his party did. In about an hour after their departure, I saw a large concourse of people, principally blacks, who collected around the public buildings, but a short distance from my office; on which, I went to where they were collected, and saw the slaves from the Creole with others going into the office of John Pinder, Esq., Inspector-General of the Police, and I attempted also to get admittance, but was prevented by the crowd, which numbered between one and two thousand, considerably over one thousand, and, as Mr. Pinder has since informed me, on that occasion he took a register of their names together with their occupations. I then proceeded towards my dwelling house, in company with Mr. Hamilton, the Pilot of the Port, who said to me, in reply to a remark of mine, it was in vain to expect that those people (meaning the slaves) would be permitted to leave the harbor without their consent; that he had orders from the Governor not to take out the brig while they were on board. After the slaves were thus landed, I also saw the troops, and the slaves retained in custody, coming from the brig to the shore, I should think nearly an hour after the landing of the slaves. During the evening Mr. Gifford and Captain Woodside reported to me the manner in which the slaves had been liberated. And on Saturday, the 13th November, I proceeded to take the examination of Captain Woodside, and the officers of the brig and of Mr. Merritt. And, early on Monday morning, the 15th November, I despatched a protest against the proceedings of Her Majesty's officers, in liberating the slaves on board, and, also, requested that the nineteen slaves in custody might be forwarded to the United States, in the brig Creole, (a copy of which communication is annexed, marked F,) which request was refused by the Governor, who, in communicating his refusal, also enclosed me the report of the Attorney General, containing his statement of the transactions, on board of the brig (See document G). During Monday, Captain Ensor sent me a letter, which he had received from Thomas M. Mathews, Esq., Attorney at Law, demanding the immediate delivery of the baggage of fifty-four slaves of the Creole, and threatening proceedings at law unless the demand was immediately complied with. On consulting with Mr. Gifford and ascertaining that the baggage consisted principally of some old blankets and some old clothes, the slaves having taken on shore their principal and best clothing when they left the vessel, as he informed me, and rather than contest fifty-four suits, and having ascertained that the retaining fee in each suit would be three guineas, and that the court of inferior jurisdiction, in which the suits would be commenced, was a court of final jurisdiction, from which no appeal would

lie, and that the juries, as far as I had observed, were mostly composed of colored people, never having seen more than two white persons on a jury at a time, I advised Mr. Gifford to give up the articles of clothing left by the slaves on a baggage pass being produced from the Custom-House, and thereupon prepared an answer to Mr. Mathews' letter, which I signed and forwarded. I subsequently saw in the hands of the searcher, so called, (being a Custom-House officer) a regular baggage permit to receive the baggage of the *passengers*, and have it landed. I attempted, with Mr. Gifford, to come to an entry in the Custom-House of the vessel and cargo that remained on board, for the purpose of disposing of some of the surplus provisions on board, which had been provided for the slaves; when such entry was refused by the Custom-House officers, unless the slaves still on board were entered as *passengers*, which entry being refused, no entry was made. On the 17th day of November, the officers of the brig, together with one seaman, Blinn Curtis, executed their protest before me, as American Consul; and, on the same day, I shipped a second mate and two men, and on the 18th the brig proceeded on her voyage to New Orleans, the captain having been left on shore with one of the men, they being too ill to proceed, and one of the wounded men being put on board, though too ill to do duty.

Mr. Dillet, the aid-de-camp of the Governor, was the only man on horseback whom I saw take any part in directing the movements of the mob on shore, and communicating with those around the vessel. And when waiting for orders or to receive reports, he reined his horse in front of the wing of the public building in which the Governor and Council held their session and while in session, and was active throughout the whole day, to wit, Friday, the 12th day of November, 1841. No attempt was made to disperse this collection of people, but, on the contrary, every facility was afforded them, by furnishing them with boats, and publicly commending their proceedings, both before and after the liberation of the slaves. For these reasons, and facts before detailed, particularly the breaking off the examination of witnesses so abruptly, and in my view so improperly, I have not the least doubt on my mind that the collection of people on this occasion was with the knowledge of persons in authority, and was for the purpose of taking off the slaves, as soon as the troops should be removed, and that but for my officially communicating the knowledge of the collection of a mob to the Governor, they would have been permitted to do so. The troops, it is true, were put on board at my request, but with the express understanding that they would be removed on the termination of the investigation; but they were not removed

until after the slaves had been liberated. Thus, the vessel, after having been occupied by the troops, was not left by them in possession of the officers and crew, so that they could exercise any control over the slaves. I was not permitted to put on board sailors, even to make good the place of those disabled. I am confident, if the investigation had continued one day longer, and I had been permitted, a sufficient force would have been put on board perfectly to manage the slaves that would have remained after the implicated ones should have gone on shore; and, consequently, that the interference of the authorities at Nassau was the sole and only cause of their liberation, no volition on the subject being permitted to the officers and crew of the brig, Immediately on the landing of the slaves I was informed that a schooner, called the Francis Cockburn, and owned by John Pinder, Esq., was to sail in a few days for Jamaica, with *emigrants*, as they are called. That on the 18th of November, she sailed for Jamaica, with some fifty or sixty colored people, between forty and fifty of whom were slaves from the Creole. This fact I state from my own knowledge. There was a vessel sailed shortly after with some of the slaves from the Creole, for the same destination.

After I had become satisfied that no assistance would be afforded me to get the vessel to her destination with the slaves on board, I consulted with Captain Woodside as to the best mode to protect the property of the owners of the slaves and vessel. While the troops were on board, I did not feel authorized to advise an abandonment of the vessel, and considered that an important point had been gained in arresting the mutiny before its consummation, by the intervention of the British authorities; and, also, an acknowledgment by them of the national character of the vessel, by permitting an investigation by British magistrates, and also permitting British troops to perform duty under the American flag. I enquired of Captain Woodside if he were willing, provided some eight or ten men were added to the crew of the brig Creole, to go on board and assist in navigating her on the voyage, as far as Stirrup Key, or further, if it should be deemed necessary; in which case, I was to provide a passage for him and such of his crew as should accompany him, back from the Key. He readily assented to this arrangement, particularly as the removal of those engaged in the murder would probably leave but few, if any, who had been active in the mutiny, as there were also some sixty women and children. There being but a single musket on board the Creole, it was thought best to procure more muskets and a couple of brace of pistols, sufficient to keep the slaves on board from leaving the vessel, after the troops should be removed; which, I supposed, agreea-

bly to the arrangement to that effect, would have been done as soon as the examination terminated. After this, I consulted with Captain Ensor in reference to this arrangement; and he approved of it. Mr. Gifford also assented to it, and expressed his willingness to go in the vessel, in command of her, under this arrangement. It was also arranged with Captain Woodside, that he should take four of his crew; and I also made an arrangement with Mr. Creasy, mate of the brig Congress, and then in command of her, for four of his men to go on board, and he also volunteered to go himself, if it was deemed necessary. This arrangement was made during Wednesday and Thursday, the 10th and 11th days of November. On Thursday afternoon, in company with Mr. Gifford and Mr. Merritt, we called at three places where such articles were kept for sale—two by colored people, and one by a white man—and enquired for muskets and pistols, but could not obtain any. Some ammunition was provided and put on board. This arrangement was prevented from being effected in consequence of the suddenly suspending the examination, and other facts on that subject, hereinbefore particularly detailed.

I have omitted to state two circumstances that may have a tendency to aid the plaintiff. Early on Saturday morning, the 13th November, 1841, on going to my office I met John Pinder, Esq., who made the following remark to me: " I think it was well we went on board yesterday; if we had not, I have no doubt, blood would have been spilled." On the morning of the 12th of November, 1841, I saw the harbor-master, Mr. Tulford, whose duty it is to see that vessels are properly moored in the harbor, (he having just returned to Nassau,) and stated to him that, in my judgment, the Creole was not anchored in a proper place, that in case of a north-west wind she would be in great danger of being driven on the rocks. He replied, " It was so;" and, on my request, promised immediately to have her warped further up the harbor, to a better situation. This not being done agreeably to his promise, I subsequently inquired of him, why he had not performed his promise. He replied, that it would have been worth his life or his commission, (I cannot be positive which), but, on Saturday, the 13th November, 1841, he did it.

Being asked, on his cross-examination, whether the first interference, if any, on the part of the British authorities, was not solicited by yourself? Whether they did not refrain from taking any steps in the matter, till you, yourself requested that a guard should be sent on board? He answered: Yes ; after the vessel arrived in port; but she was boarded outside of the harbor by a black pilot and his black crew, and brought into the harbor by him and his crew. I first communicated the situation of the

vessel to the Governor, who then ordered a guard on board, as stated in my answers to the direct interrogatories. Being asked whether if no military guard had been sent on board, would not the slaves have gone ashore without the possibility of preventing it by those on board, witness stated that he could not answer this interrogatory any further than to say, that if the military guard had not been placed on board, an attempt would have been made to prevent their landing. Being asked, were you not informed by the authorities of the island, that they would aid in arresting those guilty of the murder and mutiny, but would not interfere to prevent the others from going ashore? Witness answered: I was informed by the authorities that they would aid in arresting those guilty of murder, and prevent any from going on shore until the examinations should be completed, after which those who remained were to be released from restraint by the authorities. Being asked, in whose possession, and under whose control did the Creole arrive in the harbor of Nassau? Was she in possession of the whites or of the negroes? If of the latter, had they not to all intents and purposes gained their freedom before reaching Nassau? If Nassau had been on an uninhabited isle, would they have been, in point of fact, free or slaves, on reaching that harbor? Witness answered: In the possession and under the control of the pilot, but I have no doubt she was brought to Nassau till the pilot boarded her by the directions of the mutineers. I do not think that they had gained their freedom, nor could they even, according to the English interpretation of English law, have gained their freedom before landing on the island. As the latter part of this interrogatory is evidently framed for the purpose of eliciting an opinion only, I decline answering it.*

* Documents referred to by the witness, Bacon:

A.

CONSULATE OF THE UNITED STATES OF AMERICA,
NASSAU, *Bahamas, November* 9, 1841.

SIR: Having had detailed to your excellency the particulars of the mutiny and murder on board the American brig Creole by slaves on board said brig, I have now to request that your excellency will be pleased not to suffer any of the slaves on board to land *until further investigations can be made.*

I have the honor to be, Sir, very respectfully, your obedient servant,
JOHN F. BACON, *United States Consul.*

His Excellency Colonel Sir FRANCIS COCKBURN,
*Knight, Commander-in-Chief, &c. &c.*

B.

NASSAU, *November* 9, 1841.

SIR: The Governor has instructed me to acknowledge the receipt of your letter of this date, relative to alleged mutiny and murders on board of the Ameri-

McCargo v. The New Orleans Insurance Company.

*Ensor*, the captain of the Creole, was examined on behalf of the plaintiff, but having been disabled by his wounds, and con-

---

can brig Creole, and to acquaint you that, *for the fulfilment of the object of your letter*, his excellency has ordered a military party on board of the said brig. There will be, however, no impediment to any of the white persons on board landing here. ·

I have the honor to be, Sir, your most obedient servant,

C. R. NESBITT, *Colonial Secretary.*

John F. Bacon,· Esq.,
    *Consul for the United States of North America.*

C.

Nassau, *November* 9, 1841.

Sir: In compliance with your request, I have the honor to forward to you, by direction of the Governor, a copy of the statement communicated personally to you this morning by the Governor and Council, in reference to the case of the American brig Creole, on board of which vessel a murder and certain other offences are alleged to have been committed.

I have the honor to be, Sir, your most obedient servant,

C. R. NESBITT, *Colonial Secretary.*

John F. Bacon, Esq.,
    *Consul for the United States of North America.*

Council Chambers,
*Bahamas, November* 9, 1841.

We wish to state to you, as the representative of the ⸢American government, that the circumstances detailed to the Governor this morning in your presence, respecting the events which took place on board of the American brig Creole on the night and subsequently to the 7th of November, have been given all possible consideration to by the Governor and Council, by whom the following decisions have been come to:

1st. That the courts of law here have no jurisdiction over the alleged offences.

2d. But that as an information had been lodged before his excellency the Governor, charging the crime of murder to have been committed on board of the said vessel while on the high seas, it was expedient that the parties implicated in so grave a charge should not be allowed to go at large, and that an investigation ought therefore to be made into the charges, and examinations taken on oath, when, if it should appear that the original information was correct, and that a murder had actually been committed, that all the parties implicated in such crime, or in any other acts of violence, should be detained here until reference could be made to the Secretary of State, to ascertain whether the parties detained should be delivered over to the American government or not, and, if not, how otherwise to be disposed of.

3d. That so soon as such examinations should be taken, all the persons on board of the Creole, *not implicated in any of the offences alleged to have been committed on board of that vessel, must be released from further restraint.*

4th. That a detailed account of what has taken place should be transmitted to the British Minister at Washington.

A true copy:

C. R. NESBITT, *Colonial Secretary.*

John F. Bacon, Esq.,
    *Consul for the United States of North America.*

fined to his bed during the whole time that the Creole was at Nassau, his evidence is unimportant. He stated that the tonnage of the Creole was 157 tons and 25-95ths of a ton.

D.

CONSULATE OF THE UNITED STATES OF AMERICA,
NASSAU, *Bahamas, November* 12, 1841, 12 *o'clock, A. M.*

SIR: On proceeding to go on board the brig Creole, with the magistrates this morning, I saw a large collection of persons on the shore nearest the vessel, and many in boats; and was, at the same time, informed that the moment the troops should be withdrawn from the brig, an attempt would be made to board her by force. I was further informed an attempt had already been made. I have, therefore, to request your excellency will take such measures as you may deem proper for the protection of the said vessel and cargo.

The above facts I have every reason to believe correct; and did not accompany the magistrates, that I might communicate the same to your excellency.

I have the honor to be, Sir, very respectfully, your most obedient servant,
JOHN F. BACON,
*United States Consul.*

His Excellency, Colonel Sir FRANCIS COCKBURN,
*Knight, Commander-in-Chief, &c. &c.*

E.

GOVERNMENT HOUSE,
*Bahamas, November* 12, 1841.

Sir: In answer to your letter, this moment received, I beg to state, that I cannot think it possible that any of her Majesty's subjects would act so improperly as to attempt to board, by force, the American brig Creole; and should such an unauthorized attempt be made, I shall be quite ready to use every authorized means for preventing it.

I have the honor to be, Sir, your most obedient servant,
FRAN. COCKBURN.

JOHN F. BACON, ESQ.,
*United States Consul, &c. &c.*

F.

CONSULATE OF THE UNITED STATES OF AMERICA,
NASSAU, *Bahamas, Monday morning, November* 14, 1841.

SIR: I have the honor to state to your excellency, that I was not, from various causes, enabled, until late on Saturday evening, to obtain a detailed statement, from those on board the brig Creole, of the proceedings of the Attorney General, and those accompanying him, by which all the slaves on board the said brig, with the exception of four, were put on shore and liberated. Against the manner of their liberation, and all the proceedings which ultimately effected it, on the part of Her Majesty's officers and subjects, I deem it my duty to enter my solemn protest; and, also, on behalf of the chief mate, now, and then in command of the said vessel, also to protest.

These slaves, as I view the case, while they were under the American flag, and regularly cleared from one slave-holding State to another, within the United States, were as much a portion of the cargo of the said brig, as the tobacco and other articles on board; and whether on the high seas, or in an English port, does nor change their character; and, that her Majesty's government had not the right to interfere with, or control the officers of an American vessel, thus cir-

McCargo v. The New Orleans Insurance Company.

The plaintiffs offered in evidence a "Message from the President of the United States, communicating, in compliance with

cumstanced, in such a course as might be necessary and proper to secure such property from being lost to the owners.

I beg leave further to state to your excellency, that I shall, in a few days, be able to forward the brig on her destination, and take the liberty of requesting your excellency to permit the sixteen slaves who have been identified as having been actually concerned in the murder and outrage on board of her, and now in confinement, as, also, the three who are in confinement for the same offence, not having yet been identified by the captain of the brig, but only named by him, on account of his extreme illness, to be forwarded to the United States by this same vessel, they to be secured as is usual in such cases. I am induced to make this request of your excellency, under the circumstances that I have not the power to detain them, nor can I persuade the witnesses to remain here until it is ascertained where the slaves are to be tried. If they are to be tried here, it would, therefore, be almost impossible to obtain the attendance of all the witnesses, without which the persons implicated could not all be convicted, though guilty. This difficulty, I apprehend, must exist to nearly the same extent, if the criminals are to be detained here for any length of time, and then sent to the United States to be tried there. This difficulty would be obviated if they could be forwarded, as I have requested. I feel some embarrassment in making this request after your excellency and council have given a decision on this point; that, however, was made before the examination by which the persons have been implicated, and before it could be viewed, by me, at least, in all its bearings.

I have the honor to be, Sir, very respectfully, your most obedient servant,

JOHN F. BACON,
*United States Consul.*

His Excellency, Col. Sir FRANCIS COCKBURN,
   *Knight, Commander-in-Chief, &c. &c.*

G.

NASSAU, *November* 15, 1841.

SIR : I have the honor to acknowledge the receipt of your letter of this date, and cannot withhold from you that I feel somewhat disappointed at its contents, as it has been the wish and object of myself and Council to meet your views and wishes, as far as we were authorized, in all that has taken place respecting the American brig Creole ; and as our intentions were throughout made known to you previously to being acted upon, without calling forth any objections on your part, we could not but consider that you acquiesced in them.

As the statement contained in your letter respecting what occurred while the Attorney General was on board of the Creole, does not accord with the official report thereof made to me by that officer, I transmit a copy of the same for your information ; and by which it distinctly appears, that neither he nor any of the authorities here had any thing to do, either with the negroes quitting the vessel, or their landing here.

With respect to your request, that the nineteen persons who appear to have been implicated in the murder and other violences committed on board the Creole, when at sea, should be delivered over to you for the purpose of being secured and sent to America for trial, I can only refer you to the document already furnished to you by my order in Council, and by which it was already determined that the parties referred to should be detained here until instructions should be received on the subject from Her Majesty's government; and, under your apparent acquies-

a resolution of the Senate, copies of correspondence in relation to the mutiny on board the brig Creole, and the liberation of the

cence in which, and your agreeing to attend the investigation, the same was proceeded with.

I have the honor to be, Sir, your most obedient servant,

FRAN. COCKBURN, *Governor.*

NASSAU, *November* 13, 1841.

SIR: I have the honor to report to your excellency, that, in accordance with your wishes, I yesterday proceeded, in company with the police magistrate and the inspector general of police, for the purpose of visiting the American brig Creole, on nearing which vessel, I found in her immediate vicinity several boats filled with colored and black persons, belonging to this island; that presuming these to be the persons alluded to in the American Consul's communication to your excellency, of yesterday's date, I visited each of the boats, and addressing the persons in them, informed them of the report which had been made by the Consul, explained to them the liability which would attach to them if they acted in the way in which it was alleged they intended to act, and strenuously urged them to abstain even from using words or gestures which might be considered as having a tendency to violate the peace. In answer, they one and all assured me, that it was not their intention to resort to any acts of violence, and that they had merely assembled for the purpose of peaceably conveying to the shore such of the persons on board of the Creole as might be permitted to quit her, and should desire their assistance. The persons in these boats were without arms, or any offensive weapons, with the exception of some ten or a dozen stout cudgels, which I observed in one of the boats, and which at my request, the parties in possession of immediately threw overboard. Having thus endeavored to guard against a breach of the peace, on the part of the persons from the shore, I went on board of the Creole, and had there pointed out to me by the police magistrate, eighteen persons against whom informations had been lodged, charging them with being parties to the murder of a passenger, and the wounding of the master and the mate of the Creole; in addition to these, one other person was subsequently identified by two witnesses as being a party concerned, and placed by the magistrates with the eighteen before-mentioned. This having been done, I enquired of the chief mate (the officer in charge of the vessel) whether he had any other witnesses to produce; to this he answered in the negative. I then requested Lieutenant Hill, the officer in command of the military guard, to take charge of the accused (nineteen in number), and I, at the same time, informed these persons that they would shortly be conveyed on shore, and there imprisoned, until a representation of their case should be made to the British government, by whom it would be decided whether they should be delivered up to the American government for trial, or how otherwise dealt with; that if they wished copies of the informations, they should be furnished with them, and they should also be at liberty, if they thought proper, to have witnesses examined in refutation of the charges made against them, with all of which they expressed themselves to be satisfied.

The accused having been thus separated from the other persons on board, I told the chief mate, that, as far as the authorities of the island were concerned, all restrictions upon the movements of the other persons on board the vessel were removed, and requested him to cause every person on board the vessel to appear on deck, in order that I might communicate the same to them; with this he cheerfully complied, informing me, at the same time, that it was not his desire

slaves who were passengers on said vessel." Senate Document, No. 51, 2d Session of 27th Congress. The documents

to detain on board his vessel any one of the persons (shipped as slaves) who did not wish to remain, and that they had his free permission to quit her, if they thought proper to do so; but that he was apprehensive that the persons in the surrounding boats would, as soon as the military were withdrawn, board his vessel, and commit acts of robbery and other violence. To this I replied, that, with respect to the first point, I had no instructions to interfere between himself and the persons alluded to; and as to his fears of being attacked from the people in the boats, precautions had been already taken to guard against such an event, and that he might rely upon being protected by the authorities against any violation of the law. All the persons on board having by this time been assembled on deck, I briefly addressed them, telling them, that, on the arrival of the Creole in this harbor, information having been laid by the mate before your excellency, charging a murder, and certain attempts at murder, to have been committed on board of that vessel, and the protection of the authorities here having been claimed by the American consul, a guard of soldiers had been placed on board, for the purpose of preventing any person from quitting the vessel until an examination could take place, whereby the real perpetrators of the alleged acts of violence might be discovered; that such an examinttion had now concluded, and without any criminatory evidence having been adduced against any of the parties whom I was addressing; that such being the case, I had to inform them that, as far as the authorities of the island were concerned, all restrictions on their movements were removed. I had no sooner concluded, than a white man, who I was informed was a passenger of the name of Merritt, addressed the people who had been shipped as slaves, and told them they were at perfect liberty to go on shore if they pleased; information which they appeared to receive with great pleasure, and a general intimation of their intention to avail themselves of it. This took place in the presence of the chief mate of the vessel, who declared to myself, and, as I believe, to several others at the time, his perfect acquiescence in the measure, and refused (though urged to do so by the master of another American vessel, who happened to be on board), to forbid the approach of the boats, several of which, on signs from the negroes on board the Creole, had been brought near that vessel for the purpose of receiving them. I quitted the vessel myself in company with the police magistrate before any of the persons in question had left her, but was not many yards from her when I observed them crowding over her sides and getting into the boats. I have further to report that the inspector general of police, at the request of the mate remained on board of the Creole until the prisoners were removed, by which time, as that officer has informed me, only three or four of the persons shipped as slaves remained on board, and those expressing their determination to return with the vessel to America. In conclusion, I beg leave to state the departure of the negros in question from the Creole was their own free and voluntary act, sanctioned by the express consent of the mate, and that neither myself nor any other of the authorities of the colony then on board interfered in the slightest manner to induce them to take that step; and, in corroboration of this and the previous statements, I have to refer your excellency to the police magistrate, the Inspector General of police, Mr. Justice Barnsides, Lieutenant Hill, the Receiver General and Treasurer, and Mr. Hamilton, the pilot of the bar, who were all present during the whole transaction.

I have the honor to be, Sir, your very obedient humble servant,

G. C. ANDERSON, *Attorney General.*

To His Excellency, Col. Sir F. Cockburn, Knight, Commander-in-Chief, &c. &c.

communicated to the Senate consisted of two letters of the American Consul at Nassau to the Secretary of State; the official correspondence between him and the British Governor; the depositions of Woodside, Merritt, Gifford, Stevens, Ensor, Curtis, T. J. D. McCargo, and Leidner, taken by order of the British authorities, and the depositions of the same witnesses before the American Consul; the Protest at Nassau, made by Ensor, Gifford, Stevens and Curtis; and that at New Orleans, signed by Gifford as acting master of the Creole, Stevens as mate, Devereux as cook, Speck, Silvy, Lecompts, Foxwell and Curtis as seamen, and Merritt, T. J. D. McCargo, and Leidner as passengers. The depositions conform substantially with the testimony of the witnesses as given by such of them as were examined on the trial.

*Woodside's* evidence was not taken under a commission; but his deposition before the American Consul, printed in this document, was used on the trial.* He deposes that on the 12th November (yesterday) this deponent was requested by the American Consul to go on board the brig Creole. That he went on board about ten o'clock, A. M., and soon after two white persons came on board, who he has since ascertained to be the Rev. Mr. Poole and the Rev. Mr. Aldridge, Episcopal clergymen, who were for some time in familiar conversation with the slaves, and appeared to be giving them directions and instructions, as he noticed the female slaves to be putting on their bonnets, and and making preparations to leave the vessel. Deponent heard Mr. Poole say he was going to England, and it was requisite he should know all about this business, so that he could represent the thing. That about half-past ten or eleven o'clock, A. M., two magistrates, with a clerk, came on board to identfy the criminals. That immediately on their coming on board, a sloop, a large lighter, and other boats, came on the starboard side of the vessel, and anchored within about two rods. That a number of small boats were at the same time around the vessel, all filled with black people, and no attempt was made to keep them away, except not to board the vessel. That at about twelve o'clock a boat with five white men came alongside, and were ordered off, though this deponent informed the officers that they had been sent by the American Consul to supply the place of

* The Reporter has been informed by one of the counsel for the defence, (Mr. Smith,) that attempts were made, at different places, to obtain the testimony of this witness, under commissions; but that, being a seafaring man, they were unsuccessful.

those on shore. That 'from this time until half-past one, the boats continued to increase about the vessel. Deponent saw clubs passed from the sloop and lighter into all the small boats. About half-past one this deponent went on shore with one of the magistrates, and reported to the Consul the situation of things, the chief mate then being on shore. The Consul informed deponent the Governor and Council were in session, and he should probably soon know the result of their deliberations, and requested deponent and mate to wait. On his return from the Council Chamber he informed deponent and the mate, that the Attorney General and others had been directed to go on board, first send the criminals and troops on shore, and then to see that no obstruction was given to the slaves coming on shore, and to the boats going alongside, as they must be treated as passengers, &c. The Consul then requested us to go on board, and directed the mate to protest against all the doings of the Attorney General which should in any way liberate the slaves. That the deponent and mate in one boat, and the Attorney General and his party in another, left about the same time. The Attorney General first came alongside the large launch, and directed them to throw away their clubs; that no violence must be used; but that, as soon as the guard was ordered aft, word would be given for them to come alongside, and take away those that desired to leave. A number of clubs were thrown overboard. The two boats then immediately went alongside the brig, without communicating with more of the great number of boats which surrounded the vessel in every direction, except two or three on the starboard side. After a further examination and identification of more criminals, the Attorney General came on deck, and informed the prisoners that they stood charged with mutiny and murder, for which they must be detained in custody, and if any wished to see the affidavits, he would attend the jail to read them, or furnish them with copies, and if they wanted any evidence taken, he would attend to that for them. He then said to the other slaves, "Men, you are all free, you can go where you please," or words of the same import. That Mr. Pinder, one of those who accompanied the Attorney General, gave the word: "Boats, you can come alongside," which they immediately did, and made fast to the vessel, some of the blacks from the boats coming over the bows of the vessel. That in a few minutes most of the slaves had left the vessel. This deponent also heard threats made to the mate and crew that if any resistance was made, there would or might be bloodshed, and that they had better let them go quietly on shore. That the chief mate and crew were much intimi-

dated.   That soon after the slaves had left the vessel, the criminals, with the guard, also left the vessel.

The facts recited in the Protest at Nassau, conform to the testimony subsequently given by the witnesses.   The Protest made at New Orleans, so far as it relates to the occurrences subsequent to the arrival of the Creole at Nassau, is subjoined :

Ben. Blacksmith, Madison, Ruffin, and Morris, kept watch by turns the whole time, to their arrival at Nassau, with knives drawn.   So close was the watch, that it was impossible to rescue the brig.   Neither passengers, officers, nor sailors, were allowed to communicate with each other.   The sailors performed their usual duties, and were allowed to go about as usual.   The pilot that came on board as the brig approached Nassau, and all his men in the pilot-boat, were negroes.   The pilot was acting under the legal authorities of the island.   He and his men, on coming on board, mingled with the slaves, and told them they were free men ; that they could go on shore, and never could be carried away from there.   One of the pilot's men told one of the female slaves, that he should claim her for his wife.   The regular quarantine officer came alongside, and Gifford went on shore in his boat ; he conducted Gifford to the American Consul, who accompanied him to the Governor of New Providence and all the other Bahama islands.   Gifford then related to the Governor all the facts relating to the voyage from Richmond to that port.   The American Consul, in behalf of said vessel and all interested, requested of the Governor that he should send a guard on board to protect the vessel and cargo, and keep the slaves on board till such time as they could know what they could do.   The Governor did so, and sent a guard of twenty-four negro soldiers, with loaded muskets and bayonets fixed, in British uniform, commanded by a white officer, on board.   They took possession of the vessel and all the slaves.   That from Tuesday, the tenth, till Friday, the twelfth day of November, they tried Ben. Blacksmith, Madison, Ruffin. and Morris, and put them in the longboat, placed a sentry over them, and fed them there.   They mingled with the negroes, and told the women they were free, and persuaded them to remain on the island.   Captain Fitzgerald, commanding the company, told Mary, one of the slaves owned by Thomas McCargo, in presence of many of the other slaves, how foolish they were, that they had not, when they rose, killed all the whites on board, and run the vessel ashore, and then they would have all been free, and there would have been no more trouble about it.   This was on Wednesday.   Every day the officers and soldiers were changed at nine o'clock, A. M.   There are five hundred regular

soldiers on the island, divided into four equal companies, commanded by four officers, called captains. There was a regular sentry stationed every night, and they placed all the men slaves, except the four that were tried, in the hold, and placed a guard over the hatchway. They put them in the hold at sunset, and let them out at sunrise. There were apparently twelve to thirteen thousand negroes in the town of Nassau and vicinity, and about three or four thousand whites. That, on Wednesday, the tenth, at about nine o'clock, A. M., three civil magistrates of the island came on board, and commenced examining all the white persons on board. They completed this examination on Friday following. On Friday, the Attorney General came on board with the three magistrates, and the depositions were signed. The American Consul was present the first two days. The magistrates were acompanied by a clerk. The Attorney General, on Friday, placed the nineteen mutineers in the custody of the captain of the guard, and ordered them upon the quarter deck. There were about fifty boats lying round the brig, all filled with men from the shore, armed with clubs, and subject to the order of the Attorney General, and awaiting a signal from one of the magistrates. A sloop was towed from the shore by some oar-boats, and anchored near the brig, and was also filled with men armed with clubs. All the men on the boats were negroes. The fleet of boats was under the immediate command of the pilot who piloted the brig into harbor. This pilot, shortly before the signal was given by one of the magistrates, said that he wished they would get through the business; they had their time, and he wanted his. The Attorney General then stepped on the quarter deck, and addressing himself to all the slaves, except the nineteen who were in custody, said : " My friends, you have been detained a short time on board of the Creole, for the purpose of ascertaining the individuals who were concerned in this mutiny and murder ; they have been identified, and will be retained ; the rest of you are free, and are at liberty to go on shore, and wherever you please." Addressing the prisoners, he said : "Men, there are nineteen of you who have been identified as having engaged in the murder of Mr. Hewell, and in an attempt to kill the captain and others; you will be detained and lodged in prison for a time, in order that we may communicate to the English government, and ascertain whether your trial shall take place here or elsewhere." At this time, Mr. Gifford, the mate of the vessel, then in command, the captain being on shore under the care of a physician, addressed the Attorney General, in the presence of the magistrates ; protested against the boats being permitted to come

alongside of the vessel, or that the negroes, other than the nine-tern. should be sent on shore.   The Attorney General replied, that Mr. Gifford had better make no objection, but let them go quietly on shore, for if he did, there might be bloodshed.   At this moment one of the magistrates advised Mr. Merritt, Mr. Mc-Cargo, and the other passengers, to look to their money and ef-fects, as he apprehended that the cabin of the Creole would be sacked and robbed.   The Attorney General, with one of the magistrates, stepped into his boat, and withdrew into the stream, a short distance from the brig, where they stopped ; a magis-trate on the deck of the Creole gave the signal for the boats to approach ; instantly, with a huzza and a shout, the fleet of boats came alongside of the brig, and the magistrate directed the men to remain on board of their boats ; commanded the slaves to leave the brig and go on board the boats.   They obeyed his orders, and passing from the Creole into the boats, they were assisted, many. of them, by this magistrate.   During this pro-ceeding, the soldiers and officers were on the quarter deck of the Creole, armed with loaded muskets, and bayonets fixed, and the Attorney General, with one of the magistrates, in his boat, lay at a convenient distance, looking on.   After the negroes had embarked on the boats, the Attorney General and his ac-companying magistrate pushed out the boat and mingled with the fleet, congratulating the slaves on their escape, and shaking hands with them.   Three cheers were then given, and the boats went on shore, where thousands were waiting to receive the slaves.   That when this proceeding was over, and all the slaves, except the nineteen, landed, a barge was sent from the barracks to the Creole, to take on shore the nineteen prisoners, and the guard which had been left over them ; they were taken on shore to the barracks, and the nineteen carried thence to prison.   One of the nineteen died the day after he had been put in prison, in consequence of wounds received in the affray.   Dur-ing the investigation carried on by the magistrates on board the Creole, and on the evening of the same on which day the slaves and prisoners were landed the nineteen were recognised and identified by the witnesses.   That many of the negroes who were emancipated expressed a desire to go to New Orleans in the Creole, but were deterred from it, by reason of threats, which were made to sink the vessel, if she attempted to carry the slaves.   Three women, one girl, and a boy, concealed them-selves on board of the Creole, and were brought to New Or-leans in the brig; many of the male slaves, and nearly all of the female slaves, would have remained on the vessel and come to New Orleans, had it not been for the commands of the ma-

gistrates, and interference as before stated. That on Monday following these events, being the fifteenth day of November, the Attorney General wrote a letter to Captain Ensor, informing him that the *passengers* of the Creole (as he called the slaves) had applied to him for assistance in obtaining their baggage, which was still on board the brig, and that he should assist them in getting it on shore. To this letter, Mr. Gifford, the officer in command of the vessel, replied, that there was no baggage on on board belonging to the slaves, that he was aware, as he considered them cargo, and the property of their owners, and that if they had left anything on the brig it was the property also of their masters; besides, he could not land anything without a permit from the Custom-House, and an order from the American Consul. That the Attorney General immediately got a permit from the Custom-House, but no order from the American Consul, and sent an officer of the customs on board the brig, and demanded delivery of the baggage of the slaves aforesaid to be landed in the brig's boat. The master of the Creole not finding himself at liberty to refuse, permitted the officer with his men to come on board, and take such baggage and property as they chose to consider belonging to the slaves. They went into the hold of the vessel, and took all the wearing apparel, blankets, and other articles of the negroes; also one bale of blankets belonging to Mr. Lockett, which had not been opened. These things were put on board of the boat of the officer of the customs and carried on shore, the master of the brig refusing to send them on shore in the brig's boat. That the correspondence which took place between the Attorney General and the master of the brig, is in the possession of the American Consul at Nassau. That on the next day, Tuesday, Captain Ensor proposed to sell a portion of the provisions on board the brig, in order to pay her expenses while lying at Nassau, having more than enough for the remainder of the voyage to New Orleans. The collector of the customs refused to allow the provisions to be landed, (consisting of several barrels of meat and navy bread,) to be entered, unless the slaves which had been emancipated should be likewise entered as *passengers*. The master of the brig refused to accede to this condition. The next day after the landing of the slaves from the Creole, the officers of the government of New Providence caused to be advertised a vessel for Jamaica, to take out passengers to that island (passage paid). A number of the slaves of the Creole entered their names for that said island. It was generally said by persons, white and black, that the object of putting this vessel up for Jamaica, was to carry away the slaves of the Creole. The cap-

tain was so informed by the American Consul, and Mr. Stark, agent of the Boston Insurance Companies. That about two or three hours after the brig reached Nassau, Captain Woodside, of the bark Louisa, with the American Consul, came on board, and it was agreed that Captain Woodside, with as many of his crew as could be spared, and the second mate and four sailors of the brig Congress, should come on board with arms, and with the officers and crew of the Creole, rescue the brig from the British officers then in command, and conduct her to Indian Key, where there was a United States vessel of war. The Louisa and the Congress were American vessels, and the arrangement was made under the control of the American Consul. The captain was to come on board the Creole, with a part of the crews of the Louisa and the Congress, as soon as the Creole was ready to leave Nassau.

Frequent interviews were had every day with Captain Woodside, the American Consul, and the officers of the Congress, on the subject, and the whole plan was arranged. Accordingly, on the morning of the 12th of November, Captain Woodside, with the men in a boat, rowed to the Creole. The muskets and cutlasses were obtained from the brig Congress. Every effort had been made, in concert with the American Consul, to purchase arms of the dealers at Nassau, but they all refused to sell. The arms were wrapped in the American flag, and concealed in the bottom of the boat. As said boat approached the Creole, a negro in a boat, who had watched the loading of the boat, followed her, and gave the alarm to the British officer in command on board the Creole ; and as the boat came up to the Creole, the officer called to them, "Keep off, or I will fire into you." His company of twenty-four men were then all standing on deck, and drawn up in line fronting Captain Woodside's boat, and were ready, with loaded muskets and fixed bayonets, for an engagement. Captain Woodside was thus forced to withdraw from the Creole, and the plan was prevented from being executed ; the said British officer still remaining in command of the Creole. The officers and crews of the Louisa and the Congress, and the American Consul, were warmly interested in the plan, and every thing possible was done for its success. Indian Key is about four hundred miles from Nassau. The nineteen negroes had thrown overboard and burnt all their weapons, before their arrival at Nassau ; and the aid thus offered of American sailors and arms, was amply sufficient for the management and safety of the Creole on her voyage. That if there had been no interference on the part of the legal authorities of Nassau, the slaves might have been safely brought to

New Orleans. It was that interference which prevented aid from being rendered by the American sailors in Nassau, and caused the loss of the slaves to their owners. That on the same day on which the slaves were liberated, and before the Attorney General and the magistrates came on board, the American Consul and the captain had another interview with the British Governor. The Consul stated that they wanted time to write to Indian Key, on the Florida shore, to get a vessel of war of the United States to come and protect the brig and cargo on her voyage from Nassau to New Orleans, and a guard was wanted to protect the said brig and cargo in the meantime. The Governor refused to grant one for that purpose. The Consul then proposed to get the crews of the American vessels then in the port of Nassau, and place them on board the brig to conduct her to New Orleans, and requested the Governor to station a guard on board until the American sailors could be collected ; but the Governor refused to station the guard as requested. A proposition was then finally made by the American Consul to the Governor, that the American seamen then in port, in American vessels, should go on board the Creole, and be furnished with arms by the Governor, for the purpose of defending the vessel and her cargo, (except the nineteen slaves who were in the fight, who were to be left behind,) on her way to New Orleans. This the Governor also refused. That on the 15th, the Consul, on behalf of the master of the brig Creole and all interested, proposed to the Governor to permit the nineteen slaves who were in the affray to be sent to the United States, on board of the Creole, for trial ; and this too was refused. That two half boxes tobacco (marked L. Banks) were broken up and destroyed by the negroes, and about six or seven barrels lying on the deck of the brig were thrown overboard by the negroes, to make room for them to walk the deck ; the contents of which said barrels they do not know. That on the 19th day of November the said brig sailed from Nassau, bound for the port of New Orleans, leaving Captain Ensor at said port, unable to proceed on the voyage in consequence of the severity of his wounds.

The *Log-book* of the Creole was also offered in evidence by the plaintiff.

The defendants introduced the evidence of *George Campbell Anderson*, the Attorney General of the colony of New Providence.

He deposed, * that he visited the Creole on the 12th of November, at the desire, and by the authority of his excellency

---

* This evidence, and that of the other witnesses for defendants was taken under a commission at Nassau, in April, 1842.

Sir Francis Cockburn, Governor of the colony, and did so for the purpose of ascertaining whether an inquiry, which had been carried on, on board of such vessel for several days, relative to certain acts of violence alleged to have been committed on board of the Creole previous to her arrival at Nassau, had terminated, and, if terminated, to take the necessary measures for removing to the shore such persons as might be identified as participators in such acts; and the execution of this duty was, he presumed, entrusted to him in consequence of the office which he holds. That on getting on board the Creole, he had pointed out to him by the police magistrate, (who was one of the magistrates by whom the inquiry before referred to had been conducted,) eighteen persons who the police magistrate informed him had been identified by the oath of the mate and others, as having been concerned in the murder of a Mr. Hewell, and in the several other acts of violence alleged to have taken place on board of the Creole. The deponent then inquired of the mate whether he had any further evidence to adduce before the magislrates, and after some little delay, a person of the name of Leitener was produced, who identified one other of the black men as a party concerned in the acts before referred to; an affidavit to this effect having been sworn to by Leitener, and the mate having then informed witness that he had no further evidence to produce, witness requested Lieutenant Hill, the officer in command of the military guard, to take charge of the accused, (nineteen in number,) and at the same time informed those persons, that they would shortly be conveyed on shore, and there imprisoned until a representation of their case could be made to the British government, by whom it would be decided whether they should be delivered up to the American government for trial, or how otherwise dealt with. By this time, Lieutenant Hill had drawn his guard together on the quarter deck of the vessel, where witness requested him to keep the accused until he went on shore to make arrangements for their being received into the common goal.

Having thus disposed of the implicated parties for the time, witness turned to the chief mate, who was standing near him, and told him that as far as the authorities of the island were concerned, all restrictions upon the movements of the other persons on board of the vessel were removed, and requested the mate to cause every person on board the vessel to appear on deck in order that witness might communicate the same to them; with this the mate immediately complied, stating to witness, at the same time, that it was not his (the mate's) desire to detain on board the vessel any one of the per-

McCargo v. The New Orleans Insurance Company.

sons shipped as slaves, who did not wish to remain, and that had his free permission to quit her if they thought proper to do so ; but that he was apprehensive that the persons in certain boats, which were then, and had been during the previous part of the day, lying in the immediate vicinity of the Creole, would, as soon as the military were withdrawn, board his vessel and commit acts of robbery and other violence. In reply to this, witness distinctly told him, the mate, that he had no instructions to interfere between himself and the persons he called slaves, but that with respect to his fears of being attacked from the people in the boats, precautions had been already taken to guard against such an event, and that' he might rely upon being protected by the authorities of the island against any violation of the law. In a short time the mate informed him that all the persons on board were assembled on deck. They appeared to consist principally of black and colored persons, to the number of about one hundred. These persons being so assembled, witness addressed them, and told them that on the arrival of the Creole in this harbor, information had been laid by the mate before the Governor of the colony, charging a murder and certain attempts at murder to have been committed on board of the vessel, and that the protection of the authorities here having been claimed by the American Consul, a guard of soldiers had been placed on board for the purpose of preventing any persons from quitting the vessel until an examination could take place, whereby the real perpetrators of the alleged act of violence might be discovered ; that such examination had now concluded, and without any criminatory evidence having been adduced against any of the parties whom witness was addressing ; that such being the case, he had to inform them that as far as the authorities of the island were concerned all restrictions on their movements were removed. Witness had no sooner concluded, than a white man, who, he was informed, was a passenger, of the name of Merritt, and who was standing just below witness, on what, he believes, is called the main-deck, stepped forward, and told the colored persons that it was not the wish of any one belonging to the vessel to detain them on board against their wills ; that they were at liberty to go on shore, or stay and continue the voyage, as they thought proper ; that, as they were in a British port, they would, by going on shore, become free, and he called upon them to say what they would do. A shout almost immediately rose from among the colored persons, who appeared to witness at the time with one voice to express their determination to quit the vessel, and immediately the boats before mentioned commenced nearing the vessel ; during the time that this took place,

the mate, Gifford, was standing next to witness, and as the boats were approaching close to the vessel, a person, (who he afterwards understood was named Woodside,) said to Gifford that he ought to protest against what was taking place, when Gifford replied that he would not, and turning to witness again expressed his perfect willingness that the people should go on shore.   Immediately after this took place, witness accompanied by the police magistrate, quitted the vessel.   That immediately after his quitting the vessel, he observed numbers of colored persons crowding over her sides and getting into the boats which were then alongside of her.   On his getting to the shore he directed the provost-marshal to proceed on board and take charge of, and bring on shore the nineteen persons before particularly mentioned, and in the course of that evening the provost-marshal reported to him that he had done so, and had lodged the accused parties in the common goal.   With the exception of those nineteen the leaving of the said vessel by the colored persons appeared to be, and was, as witness verily believes, entirely voluntary, but as to their ages and appearances he cannot depose.   The names of the nineteen persons so accused are George Grundy, Adam Carnay, Madison Washington, Ben Johnson, Elijah Morris, Doctor Ruffin, Richard Butler, Philip Jones, Robert Lumpkins, Peter Smallwood, Warner Smith, Watter Brown, American Wordhouse, Horace Beverley, Addison Tyler, William Jenkins, George Burden, George Portlock, and Pompey Garrison ; George Grundy and Adam Carnay have, as he has been informed, since died, and the remaining seventeen were, on the sixteenth of this month, liberated by an order of the judges of the Court of Admiralty Sessions of this colony.

On his cross-examination this witness stated, that he is a member of Her Majesty's Executive Council of the colony, as also Her Majesty's Attorney General for the colony, both of which situations are held during pleasure, and he has held the first for about fifteen months, and the other between four and five years; the first is merely an honorary appointment, the latter one of emolument ; as a member of the Executive Council, he is a sworn adviser of the representative of his sovereign in this colony; and as Attorney General, he performs all those forensic duties, which appertain to the office of a crown lawyer.   That he is of European descent, and is in no way connected by descent with the African race.   That he is not aware of having ever openly declared any particular views on the subject, but has no hesitation in saying, that he is favorable to a general emancipation of slaves, without reference to the particular nation to which they may belong.   That he holds that, as

slavery is abolished throughout the British dominions, the moment a vessel comes into a British port with slaves on board, to whatever nation such vessel may belong, and however imperious the necessity may have been which drove her into such port, such slaves became immediately entitled to the protection of British laws, and that the right of their owners to treat and deal with them as slaves, ceases. That he has perused the copy of the protest referred to, and finds several allegations mentioned in it which are wholly untrue. First: That part of the protest which alleges that the boats were subject to the order of the Attorney General. Second: That part which alleges that Gifford addressed the Attorney General, and protested against the boats being permitted to come along side, and that the negroes, other than the mutineers, should be sent on shore : as also, that part which alleges that the Attorney General replied, that Gifford had better make no objection, but let them go quietly on shore, for if he did there might be bloodshed. That the whole of the above mentioned statement is a complete fabrication, nothing in the slightest degree similar to it having taken place, but, on the contrary, Gifford, in his, witness' presence, not only refused to protest when urged to do so by Captain Woodside, but expressly told witness that he had no objection whatever to the persons in question landing, if they wished to do so. Third : That part which alleges, that after the negroes had embarked in the boats. the Attorney General and magistrate pushed out their boat and mingled with the fleet, congratulating the slaves on their escape, and shaking hands with them. Fourth: All that part in which the Attorney General is mentioned, as concerned in any way with obtaining the landing of the baggage of the slaves. That witness never wrote a letter to Captain Ensor, nor was concerned directly or indirectly in obtaining the landing of the baggage of the persons referred to. Fifth: That part also, which pretends to set out the words made use of by deponent in addressing the slaves, is partially untrue, deponent never having made use of the words, "you are free and at liberty to go on shore, and wherever you please." That witness purposely avoided making use of language similar to that set forth, for although he considered that the persons referred to were indisputably entitled to their liberty, and had the same right as the other persons on board of the Creole to visit the shore, and to remain there if they thought proper, yet he did not conceive that it was necessary that there should be any interference on the part of the authorities to enable them to exercise such right.

The foregoing contradictions he makes from his own knowledge, as the allegations refer to himself individually. He also

knows that part of the protest to be untrue which alleges that a vessel was put up by the officers of government for Jamaica. He also believes all such parts of the protest as go to allege that the boats were waiting the signal of a civil magistrate, and that such signal was made by a magistrate, to be entirely untrue. And he verily believes that if such had been the case, that he must have known it   There are also various other parts of the protest which he believes to be untrue.   In answer to the question, whether an American citizen, owner of a slave on board of an American vessel in the port of Nassau, would be permitted by the local authorities to exercise that control over his slave at that place, which such owner would be permitted to exercise in a country where the rights of a master over a slave are fully recognized, and where the person standing in the relation of a slave is bound to implicit obedience ?—the witness stated, that British laws do not recognize the relation of master and slave, and therefore, as a matter of course, in the case supposed, the person termed a slave would be considered and treated by the local authorities as a freeman.   Being asked, whether if such an American owner had used violence or blows, or put such slave in fetters to enforce his control as master over the slave, would or would not the British authorities at Nassau, upon application to them or upon their knowledge of the facts, have interfered to prevent the master from using any such means to enforce his control over the slave, or have punished him if he had used them?—he answered, that he decidedly thinks in a case similar to the one supposed, that it would be the duty of the local authorities to interfere, to prevent and to punish conduct similar to that supposed, in the same manner as it would be the duty of the authorities to interfere to preserve the peace, and to punish offences committed in the port of Nassau, by one white American citizen on another.   On being asked, whether if Captain Woodside and others had joined the officers and crew of the Creole, and fired upon the blacks in the musquito fleet when they advanced upon the Creole. and killed any of the negroes belonging to the Creole, for attempting to go ashore at Nassau, would or would not all the American citizens concerned in these deaths, have been hanged as murderers ?—witness stated, that he is of opinion that such killing would have been murder, and that all the parties concerned therein would have been liable to the pains and penalties attaching to that crime.

On being asked : Can you state positively, that no officer, civil or military, of the island of Nassau, did either directly or indirectly aid, countenance, advise, encourage or assist in any manner the slaves or negroes on the Creole to obtain their

liberty? Can you state the same as to the people of the island
black and white? Witness answered, that the authorities of
the colony were passive on the occasion referred to; they nei-
ther interfered to prevent the landing of the persons in ques-
tion after the investigation had terminated, nor did they inter-
fere to induce the carrying into effect such landing, save and
except so far as relates to the nineteen accused parties. With
respect to the black and colored population of the island, he
believes that a great number of them did, as far as they possi-
bly could, without proceeding to acts of violence or breaches of
the law, aid, countenance, encourage and assist the persons in
question in landing from the vessel. That a number of the co-
lored persons who arrived on the Creole are still in Nassau; oth-
ers, he believes, have left for Jamaica, but he knows nothing
on this latter point of his own knowledge. That he has set
forth truly and correctly every circumstance coming within his
knowledge, and has truly stated the substance of every word
uttered by him while on board the Creole, having any connec-
tion with the matters at issue between the parties to this
suit: as also, of what was said to him by Gifford, the
mate, and what he heard said by Merritt, the passenger.
That he has already stated every particular connected with
the landing of the people in question from the Creole. With
respect to what was done by the Governor, he can only say
that, at the request of the American Consul, the Governor sent
the military guard before mentioned on board; that he caused
the enquiry before mentioned to be carried on by the police
magistrate, assisted by another justice; and that he sent depo-
nent on board as before stated; and that he afterwards caused
the accused parties to be detained in custody until the decision
of his government, to whom he made a full report of the case,
was made known.

The deposition of the Attorney General as to the addresses
made by him on board the Creole, and as to the remarks of
Merritt to the slaves, is confirmed by the testimony of all the
witnesses examined on behalf of the defendants, who were pre-
sent at the time. These witnesses all concur in declaring that,
with the exception of the nineteen implicated in the murder,
all the negroes who left the brig did so voluntarily, and without
any inducement or encouragement from the colonial authorities,
civil or military. They contradict the statements in the protest
in many other respects, as to the number of boats around the
Creole, the fact of the magistrates having assisted the negroes
into the boats, &c.

*Hamilton,* a lieutenant in the British navy, and branch pilot, and magistrate at Nassau, deposed, that when the Attorney General had finished his address, "that Mr. Merritt, one of the passengers, (a white person,) then stepped forward, and addressing the colored people, told them, that there was no wish or intention to prevent them from going on shore, but that they might either go or stay as they pleased. That to these exact words he would not depose, but that the person whom he understood was Merrit, used words to that effect, and with precisely the same meaning. He does most solemnly swear, that so soon as the last speaker had finished, Captain Woodside came to him and said: 'If I had been Mr. Merritt, I would not have acted as he has done, but would have protested against their leaving the vessel;' thus openly acknowledging, that free permission had been given, without the slightest intervention of any of the authorities. That the mate Gifford expressed his fears, that a disturbance would take place, upon the authorities leaving the vessel, and the boats coming alongside. Upon which he (witness) spoke to the Inspector-General of the police, and both of them offered to remain on board, and promised that they would prevent any person from coming on board, which offer was gratefully accepted. That so soon as the boats came alongside, they ordered that no person should come on board, and that the colored people jumped and scrambled into the boats as fast as they could, without a word being spoken to them. Their leaving was, therefore, voluntary. After all but four or five had left the brig, some of the colored people in the boats asked them, if they also were not coming; but they were desired not to interfere, but to allow every person to do as he pleased. That accordingly those persons remained, and the others in the boats left for the shore, where he (witness) also went. That Gifford, on the morning before witness went on board, expressly stated to him, that it was not his intention to endeavor to prevent the negroes from landing, as he was determined not to go to sea again with these people."

*Pinder,* the Inspector-General of police of the Bahama Islands, confirmed the evidence of Anderson and Hamilton. He further deposed, that "the leaving of the brig by the negroes was their own voluntary act, sanctioned by the mates then in charge, who expressed a wish to him (witness) to get rid of them, inasmuch as their lives were in danger while the colored passengers continued on board, and declared that they would not proceed on the voyage with them, and requested him, as an officer of the police, to remain on board for their protection until they went on shore, which he did. The person calling himself second mate further told him, that the chief mate and himself had told

the colored persons, previous to his (witness') going on board, that they could not be carried from this port contrary to their wish."

· . *Dalzell*, a serjeant of police, who acted as clerk in taking the depositions under the orders of the colonial Governor, deposed, " that he distinctly heard Mr. Merritt, after the Attorney General informed those against whom no charges had been brought, that the restrictions which it had been necessary to place over them were then withdrawn, state to those persons, (the colored passengers,) that they were free, and that they could stop on board, or go on shore if they pleased ; that he distinctly heard Mr. Gifford, Mr. Stevens and Mr. Merritt state, on the quarter deck of the brig, that they would not stop on board with the colored passengers if the authorities took away the military guard, as they did not consider themselves safe. Mr. Gifford, the first mate, never did, by any means whatsoever, endeavor to hinder the colored passengers from leaving the vessel, but appeared more satisfied to be left on board by himself with the white passengers and the crew of the vessel."

*Burnside*, the Surveyor-General of the colony, who had accompanied the police magistrate on board by desire of the Governor, corroborated the evidence of the other witnesses for the defence.

*John Grant Anderson*, the Receiver-General and Treasurer of the colony, deposed, " that he was on board of the Creole on the day on which the American negroes quitted her. He heard the Attorney General's address to the prisoners and others on board ; it was uttered in a loud tone of voice from the front of the poop deck. He was standing on the larboard side of the main deck, near the main mast, and is positive the Attorney General never made use of the words : ' You are free, and at liberty to go on shore and wherever you please ;' but after the Attorney General had ceased speaking, Merritt, from about the same place from which the Attorney General had addressed the people, also addressed them, telling them they were free to go on shore or wherever they pleased—if they wished to leave the vessel they could do so : upon which the boats in the vicinity of the vessel were called alongside, he believes, by the American blacks, and the disembarkation immediately commenced. He is so positive as to Merritt's giving the people the permission he has stated, as Merritt had been previously standing on the larboard side of the deck with him, and had asked him to tell the people, there was no wish to detain them, provided they desired to go on shore ; but not having come on board in any official capacity, he told Merritt that interference on his part might be

injudicious, and advised him to make known his wishes to the Attorney General and magistrates, then standing upon the starboard side of the poop or quarter deck, and Merritt immediately passed over to hi.n. He does not know what might have passed in conversation between these gentlemen, but he is positive as to the facts he has stated as to their addresses to the people, every word of which he could distinctly hear from where he was standing, complete silence and order prevailing at the time."

*Mends, Glubb, Fitzgerald* and *Murray*, lieutenants in the second West India Regiment of British troops, were examined and confirmed, as far as they had any knowledge of the facts, the testimony of the other colonial officers. Lieutenant Hill, who commanded the guard on board, the day it was withdrawn with the 19 charged with mutiny and murder, testified " that the mate, together with Mr. Merritt, and the officers of the brig, repeatedly asked witness whether he had any orders to withdraw the guard, and requested him to notify them of his intention, if such should be the case, as they were afraid to remain with the people without protection. This was of course previous to the negroes having left the brig."

*Cobbe*, a Major in the 2d British West India Regiment, deposed, "that the Governor desired him, on the morning of the arrival of the Creole in the harbor of Nassau, to send an officer and guard on board of her, which he told witness had been applied for by the American Consul. That the muskets of the soldiers were by his orders, and not by those of the Governor, loaded, from a fear that the negroes on board. on seeing the approach of a military guard, might resist, and with the sole and only view of preventing and putting down any violence which might originate with them, and with respect to the taking possession of the vessel. The officer's orders, which were given by him in writing, were not to interfere, but to prevent violence, and to allow no one to come on board except the authorities, and not to permit any of the negroes to land until an investigation had taken place, when he would receive further instructions, but to allow the crew to do just as they pleased. It is false, that there were fifty boats about the brig filled by negroes. The number of boats, excluding those belonging to officers and persons in official capacities on board of the brig, did not exceed five, if there were so many. There was one large launch, and three boats were lying off about her, no boat having been allowed to come alongside except those which had brought persons official-

ly occupied on board. There may have been sticks in the boats, but at the time he arrived on board he observed none. It is also false, that the slaves who returned to New Orleans, were obliged to secrete themselves, inasmuch as he himself saw three of them, after all the others had left the vessel, upon deck, and before the guard and prisoners had been removed, and who were as much at liberty to go on shore as the other negroes, had they so desired."

*Gifford,* who was re-examined after the testimony of the defendants' witnesses had been taken, deposed " that Merritt made use of no such language as is stated in the testimony of G. C. Anderson, the Attorney General; that he did not step forward, and tell the slaves, 'that it was not the wish of any one belonging to the vessel to detain them on board against their will;' 'or that they were at liberty to go on shore, or stay and continue the voyage, as they thought proper; that, as they were in a British port, they would, by going on shore, become free; and he called upon them to say what they would do.' If Merritt had said anything of the kind, witness would have heard him; the whole of it is a fabrication. That it is utterly false, as stated by Hamilton, 'that witness, the same morning, before he, Hamilton, went on board, stated to him that it was not his intention to prevent the negroes landing, as he was determined not to go sea again with those people.' That witness protested against the boats being permitted to come alongside of the vessel, or the slaves going on shore; and it is a fabrication that witness ever remarked, 'that he would not stop on board of the brig, or take charge of her to her destined port, with the slaves on board,' as stated in Dalzell's testimony. Witness never expressed to the Attorney General his willingness that the slaves should go on shore; and had no further conversation with him than what has been already stated. Captain Woodside never said to witness, that he ought to protest against what was taking place, and witness never said to Captain W., that he would not, as stated in the Attorney General's deposition."

*T. J. D. McCargo,* whose evidence was also taken after the testimony of the defendants had been received, declared, ' that he did not hear Mr. Merritt make use of any such words as stated in said depositions; that Mr. Gifford protested against the boats coming alongside, and the negroes going on shore. Witness never heard Mr. Stevens remark that he would be glad to get rid of the slaves, nor any one else on board. Witness is positive that the Attorney General said to the slaves, " you are free, and at liberty to go on shore, and where you please." He was standing near the Attorney General."

*Stevens,* on his re-examination by the plaintiff, after the defen-

dants had introduced their evidence, deposed "most positively
that the statements made by defendant's witnesses, as to what
was said by Wm. H. Merritt, Z. C. Gifford, L. A. Stevens, and
G. C. Anderson are not true.   The Attorney General made use
of the words, to the slaves, except the nineteen who were in
custody : 'My friends, you have been detained here for a short
time, for the purpose of finding out who were engaged in the
mutiny, and murder of Mr. Hewell, on board of the brig, on
the high seas ; and that nineteen had been identified, and would
be lodged in jail, till he could communicate with the English
government as to what was to be done with them.   The rest
are free, and at liberty to go on shore or where they pleased.'
He then turned round and waived his handkerchief to the boats,
which surrounded the brig ; as also did the other magistrates,
&c., who accompanied the Attorney General.   Witness is posi-
tive that the Attorney General made use of the words—'The rest
are free and at liberty to go on shore or where they pleased ;'
and that the Attorney General did not say, 'there will no longer
be any restraint upon persons on board.'   Witness was stand-
ing within six feet of the Attorney General when he spoke to
the slaves, and could not be mistaken in what he said.   Mr.
Merritt did not tell the slaves that they might go or stay as they
pleased, nor did he say any thing to them that he heard ; wit-
ness would have heard it, if he had said anything to them.   That
witness heard Mr. Gifford protest to the Attorney General,
against the boats coming alongside and against the negroes go-
ing on shore.   This was in the morning of the 12th of Novem-
ber; after Mr. Gifford had come with Captain Woodside in the
boat to the brig, after the address of the Attorney General.
Witness did not (as stated in John Pinder's testimony) express
a 'wish to said Pinder to get rid of the slaves, in as much as
their lives were in danger while the colored passengers contin-
ued on board, and declared that they would not proceed on the
voyage with them, and requested him, as an officer of the police,
to remain on board for their protection, until they went on shore.'
The whole of the above is false.   Witness never did tell said
Pinder, 'that chief-mate and himself (witness) had told the co-
lored persons, previous to his (Pinder's) going on board, that
they could not be carried from this port contrary to their wish.'
Witness never spoke to said Pinder."

There was a verdict and judgment below in favor of the
plaintiff for $18,400,* from which the defendants appealed.

---

* The amount sued for was $20,800.  The jury deducted $800 for one of the

McCargo v. The New Orleans Insurance Company.

*F. B. Conrad, T. Slidell* and *Benjamin,* for the appellants.

The policy in this case is on certain slaves, at and from Norfolk to New Orleans, "beginning the adventure upon said goods and merchandize from and immediately following the loading thereof on board the said vessel, at Norfolk aforesaid."

The policy contained the following written clause: "This policy covers all risks; and chiefly that of foreign interference. Warranted by the assured free from elopement, insurrection and natural death."

I. The risk in this case never commenced. The slaves of plaintiff were never put on board at Norfolk, but some at Richmond, and some a few miles below Richmond. All the testimony is concurrent to show that the vessel never was at Norfolk at all: that it never approached nearer to Norfolk than twelve miles. Some slaves were brought from Norfolk to the vessel, as she lay twelve miles distant, in Hampton Roads, but none of these belonged to plaintiff. 1 Phil. on Insurance, 441. *Murray* v. *Columbian Insurance Company,* 4 Johnson, 442. *Graves* v. *Marine Insurance Co.,* 2 Caines, 340. *Constable* v. *Noble,* 2 Taunton, 405. *Payne* v. *Hutchinson,* 2 Taunton, 405. Hughes on Insurance, 147-8.

II. The insurors are discharged, the vessel not having been seaworthy. She was unseaworthy in consequence of not being furnished with arms; from the want of proper precautions and discipline with regard to the slaves; and from the numbers crowded into so small a vessel. See 1 Phillips, 308, 311, 329, *Fontaine* v. *Phœnix Insurance Company.* 10 Johns. 57. 3 Kent's Comm. 288. If we consult the log-book, a daily record made before the loss, and better entitled to consideration than testimony collected subsequent to the loss, we shall find that it shows a cargo of one hundred and eighty-six slaves; 150 on board on the 25th October, three taken on board at Day's Point on the 27th, and thirty-three taken on board on the 28th October. The testimony subsequently taken declares there were only 135; the discrepancy, however, is very lamely and unsatisfactorily accounted for by Gifford, who says, "he asked the captain how many slaves he *expected* to have on board? he replied from *one hundred and fifty to two hundred.* Deponent made the entry of 150 on the log book, and let it remain so."

Let us suppose, however, that there were not 186 slaves, but only 135. Of these it is shown by Gifford's evidence that about

---

slaves who reached New Orleans in safety. A further sum of $1,600 appears to have been deducted, as half the value of four of plaintiff's slaves, who were proved to have taken part in the insurrection, the jury being of opinion that their loss should be divided between the insurers and the plaintiff.

two-thirds were males; this gives 90 males. The tonnage of the Creole was 157 25-95ths tons. Was not this an excessive cargo, both on the score of humanity and safety. The act of Congress of 2 March, 1819, (which does not indeed apply to the very same subject matter, but which may well be invoked for the purpose of showing what humanity would dictate), forbids the carrying of more than two passengers for every five tons; the extent to which the Creole could have gone, had her passengers been ordinary passengers, would have been 63. Now this act of Congress was based upon considerations of humanity, and it was deemed necessary to enact such a law, although our country has always been disposed to encourage the immigration of foreigners. Will this court be disposed to recognize one standard of humanity for the white man, and another for the negro. Will any reasonable man say that 135 negroes would be as cheerful, contented and indisposed to insurrection, under such circumstances of discomfort, as they would have been in a larger and more commodious vessel?

But again—two-thirds of the slaves, say ninety of them, were males; there were ten whites, all told, comprising the crew of the Creole, and four white passengers, T. J. D. McCargo, Hewell, Merritt and Leidner.

Now considering this immense disproportion of the whites to the blacks, common prudence would have dictated two precautions—one, that the whites should have been armed—the other that a strict police should have been maintained. Both were entirely neglected.

No candid mind can compare the great disparity of physical force, can consider the nature of the slave, and his ever wakeful and ever active longing after liberty, can reflect upon the utter absence of an armament on the part of the whites, and the preparation on the other hand of the blacks, can mark the neglect of wholesome discipline, and of reasonable precaution by the officers and agents throughout the voyage, and especially when they approached British territory, without arriving at a clear conviction that this vessel was neither properly equipped nor prudently governed. If we view the whole evidence practically and disinterestedly, we surely cannot undertake to say that this insurrection would have occurred, that the control of the vessel would have been usurped and the vessel and slaves have gone into Nassau harbor, if the vessel had been properly armed, and a reasonable discipline had been maintained on board of her. One of the great and wholesome principles of insurance law has been palpably violated. The vessel was not seaworthy, either in equipment or management, considering the nature and purpose of her voyage.

Conscious of their indefensible position on the score of prudence and reason, the plaintiff attempts to bolster up his cause by evidence of usage. The captain, mate and sailors are called upon to establish principles of law under the *convenient* form of usage, to justify the absence of arms, the omission of reasonable precaution when the slaves came on board, and the subsequent neglect of police and discipline.

A custom, to obtain the force of the law, must have been not only of long continuance, and have received the general acquiescence, but it must have its foundation in *reason*. "Customs must be reasonable," says Blackstone, vol. 1, p. 53, [77].

"Four properties are essential to a custom," says Petersdorf, "viz: a *reasonable* commencement; to be certain; to have a continuance; and not to be against the king's prerogative." *Verbo* Custom, p. 482.

Pour qu'une coutume soit censée veritablement introduite, il faut que ce soit *au défaut de la loi*, ou du moins que la loi ayant cessé d'être utile, ait cessé d'être executée; que la coutume soit conforme à la *raison* qui doit être le fondment de la loi qui n'est pas écrite, assui bien que de la loi écrite; qu'elle soit autorisée par le consentement de celui qui a droit de faire des lois; enfin qu'elle ait tojours été observée, c'est à-dire, qu'on ignore le tems qu'elle a commencée d'être mise en usage, car une coutume inveterée sert de loi. Clef des lois Romaines—*Verbo* Coutume, vol. 1, p. 98.

Consuetudinis ususque longœvi non'vilis anctoritas est verum non usque adeo sui valitura momento, ut aut *rationem vincat,* aut legem codicis Lib. VIII. Tit. LIII. 2. And Blackstone, in the same spirit, tells us, when a custom is actually proved to exist, the next inquiry is into the legality of it: for if it is not a good custom, it ought to be no longer used. Malus usus abolendus est. Blackstone, vol. 1, p. 52.

But if the usage contended for by the plaintiff were clearly established, it would be repudiated by the courts, as inconsistent with prudence and common sense. An usage that trifles with safety is not to be tolerated.

III. The occurrence of an insurrection of the slaves put an end to the risk. This was an occurrence against which the assured warranted the underwriters. On the breach of the warranty the risk terminated.

If the clause in the policy be indeed a warranty, the conclusion that on its breach the underwriters were discharged, is not contested; but it is strenuously contended that this is not a warranty; that it is an exception of certain risks; and the following passage is relied on, contained in 1 Phil. p. 34: "As any statement of a fact in the policy is a warranty, though neither

the word *warrant*, nor any formal expression of like import is used, so there is frequently a warranty in form, where there is none in fact.   The insured often *warrants* the property *free from average, free from detention or capture*, or from other losses and perils, which is no more than an agreement that those shall not be amongst the perils and losses insured against, and for which the underwriter is to be liable.   Although these forms of expression are sometimes spoken of as warranties, it would be absurd to consider them as such in their character and construction, since, in the case of an insurance *free from average*, for instance, it would be adopting the doctrine that the occurrence of an average loss would render the policy void, and consequently that the happening of a loss which is not insured against deprives the assured of the right to recover for one that is insured against."

One of the plaintiff's counsel went so far as to assert as a principle of insurance law, that there could be no *warranty*, technically so termed, except of a fact within the power and control of the assured; and another stated in argument, that when, in a policy, the assured stated, "I warrant," the law construed this into "I do *not* warrant."   The extremes to which counsel are driven are generally sure indications of the weakness of their positions; and, we think, it not difficult to show that the law of insurance is not in this particular as *absurd* as it is stated to be.

We understand Mr. Phillips to mean by the remarks above quoted, that parties sometimes ignorantly use a word in a wrong sense, and that such misapplication of a term cannot change the nature of the thing itself.   If a man say I *sold* my horse for a hundred bushels of wheat, his misapplication of the word " sold" cannot change the nature of the contract from an *exchange* into a *sale:* and thus, says Mr. Phillips, if a man says in a policy *warranted free from general average*, he only means that the risk of general average is excepted from amongst the responsibilities of the underwriter and assumed by himself. But we believe it to be an incontrovertible proposition, that language is to be understood in its usual nnd proper sense, *if it can* be applied to the subject matter in that sense.   Now, how can it be pretended that, in the nature of things, it is impossible to warrant against an insurrection of slaves insured?   Is it because it is a future event?   Or is it because, as contended by one of the counsel it is a matter beyond the control of the assured?

Admitting what is very questionable, and what might indeed be confidently asserted to be incorrect, that an insurrection of the slaves was a matter beyond the control of the assured, let us see whether, by reason or authority, the plaintiff's pretensions

can be sustained. · One of the most familiar warranties is that of sailing with convoy. Suppose a vessel insured from London to any port in the Mediterranean, *warranted to take convoy at Gibraltar*. Here is a future event.

Now suppose the vessel to be detained by head winds or calms until after the departure of the convoy from Gibraltar, could a departure without convoy be excused on the ground now assumed by the plaintiff, and the underwriters held liable notwithstanding the breach of the condition on which they consented to bind themselves ?

Suppose a vessel bound from Natchez to New-York, *warranted to take four additional seamen at New-Orleans*, and that the assured, by reason of an epidemic in New-Orleans, should be utterly unable to comply with his warranty, would the underwriters remain liable on the voyage, if continued without this addition to the crew ?

Now in what manner can the present warranty, that there shall be no insurrection of the slaves of the accused, be distinguished from those just cited ?

Marshal, vol. 1, p. 347, (Condy's ed.) expressly divides warranties into *affirmative* and *promissory*. He cites among *promissory* warranties, that the ship shall sail on or before a given day; that she shall depart with convoy; that she shall be manned with a certain complement of men, etc. So in this case, that the slaves shall be submissive; that they shall not become insurgents or mutineers. He says that a warranty is a conditition precedent; its breach consists either in the falsehood of an affirmative, or non-compliance with an executory stipulation. " In either case the contract is void, *ab initio*, the warranty being a condition precedent; and whether the thing warranted was material or not; whether the breach of it proceeded from fraud, negligence, misinformation, or any other cause, the consequence is the same. The warranty makes the contract hypothetical; that is, it shall be binding, *if* the warranty be complied with. With respect to the compliance with warranties, there is no latitude, no equity; the only question is, has the thing warranted taken place or not ? If not, the insurer is not answerable for any loss, even though it did not happen in consequence of the breach of the warranty."

And the same writer, when speaking of the causes to which non-compliance may be attributed, at p. 349, says: "It is also immaterial to what cause the non-compliance is attributable, for if it be not in fact complied with, *though, perhaps, for the best reasons*, the policy is void. The condition has not been performed, or the contingency has not happened, on which the contract was made; and *the underwriter has a right to say*

*that there is no contract.* Therefore, if a ship be warranted to sail on a given day, and she be prevented by any accident, as the sudden want of repairs, the appearance of an enemy, etc., from sailing till the next day, though it may be right in such case not to sail upon the day, yet the warranty is not complied with, and there is an end of the policy."

In *Hore* v. *Whitmore*, Cowper, 784, Lord Mansfield held, that an irresistible force, *though one of the perils insured against,* would not excuse a non-compliance with a warranty. See Marshall's observations on the case, vol. 1, p. 352.

In *Smith* v. *Readshaw,* where the ship insured arrived at the place of rendezvous *before the time appointed for the convoy to sail,* but, finding the convoy gone, put herself under the protection of a man-of-war, *which came there to join the squadron which composed the convoy, and, under her protection, joined the convoy,* but without obtaining sailing instructions, the warranty was held to be broken, and the insurers discharged. 1 Marshall on Ins. 262.

How do these decisions compare with plaintiff's position, that in the present case there is no warranty, although the assured expressly agrees to warrant, because the promise was of a future event, over which the assured had no control.

Suppose an assurance against a capture only, and a warranty by assured against the vessel's losing any of her sails or spars by stress of weather, could the assured recover if the vessel, being dismasted by a storm, should afterwards be captured by an enemy?

In this case there is insurance against British interference, with a warranty by the assured that his slaves shall not mutiny. They do mutiny, and carry the vessel within British jurisdiction. Of what value is the warranty to defendants, if they are held to be liable for the direct consequences of the very contingency against which they were warranted.

The palpable meaning of the contract is, we will assure you against British interference, but you must warrant that your slaves will not expose us to that interference by a mutiny.

IV. But if this clause in the policy be construed into a mere excepted risk, instead of a warranty, the result will be equally fatal to the plaintiff's claims. His slaves were lost by the excepted risk; *i. e.* by the insurrection; and have not been recovered to the present hour. The mutiny then was the proximate cause of the loss, even if a British interference to aid the slaves on their arrival at Nassau were clearly proved. See *Duval* v. *Com. Ins. Co.* 10 Johns, 279. *Patrick* v. *Com. Ins. Co.* 11 Johnson, 9. *Waters* v. *Merchants' (Louisville) Ins.*

*Co.* 11 Peters, 219. *Peters* v. *Warren Ins. Co.* 14 Peters, 109–10.

V. It is clear that as soon as the mutiny was consummated, the destination of the vessel was changed, the intended terminus of the voyage was abandoned, and a new one substituted.

An unjustified deviation destroys all claim against the underwriters. Was the deviation in this case justified? This question depends wholly upon another question, viz: who is answerable for this insurrection and its consequences? The underwriters, or the owner of the slaves?

The general principle has been universally recognised in civilised countries where the institution of slavery has existed, that the master is answerable for the wrong doing of his slave.

Thus, among the Romans:

"Ex maleficiis servorum, veluti si furtum facerint, aut bona rapuerint, ant damnum dederint, aut injuriam commisserint, noxales actiones proditæ sunt ; quibus domino damnato permittitur aut litis æstimationem suffere, aut ipsum hominem noxœ dedere." Justinian's Institutes, Lib. iv. Tit. viii.

The same principle is recognised in Merlin, Repertoire de Jurisprudence, vol. ii. p. 75, title Esclavage :

"En cas de vol ou d'autre dommage causé par l'esclave, outre la peine corporelle qu'il subit, le maitre doit en son nom reparer le dommage, si mieux il n'aime abandonner l'esclave ; cequ'il doit opter dans trois jours."

The Civil Code of Louisiana, art. 2300, declares: "That the masters of slaves are responsible for the damage occasioned by them ; the master, however, has the right, as established under the title of master and servant, of abandoning his slave in discharge of his responsibility ;" and art. 180, that "the master shall be answerable for all the damages occasioned by an offence or quasi-offence committed by his slaves, independent of the punishment inflicted on the slave."

Unless the underwriters have *expressly* taken upon themselves the liability for a loss arising from an insurrection of the slaves of the assured, the principle above established would clearly throw upon the plaintiff the responsibility of the insurrection, and of the deviation, which, as it was the motive of the revolt, was also its direct and immediate consequence.

Where the loss arises from the inherent vices of the subject insured, the underwriters are not liable. See Pothier, Contr. d'Assurance, p 105. Stypmannus, part 4, cap. 7, No. 319, p. 45; and Emerigon's edition of Boulay Paty, vol. 1, p. 358. 1 Phillips on Ins. 627.

In the present case, what was the "*vice pupre de la chose.*" Considering the character of the slave, and the peculiar passions, which, generated by nature, are strengthened and stimulated by his condition, he is prone to revolt in the very nature of things, and ever ready to conquer his liberty where a probable chance presents itself. Hence the profound attention which the penal codes of all slave holding countries give to the police of the servile population. In our legislation, we find the most minute and careful details upon this subject, establishing a discipline rigorous indeed, but which no prudent citizen would desire to relax. With what reason can we distinguish this subject matter of insurance, and abstract it from the operation of the well established general principle which we have just invoked? Will any one deny that the bloody and disastrous insurrection of the Creole was the result of the inherent qualities of the slaves themselves, roused not only by their condition of servitude, but stimulated by the removal from their friends and homes, for the purpose of sale by their owners in an unknown land, and encouraged by the lax discipline of the vessel, the numerical weakness of the whites, and the proximity of a British province?

To escape this well established rule, the plaintiff's counsel have cited a decision rendered in 1778 by a tribunal in France, in the case of the brigantine Le Comte d'Estaing. The facts in that case are thus stated at length by Emerigon (Boulay Paty), Cont. d'Assurance, ch. 12, sec. 10:

" J'ai parlé du brigantin Le Comte d'Estaing, Capitaine Jean Jacques Olivier.

" Ce navire équipé de dix neuf hommes, arriva a la cote de Gambée, où le capitaine acheta dix neuf captifs. *Le contre maitre mourut.* On toucha à Gorée, où le *Capitaine Olivier et le maitre de l'equipage moururent.* César Gasqui, Capitaine en second, prit le commandement du brigantin, et se donna pour second Gaspar Benoit.

" On acheta encore quatorze captifs, ce qui fit en tout trente trois têtes, savoir : Onze nègres, quatre négresses, dix huit nègrillons ou negrites.

On se hata de quitter ce rivage funeste, *ou les fievres avaient saisi presque tout le reste de l'équipage ;* on mit à la voile pour les iles Françaises. Pendant la route, les nègres se saisirent de l'entrepont, pénétrèrent dans la Sainte Barbe, d'où ils montèrent dans la chambre, s'y retranchèrent, se rendirent maitres des armes et firent feu ; Gaspard Benoit fut tué ; d'autres furent blessés. On se réfugia sur la dunette, et en avant du mât de misaine, où l'on resta pendant quatre jours, n'ayant pour tout aliment qu'une ancre d'eau-de-vie. Le brigantin allait au gré du vent. '

" On aperçut au loin un navire. On mit pavillon en berne ; les signaux furent multipliés. Ce navire qui était le Senaut la Brunette, de Bordeaux, Capitaine Jean Malleville, s'avança ; Gasqui et ses gens s'y réfugièrent ; on laissa à bord un novice qui était malade, et un petit mousse que les nègres révoltés avaient retenu auprès d'eux.

La Senaut arriva à la Martinique, où le capitaine Gasqui fit son consulat.

Les nègres, délivrés de la présence de l'équipage Français, jouirent pendant quelque temps de la liberté pour laquelle ils avaient combattu. Le Brigantin courut une route incertaine. Il échoua sur les roches d'une des iles Caiques, où les nègres se réfugièrent. Un bateau Bermudien Anglais se trouvait sur les lieux. Le capitaine de ce bateau enleva tous les effets du brigantin, et mit feu au navire.

Les habitans des iles turques ayant appris que des nègres s'étaient refugiés aux Caiques, y coururent ; ils se saisirent de sept nègres, dont le chef, pour échapper de nouveau à la servitude, se précipita dans la mer, où il trouva une mort volontaire : Servitus malorum omnium postremum, non modo bello, sed morte etiam repellendum. Cicéron, Philip. 2, cap. 44.

On prétend que le autres nègres et négresses périrent de misère. On ignore ce que dévinrent le mousse et le novice.

La sieur Sales, propriétaire du brigantin et de la cargaison, fit abandon a ses assureurs, et présenta contre eux une requête en paiement des sommes assurées.

Les assureurs proposaient quatre moyens principaux de défense. J'ai parlé des deux premiers, supra, ch. 8, sect. 4. Ils disaient de plus, que l'accident était arrivé par la faute du Capitaine Gasqui et de l'équipage ; ils ajoutaient enfin que le sinistre procédait du vice propre de la chose.

L'assuré répondait : 1° *Qu'on ne pourrait imputer aucune faute au capitaine ni aux mariniers : un équipage affaibli par la mort des principaux officiers et par les maladies, était hors d'état de contenir des nègres dans le devoir.* 2me. Par vice propre de la chose, l'ordonnance entend la corruption physique qui corrode, gâte et détruit les marchandises proprement dites. Les mots déchet, diminution, empirance, dégât, déperdition, dont se servent les textes cités dans la section précédente, n'ont aucun rapport ni aux affections de l'âme, ni aux élans produits par l'amour de la liberté.

Quand on embarque des nègres, ce sont des enemis qu'on embarque ; car, comme les embassadeurs Scythes disaient à Alexandre, il n'y a jamais d'amitié entre le maître et l'esclave ; au milieu de la paix, le droit de la guerre subsiste toujours. Inter dominum et servum nulla amicitia est ; etiam in pace, belli tamen jura servantur. Quinte-Curce, lib. 7, cap. 8.

Les assureurs d'un navire qui va faire la traite des nègres savent qu'on y embarquera des ennemis qui, par leur fait, pourront occasionner la perte du bâtiment ; la révolte des nègres est donc *une fortune de mer.*

Sentence de notre amirauté, rendue en Mars, 1776, qui condamna les assureurs à payer au sieur Salles les sommes assurées.  Arrêt du 13 Mai, 1778, qui confirma cette sentence.

Now there were circumstances in the case of the Compte d'Estaing which we look for in vain in the present case.  The point is clearly supported by evidence, and is made by the assured, that the crew of the vessel had been weakened by the death of the principal officers, and by the debilitating effect upon the survivors of a disease engendered by the climate, and were thus incapacitated to keep the negroes in subjection.  It is quite clear that the sickness was a peril of the sea, and as the reasons of the decision of the Court of Admiralty are not given, they may well have been influenced by that consideration, as well as by the position taken by the assured, that revolt was not comprehended under the general principle concerning losses arising from the qualities of the subject matter.

Certain it is that the logic in favor of the assured, as stated by Emerigon, is singularly inconsequent.  " The insurers of a ship which is engaged in the slave trade know that she is to take on board enemies, who may, by their conduct, occasion the loss of the vessel.   The revolt of negroes, then, is a peril of the sea, une fortune de mer."   This is a very strange deduction from the premises ; so illogical in itself, and so inconsistent with a clear principle of insurance law, that Estrangin and Boulay Paty, whose opinions are entitled to high respect, express distinctly their disapproval.

The text of Pothier, p. 106, Contrat d'Assurance, who it will be observed, does not speak of the case of mutiny, is as follows :

"Suivant la même règle, si des voiles ou des cables sont usés de vétusté, l'assureur n'en est pas tenu, au lieu qu'il en serait tenu si c'était la violence des coups de vent qui en eût causé la rupture.

Suivant la même règle, lorsque des animaux ou des nègres sont morts de mort naturelle, où même lorsque des nègres par désespoir, se sont donné la mort, l'assureur n'en est pas tenu : car ce sont pertes arrivées par la nature, ou le vice de la chose, ou quelquefois par la négligence du maître, qui ne peut être imputée à l'assureur s'il ne s'en est chargé expressément.   Autre chose serait s'ils étaient noyés *dans une tempête ou tués dans un combat.*"

The note of Estrangin on this text is as follows :

" Je pense, comme Pothier, que l'assureur n'est pas tenu si les

nègres se sont tués par désespoir. Valin, Ordon., 1681, Ass. Art. 11 et 15 ; et Emerigon, Ass. ch. 12, sect. 10, sont du même avis. Néanmoins ils tiennent que la révolte des nègres est à la charge des assureurs. Emerigon donne pour motif que ce sont des enemis desquels on a pu prévoir qu'ils se révolteraient et que cet événement ayant lieu en mer, est à la charge des assureurs. On pourrait dire de même que les assureurs ont su qu'on embarquait des hommes susceptibles de se livrer au desespoir, it de se tuer pour se soustraire à l'esclavage et au traitement qu'ils éprouvent à bord.

Il me parait que la révolte et le désespoir des nègres tenant au vice ou au caractère de la chose, doivent demeurer à la charge de l'assuré, à moins que les circonstances ne le fassent rapporter á quelque événement particulier.

" Ainsi Emerigon, à l'endroit cité, et ch. 8, sect. 4 et 5, rapporte un jugement qui dans un cas de révolte des nègres, mit l'événement à la charge des assureurs ; mais il y avait cette circonstance que l'équipage affaibli par des maladies contagieuses et réduit à peu de monde, n'avait pas pû se défendre contre les nègres, l'événement pourrait dès-lors être imputé à la maladie qui avait affaibli l'èquipage, et qui prise en mer était un événement de mer ; mais s'il n'y a pas de circonstance particulière qui en fasse juger autrement, la révolte ne peut être attribuée qu'au vice de la chose, ou à ce que le capitaine n'a pas fait ce qu'il fallait pour la prévenir, ce qui, dans ce dernier cas, attribuerait l'événement à son fait ou à sa faute, dont l'assureur ne répond pas."

Boulay Paty, in commenting on the text of Emerigon and the decree of the French Court of Admiralty, thus expresses his opinion. Assur. ch. xii, sec. 10 :

" Si la traite des noirs n'était pas défendue par nos lois, nous penserions avec Pothier, Valin et Emerigon, que les assureurs ne sont pas responsables, lorsque des nègres, par désespoir se sont donné la mort. Ce sont pertes arrivés par la nature ou le vice de la chose, ou quelquefois par la négligence du maître, qui ne peut être imputée à l'assureur, s'il ne s'en est chargé expressément.

Mais nous dirions aussi avec M. Estrangin contre l'avis de ces trois auteurs, que la révolte des nègres à bord serait également perte arrivée par la nature ou le vice de la chose, ou quelquefois par la négligence du maître. La révolte, ansi que la mort par désespoir l'tient aux affections de l'âme, et aux élans produits par le désir de se soustraire à l'esclavage. L'une et l'autre ont pour motif les mêmes causes, qui prennent naissance dans le caractère de la chose. (Voyez M. Estrangin sur Pothier, No. 66, des Assurances.)

Cependant il pourrait y avoir des circonstances qui, comme celles de l'espèce de l'arrêt du 13 Mai, 1778, rapporté par Emerigon, mettraient la révolte des nègres à la charge des assureurs."

Let us add to the authority of these distinguished French commentators, the opinion of Lord Mansfield, the father of the law of insurance in England. The case is found in a note in 1 Durnford & East's Rep. vol. 1, p. 130. It was an action on a policy of insurance on slaves. The policy, as Lord Mansfield states, in his decision, was in the *common form.* But there was a memorandum on the policy, that " the assurers are not to pay any loss that may happen in boats during the voyage (mortality of negroes by natural death excepted) : and not to pay for mortality by mutiny, unless the same amounts to ten per cent to be computed upon the first cost of the ship, outfit and cargo, valuing negroes so lost at £35 per head." The demand upon the policy was the loss of a great many slaves by mutiny. It was proved that some died from abstinence, some were killed outright, or received wounds, subsequently proving mortal, in the quelling of the mutiny, some died from the chagrin at their disappointment in the failure of the mutiny. The decision of Chief Justice Mansfield not only establishes that underwriters are not liable for those slaves who died by fasting or despondency, thus recognizing the doctrines of Pothier, Estrangin and Bouly Paty, etc., but covers fully the position for which we contend, that underwriters are not liable for losses by the mutiny or insurrection of the slaves, unless by the positive provisions of the policy they, the underwriters, have taken upon themselves that risk. Now, what says Lord Mansfield? We quote for greater certainty, his very words :

"I think the underwriters not answerable for the loss of the market or the price of it; that is *a remote* consequence, and not within any peril insured against by the policy.

"The question for the jury will be, whether any of those who died by any other means, except their being fired upon, or in consequence of the wounds and bruises which they received during the struggle, are within the meaning of that clause in the policy which insures against the damage by mutiny.

"It is not a law question. I know of no law on the subject; the jury must fix the rule, as the question arises upon a matter of fact. Some of them died in consequence of the insurrection failing ; those certainly cannot be within the policy.

" *This policy is in the common form, and, if it were not for the memorandum,* I SHOULD SAY THAT THE CASE WAS NOT WITHIN THE INSTRUMENT. But as it now stands, it is clear that those who were killed by the firing, or died in consequence of their bruises,

McCargo v. The New Orleans Insurance Company,

are within the policy. The other complicated cases must be left to the jury.

" I shall endeavor to discriminate the different classes, and when the general rules for each are fixed, it will be easy for the jury to apply the particular instances.

1st. The first class certainly comes within the meaning of the policy, of *mortality* by mutiny : such as were killed in the affray.

2d. The second also comes within the same description ; namely, those who died from the wounds they received from the firing and other hostillites.

3d. Another class is, I think, as clearly not within the policy. Such as, being baffled in their attempts, in despair chose a mode of death by fasting, or died through despondency. That is not a mortality by mutiny, but the reverse ; for it is by failure of mutiny.

4th. The great class are such as received some hurt by the mutiny, but not mortal, and died afterwards of other causes, as those who swallowed water, jumped overboard, etc. This is the great point."

*Verdict :* That all the slaves who were killed in the mutiny or died of their wounds, were to be paid for.

That all those who died of their bruises which they received in the mutiny, though accompanied with other causes, were to be paid for.

That all who had swallowed salt water, or leaped into the sea, and hung upon the sides of the ship, without being otherwise bruised, or died of chagrin, were not to be paid for.

This decision is positive, that if the underwriters had not expressly made themselves liable for the mortality by mutiny, that is, for a loss by the direct and immediate consequences of mutiny, they would not have been bound.

Whether we recur to the principle expressly embodied in our law, that the master is responsible for the wrong-doing of his slaves, or to the principle of insurance law respecting the vices of the subject matter, and the weight of authority which applies this principle to the mutiny or revolt of slaves, we are alike brought to the clear conclusion that the assured must bear the loss thus incurred.

We have thus endeavored to show that the deviation is at the responsibility of the plaintiff; and we had already shown that a deviation exempts the underwriters from further responsibility.

The propriety of applying the rule is peculiarly obvious in the present case. We have seen that the law is so rigid on this subject, that a deviation has been repeatedly held fatal, although

the risk was not thereby increased, but only changed so as to be no longer the identical risk. With how much greater force does the rule apply to the present case, where the object and the consequence of the deviation was the carrying the vessel at once to the shores of a British province, and exposing her to interference of British power, the risk against which the underwriters undertook to indemnify, in case the exposure thereto should take place by those fortuitous events, those perils of the sea, and those alone which are comprehended in the policy.

VI. It has been contended that the insurrection was only the remote, and that British interference was the proximate cause of the loss. It will hereafter be shown that the slaves were not lost by "foreign interference," the risk expressly assumed by the underwriters; that, on the contrary, if the policy was not extinguished by the insurrection and deviation, still the slaves *voluntarily* left the vessel at Nassau, thus accomplishing the sole object of their going there, and that the underwriters are protected by the clause that the company is not liable for "elopement." What is the standard by which to test the cause of a loss?

The case of *Vallejo* v. *Wheeler*, Cowper's Reports, p. 143, was an action on a policy of insurance upon goods on board the Thomas and Matthew, from London to Seville. The policy was in the common form, and contained a clause to indemnify against barratry of the master. On the trial, it was proved that this ship was put up as a general ship from London to Seville, and was let to freight by one Darwin, who chartered her to Brown, the captain. That it is the course of vessels going on this voyag to stop at some port in the west of Cornwall, to take in provisions. That this ship having taken her cargo on board, sailed from London to the Downs; while she lay there, all the other ships bound to the westward bore away; but she staid till the night after, and then sailed to Guernsey, which was *out* of the *course* of the voyage. That the captain went there for his own convenience, to take in brandy and wine on his own account: after which he intended to proceed to Cornwall. That the night after the ship quitted Guernsey, she sprang a leak, which obliged her to put into Dartmouth.

When she was refitted she set sail again, and proceeded for Helford, in Cornwall, where it was always intended she should stop to take in provisions; but on her way she received further damage, and, on her arrival, was totally incapable of proceeding on her voyage, and the goods were much damaged.

"Lord Mansfield.—The question then is, what is the ground of complaint against the master? He had agreed to go on a voyage from London to Seville; Darwin trusts he will set out immediately; instead of which the master goes on an iniquitous

scheme, totally distinct from the purpose of the voyage to Se-ville; that is a cheat and a fraud on Darwin, who thought he would set out directly; and whether the loss happened in the act of barratry, that is, during the fraudulent voyage or after, is immaterial; because the voyage is equally altered, even though there is no iniquitous intent. But, in the present case, there is a great deal of reason to say, *that the loss was sustained in consequence of the alteration of the voyage. The moment the ship was carried from its right course, it was barratry; and here the loss was immediately upon it. Suppose the ship had been lost* AFTERWARDS, *what would have been the case of the insured, if not secured against the barratry of the master? He would have lost his insurance, by the fraud of the master; for it was clearly a deviation, and the insured cannot come on the underwriters for a loss in consequence of a deviation.* Therefore, I am clearly of opinion, this smuggling voyage was barratry in the master.

"Willes, Justice, concurred.—The only doubt I had in this case was, when the loss accrued; and I think it may reasonably be said to *have happened in consequence of the smuggling voyage; for if the ship had proceeded on her first intended course, she would have escaped the storm.* Though this was a deviation, yet it is a just and fair rebutter to say, that it was barratry in the master, which is insured against in the policy. I think the justice of the case is on the side of the plaintiffs, and, therefore, that there ought not to be a new trial."

This case is quite in point, and more particularly for this reason; barratry of the master is a risk for which the underwriters are not liable, except by special declaration in the policy, and hence almost all policies now especially include that risk. Barratry then, if not especially provided for in the policies, would stand on the same footing as a loss from the vice of the thing, *le vice propre de la chose,* for which the underwriters are not bound, unless they expressly assume it.* Apply then the language of Lord Mansfield, substituting the word insurrection for barratry, and how would this decision stand in a case where the underwriters had expressly assumed the risk of insurrection?

---

* To show how entirely barratry and the vices of the thing stand on the same footing, take the recent Code of Spain, made in 1829, where the two are found in immediate juxtaposition. "No son de cuenta de los aseguradores los danos que sobrevengan por alguna de las causas siguientes." After citing deviation, voluntary separation from convoy, going to a different port, the Code proceeds—"Baraterias del capitan o del equipage, no habiendo pacto espreso en contrario—Mermas, desperdicios y pérdidas que procedieren del vicio propio de las cosas aseguradas, como no se hubieren comprendido en la poliza por clausula especial.—Codigo de Commercio, p. 363, Madrid edition.

" Suppose the ship had been lost *afterwards*, what would have been the case of the insured if not secured against the insurrection of the slaves ?   He would have lost his insurance by 'the insurrection of the slaves and altering the ship's course.'   For it was clearly a deviation ; and the insured cannot come on *the underwriters for a loss in consequence of a deviation.*"

Make the same substitution of words in the opinion of Justice Willes.   " The only doubt I had in this case was, *when the loss accrued ;* and I think it may be reasonably said to have happened in consequence of the 'insurrection of the slaves, and their carrying the vessel to Nassau' ; for if the ship had proceeded on her first intended course 'to New Orleans, she would have escaped the British emancipation.' "

In *Schieffelin* v. *The New York Insurance Company*, 9 Johnson, p. 26, Kent, C. J., says : " Suppose the policy was against capture only, and the vessel was captured, and then shipwrecked while in the hands of the captor ; I should think the assured would have a right to abandon, and to maintain that his right to recover, as a total loss, attached upon the capture ; and that the subsequent casualty was one with which he had no concern."

Now apply this opinion to the present case.   Suppose that here the underwriters had expressly assured against insurrection, and had not made themselves liable for " risks of emancipation, seizure or detention of foreign powers," and suppose the slaves having risen and taken possession of the vessel, as they did, and carried her to Nassau, were there all seized by the British government ; what would be the position of the assured upon such a policy, and under such facts ?   Why, in the language of Kent, the assured would have a right to abandon, and to maintain that his right to recover, as for a total loss, attached upon the insurrection and the seizure of the vessel by the slaves ; and that the subsequent casualty was one with which he had no concern.   Now here the parties occupy exactly the reverse of the position in the supposed case.   The mutiny here is at the risk of the assured ; the foreign seizure at the risk of the underwriters ; but the mere change of position does not change the law.   The same rule must apply to both.   There cannot be one rule for underwriters, and another rule, in the same supposed case, for owners.

Again in *McGowan* v. *The New England Insurance Company*, the vessel was seized and detained by a foreign power, and subsequently restored ; but, when restored, it was found, from her long exposure to the weather in a hot climate, in an open roadstead, that her hull, sails and rigging were so much injured, that she could not, without very great repairs, be enabled to perform

the voyage, and that the repairs would cost more than the vessel was worth.    Under the circumstances, the master refused to receive her back without indemnity by the foreign power, and abandoned her ; and his owners, as soon as they received the information, abandoned her to the underwriters.    Now, the policy covered the capture and seizure, but did not cover a destruction by the effect of the climate.

The question, among others, on which the liability of the underwriters turned, was to what cause was the loss legally attributable ? whether to the seizure, or to the effects of the climate. The plaintiffs contended that the seizure was the cause, and that it was the immediate cause, though not the active agent in the destruction.    Story thus disposes of the question (Story's Rep. vol. 1, p. 164):

"The first question which arises in the present case, is, whether there has been a total loss in the sense of the law of insurance ?   It is clear there has been no loss by the perils of the seas, but there has been a restraint and detainment of the government, within the words of the policy.    Has there been a total loss by reason of that restraint and detainment ?   I think there has been.    The argument is, that the injury to the vessel, by the long delay and exposure to the climate, was the immediate cause of the loss, and the seizure and detainment the remote cause only ; and that, therefore, the rule applies—causa proxima, non remota, spectatur ; and the underwriters are not liable for injury by mere wear and tear, or by delays in the voyage, or by worms, or by exposure to the climate.    But it appears to me that this is not a correct exposition of the rule.    All the consequences naturally flowing from the peril insured against, or incident thereto, are properly attributable to the peril itself. If there be a capture, and before the vessel is delivered from that peril, she is afterwards lost by fire, or accident, or negligence of the captors, I take it to be clear, that the whole loss is properly attributable to the capture.    It would be an over refinement and metaphysical subtlety to hold otherwise ; and would shake the confidence of the commercial world in the supposed indemnity held out by policies against the common perils."

So in *Potter* v. *Ocean Insurance Company*, 3 Sumner, 41, Judge Story remarks :

"In relation to the next point of objection, as to the payment for the loss of the boat, it seems to me to be disposed of by the verdict of the jury.    They have found that it was a direct consequence attributable to the preceding storm ; so that the principle, in case of loss, that, causa proxima, non remota, spectatur, is not at all interfered with.    If the bark has become wholly un-

manageable and innavigable from the immediate effects of the storm, I do not well see how the direct result from unmanageableness and innavigability, are to be treated otherwise than as a part of the loss. The storm is still the causa proxima. In causes of this sort it will not do to refine too much upon metaphysical subtleties. If a vessel is insured against fire only, and is burnt to the water's edge, and then fills with water and sinks, it would be difficult in common sense to attribute the loss to any other proximate cause than the fire, and yet the water was the principal cause of the submersion. If a vessel be insured against barratry of the master and crew, and they fraudulently bore holes in her bottom, and thereby she sinks, in one sense she sinks from the flowing in of the water; but, in a just sense, the proximate cause is the barratrous boring of the holes in her bottom."

In the case of *Hahn* v. *Corbett*, 2 Bingham, p. 205, the insurance was on goods in a ship, *warranted by the assured free from capture and seizure.* The ship was stranded on a shoal within a few miles of the port of destination, disabled from proceeding, and lost; but while she lay in the sand, she was seized by the commander of the place at which she was stranded, and the goods were confiscated by him. This was held a loss by the perils of the seas. Park, Justice, thus treats the case:

"I thought at first that the plaintiff could not recover, but I am now convinced of the contrary, and the confusion has been occasioned by the way in which the case is stated. But, in fact, the vessel and cargo were wrecked, and a total loss incurred before the enemy interfered. Not a twentieth part of the cargo remained undamaged, and there were no means of carrying it on. Supposing the goods had been sunk, the assured would have been entitled to recover for a total loss; and if they had afterwards been fished up by the enemy, would that have made any difference? Assuredly not. In *Bondrell* v. *Hentigg*, 1 Holt, N. P. C. 149, an action on a policy of insurance on goods, the vessel was wrecked, and part of the goods were lost and part were got on shore, but whilst on shore they were destroyed and plundered by the inhabitants of the coast, so that no portion of them came again into the possession of the assured; it was holden, that this was a loss by the perils of the sea, and that no abandonment was necessary. If we change 'enemy' for 'inhabitants,' that case is not unlike the present, in which our judgment must be for the plaintiff."

The court will have no difficulty, if the above decisions are entitled to any weight, in coming to the conclusion, that the voyage was gone, and all recourse under the policy lost, when the slaves took possession of the vessel, and changed her destination,

It has been well observed by Judge Story, "that if there be any commercial contract, which more than any other requires the application of sound common sense and practical reasoning in the exposition of it, and in the uniformity of the application of rules to it, it is certainly a policy of insurance; for it deals with the business and interest of common men, who are unused to deal with abstractions and refined distinctions." Let us take then a practical view of this case, and ask whether these underwriters, by any clause or expression contained in their contract, can be considered as agreeing that they should be liable, if this vessel should by an insurrection of the negroes themselves, thus crowded in this unreasonable number in a vessel of such a size and unrestrained by suitable precautions and discipline, be wrested from the control of the captain and crew, and carried into a British province? Did they contemplate any other exposure to foreign interference than such as should result from the vessel being captured on the high seas, or driven by the violence of the winds and waves or other external force upon the shores of a country hostile to the institution of slavery? But one reply can be made to this enquiry.

VII. The plaintiff has attempted to class this loss as a loss by piracy—the slaves, says he, were pirates. It might suffice to say, that piracy implies the *animus furandi*, and that these slaves were instigated, not by the thirst for plunder, but by the mere desire of liberty. But these disquisitions are of little moment. The question is, what piracy the policy contemplated, and what loss did it intend to cover? The natural answer is—external attack and the carrying off of the slaves by pirates, not the case of the subject matter of the insurance itself assuming a piratical character.

VIII. If, however, the court shall be of opinion that no one of the grounds of defence hitherto assumed is tenable, and that the slaves were not lost to the assured on their arrival at Nassau, but were still covered by the policy, it becomes necessary to enquire into the occurrences at Nassau, and to examine the question, whether the loss of the slaves is to be attributed to the "foreign interference," for which the defendants would be liable under the policy, or to the "elopement" of the slaves, which cause of loss was expressly assumed by the plaintiff.

Without going into a detailed examination of the testimony, we take it to be incontrovertible that, from the moment the vessel's head was turned towards Nassau instead of New Orleans, till her arrival at Nassau, she was under the undisputed control of the blacks. This fact results from the testimony of the plaintiff's witnesses, and is not understood to be denied by counsel; but it was seriously contended in argument, that the muti-

ny had *ceased*, prior to the vessel's having any communication with any persons at Nassau. If by the word *ceased*, it is meant that there was no longer any contest between the whites and blacks, and that all was quiet on board, the fact is unquestionable. The mutiny had *ceased*, because it had been completely successful, because the whites had ceased to struggle against the revolt of the blacks, and had become the *captives* of the blacks, so much so, that by their own confession, they considered their lives as completely at the mercy of the blacks, and to use their own language, " had abandoned all hope of ever setting foot on shore." But if by the expression that the mutiny had *ceased*, plaintiff intends that it had been *quelled*, and that the whites had succeeded in recovering control over the negroes, and reducing them to subjection before a British guard had been sent on board, the position is borne down by the weight of the entire testimony of the witnesses on both sides, and this too in a manner so conclusive, that we should scarcely deem it necessary to notice the point, had it not been strenuously urged by the very respectable counsel who appear for the plaintiff. Leaving out of view the concurrent testimony of all defendants' witnesses, let us see what is the state of the case, according to the evidence produced by the plaintiff. After the pilot had got the vessel into the harbor, Gifford says : " As the pilot was bringing the vessel to in the harbor, the quarantine officer came alongside in his boat. Deponent jumped into his boat, and told him the cause of our coming in there, and asked him to put deponent on shore, and to watch the vessel, and to let them have no communication with the shore till he returned. He then accompanied deponent to the American Consul. The officer watched the vessel, and deponent and the Consul went to see the Governor of Nassau, and saw him at his house, and stated the case to him. The Consul then asked protection to guard the vessel till something could be done. The Consul asked him, if he would send some soldiers on board to guard the vessel, cargo and passengers, and crew, till something could be done, which was done."

It was only after the British guard came on board that any semblance of control over the blacks was resumed. Gifford goes on to say, that " the officer in command was Capt. Mins. These soldiers, when they came on board, put the men forward and the women aft. They then tied Ben Blacksmith, Madison Washington, D. Ruffin and Elijah Morris, and confined them in the long boat on deck, where they were kept till the slaves were liberated."

How happened it, if the mutiny was quelled, and the slaves recovered prior to the appearance of a British force on board, that the leaders of the mutiny were left at liberty, and that the

first step towards getting control of the ship, viz., the confining of the chiefs of the insurgents, was taken by the British soldiers sent on board at the Consul's request?

But see the testimony of this witness for the plaintiff, " that on the day they arrived at Nassau, Captain Woodside came on board with the American Consul. *He offered to assist in taking charge of the vessel,* AND TO HELP TO MASTER THE SLAVES." " It was intended, *whenever the nineteen slaves should be taken out of the brig,* that witness and the aid he was to receive, should take possession of the brig and remaining slaves, and bring them to Indian Key, *for which purpose their force would have been sufficient."*

Again, the same witness says : " The negroes had no arms at Nassau, (they had been thrown overboard,) and *might have been easily overcome,"* etc. So they were not overcome, but *might* have been.

The testimony of Captain Ensor, Stevens, the second mate, and Lieut. Mends, who was the officer first sent on board with the guard, corroborates the evidence of Gifford on this point.

Assuming, then, as a fact, that on the arrival of the vessel at Nassau, the blacks on board were fugitive slaves, who had succeeded in overpowering their masters, and in escaping into the jurisdiction of a foreign power, by whose laws slavery is not tolerated, we will next examine what was the effect of this state of things by the law of nations, and what were the obligations which either the law of nations or the comity of nations imposed on the British authorities, and whether the slaves acquired their freedom in Nassau by reason of " the foreign interference," the risk assumed by the underwriters, or by the force and effect of the law of nature and of nations on the relations of the parties, against which no insurance was or could be legally made.

Slavery is against the law of nature; and although sanctioned by the law of nations, it is so sanctioned as a local or municipal institution, of binding force within the limits of the nation that chooses to establish it, and on the vessels of such nation on the high seas, but as having no force or binding effect beyond the jurisdiction of such nation.

The position, that slavery is a contravention of the law of nature, is established by the concurrent authority of writers on national law, and of adjudications of courts of justice, from the era of Justinian to the present day.

What is the very definition of slavery, as given in the Institutes, Lib. 1. Tit. 3, sec. 2 ?

"Servitus autem est constitutio juris gentium, qua quis dominio alieno *contra naturam* subjicitur."

See also Burlamaqui, vol. 2, p. 297, 302-3-4. Puffendorff,

book 3, chap. 2, sec. 5.    Story's Conflict of Laws, sec. 96 ; and
the cases of *Lunsford* v. *Coquillon,* 2 Mart. N. S. 401 ; *Marie
Louise* v. *Marot,* 9 La.   473.   *The Antelope,* 10 Wheaton, 120.
*Commonwealth* v. *Aves,* 18 Pickering, 193.   *Forbes* v. *Cochrane,*
2 Barnewell and Cresswell, 448.   *The slave Grace,* 2 Haggard's
Adm. Rep. 94.

This view of the principles of the law of nations in respect to
the institution of slavery is supported by an implication of the
strongest character, derived from the Constitution of the United
States.   These States being about to be united in one great
confederacy for the common interest of all, provisions were
made for drawing the ties which bound them together more
closely than those which unite independent states under the law
of nations.   The second section of the fourth article of the
Constitution contains three distinct clauses, each intended to
promote this object.   The first provides that the citizens of each
State shall be entitled to all the privileges and immunities of
citizens in the several States.   This clause was necessary ;
without it, under the law of nations, each State might have re-
fused such privileges to the citizens of other States.   By the
second clause, the extradition of fugitives was rendered imper-
ative on each State when demanded by a sister State.   This
clause was necessary: without it, under the law of nations,
each State might have refused extradition.   By the third clause,
the emancipation of fugitive slaves is forbidden, and their res-
toration to their owners required.   This clause was also neces-
sary : without it, under the law of nations, each State might
have declared such fugitive slaves to be free, and have forbid-
den their restitution to their former owners.   When we examine
the language of the constitution, the juxta position of this
clause to the two preceeding ones, the three clauses forming to-
gether a distinct section of the constitution, the implication is
irresistible, that the eminent statesmen who represented South-
ern interests and Southern institutions in the convention that
framed that instrument, were convinced that by national law
the fugitives from slavery in the Southern States would acquire
freedom by escaping into the Northern States, and that a provi-
sion, in the nature of a treaty stipulation to the contrary, was
indispensable to the protection of Southern rights.   Indeed the
principles for which we contend in this branch of the argu-
ment are fully and freely admitted to be correct by our own gov-
ernment, in its diplomatic correspondence on this subject.   Mr.
Webster, in his letter to Lord Ashburton, on the 1st August,
1842, says explicitly: " *If slaves, the property of citizens of the
United States, escape into the British territories, it is not expect-
ed that they will be restored.   In that case, the territorial juris-*

*diction of England will have become exclusive over them, and must decide their condition."* It is true that he goes on to say, "but slaves on board of American vessels lying in British waters, are not within the exclusive jurisdiction of England, or under the exclusive operation of English law, and this forms the broad distinction between the cases." We shall examine hereafter the force of the exception here laid down, and continue our quotation of the paragraph. "If persons guilty of crimes in the United States, seek an asylum in the British dominions, they will not be demanded until provision for such cases be made by treaty; because the giving up of criminal fugitives from justice, is agreed and understood to be a matter in which every nation regulates its conduct according to its own discretion. It is no breach of comity to refuse such surrender."

This letter of Mr. Webster was the last of a long series of official communications from this government to that of Great Britain, growing out of certain outrages committed by the latter on our commerce. In the cases of the Hermosa, the Comet, the Encomium and the Enterprise, American vessels, sailing under the American flag, from one American port to another, on lawful voyages, had been driven by stress of weather to take refuge in a British port, and British authorities had asserted and acted under the monstrous pretension that they were entitled to enter such vessels, to examine into the nature and character of the cargo, to investigate the personal relations of those on board, and by active interference to set free slaves, the property of American citizens, thus thrown by unavoidable necessity into their power. Such pretensions were met by a universal burst of indignation from those whose rights were so lawlessly invaded, and, if persisted in, would have unquestionably afforded the justest cause of war to this nation. In a series of letters from American Secretaries of State and American Ministers at the Court of St. James, the absurdity of these pretensions, the utter absence of all basis for them in the law of nations, were demonstrated with signal ability. In Mr. Forsyth's letter of instructions to Mr. Stevenson, under date of 27th March, 1837, and in Mr. Stevenson's letter, embodying these instructions, and addressed to Lord Palmerston, on the 12th May, 1837, the doctrines asserted by the American government are enforced by a weight of argument and cogency of reasoning, perfectly irresistible.

But admitting, as we do, to their fullest extent these doctrines, we deny their application to the case of the Creole, and it is impossible not to perceive the marked distinction between this case and that of the other vessels. Indeed the very reasoning employed by the American diplomatists in their correspond-

ence relative to the Hermosa, Comet, etc. when applied to the case of the Creole, leads to exactly the opposite result. The Creole reached the port of Nassau, a port of a power by whose laws slavery is not tolerated, in the possession of black persons, masters of their own movements, under no physical control, who had succeeded by force of arms in overpowering their owners, and were seeking a refuge from slavery. All the other cases were those of American citizens, with their slaves under their control, and in their peaceable possession, in American ships, driven by stress of weather to seek hospitality in British waters. In the case of the Creole, the blacks brought the whites captive into Nassau, on board of a vessel captured in a successful revolt. In all the other cases, the whites brought submissive slaves into Nassau on their own vessels. What was the complaint made by this government, as regards these latter cases ? It said to Great Britain : you have no right to enter those vessels, and to examine into the relations of the persons on board. You are bound to leave them as you find them ; to afford the hospitality of your ports to those who enter in time of peace; and you are not permitted to interfere and to set the blacks at liberty ; they are our property : leave them untouched. See the letters of Mr. Forsyth and Mr. Stevenson, above referred to.

But we are asked in accents of indignation, can it be pretended that the situation of the blacks who reached Nassau in the Creole, after committing the most atrocious crimes, is better and more advantageous than that of those who reached there in due and proper submission to their owners ? Can crime confer immunities and privileges ? To this we answer, that the freedom of those who reached Nassau in the Creole was acquired, not by *reason*, but in *spite of* the commission of the crimes. The freedom was acquired by their *escape* from slavery into a free country. The *means* of escape cannot affect the consequences resulting from it. If a slave eludes the vigilance of his owner and escapes into a free country, he becomes free. If, whilst effecting his escape, he is discovered and impeded in his flight, and overcome the impediment by violence, the result is the same. In neither case can he be reclaimed. If that violence proceeds to the extreme of murdering his master, the crime is one for which he may be demanded from the nation into whose dominion he escapes. If their be a treaty stipulation, his extradition may be required as a right; if not, it may be asked as a favor ; but, in the language of Mr Webster, may be refused without a breach of comity. Such treaty stipulations now exist between this country and Great Britain ; but, at the date of the entry of the Creole into the harbor of Nassau, they did not exist.

View this matter as we may, it at last resolves itself into this simple question: does the law of nations make it the duty of Great Britain to refuse a refuge in her dominions to fugitives from this country, whether black or white, free or slaves? It would require great hardihood to maintain the affirmative as to whites; but the color of the fugitive can make no possible difference. It will scarcely be pretended that the presumption of our municipal law that blacks are slaves, is to be made a rule of the law of nations; and, if not, in what manner are the British authorities to determine between the blacks and whites reaching their ports on the same vessel, the former asserting their liberty, and the latter denying the fact, and claiming the blacks as slaves? It is obvious that the only criterion by which they can properly be governed, is that which is insisted on by the American Government, viz: not to inquire into the relations of the parties as they previously existed; if the blacks reach thereunder the control of the whites, and as their slaves, so to consider them; but if the blacks reach there uncontrolled by any master, and apparently released from any restraint on the part of the whites, to consider them as free.

These being the principles on which, by the law of nations, Great Britain has the right to regulate her conduct towards fugitives from this country, let us inquire into the occurences at Nassau. It is not our intention to enter into a minute examination of the contradictory statements of witnesses, many of whom labor under an evident bias, but to show by the official correspondence, that the action of the British authorities afforded no ground for any just complaint; that the only interference on their part was that which was solicited by the representative of our government, and that the acquisition of liberty by the slaves, and consequent loss to the owners, resulted not from " interference by the British authorities," but from their escape from their masters, and the operation of the law of nations, acting on the relations of the parties.

It is admitted by all, even by the plaintiff's witnesses, that none of the authorities at Nassau interfered in the slightest degree with the persons on board of the Creole, till a request to that effect was made by the American Consul. See the official correspondence, *ante* p. 234—9.

This correspondence has been made the subject of a great deal of comment, and the third clause of the decision of the Governor and Council as to the course they would pursue, has been denounced as an active interference to set at liberty persons who reached their jurisdiction in the condition of slaves. But it would be difficult for any person whose interests are not involved in this controversy, to misunderstand what occurred,

or to find in it cause of complaint, when the facts are borne in mind.

The blacks arrived under no restraint. Nothing, except an interference of some external force could prevent their immediate landing. In this emergency the Consul visits the Governor. He knew, as he states himself, that any request to the Governor to use force to prevent the blacks from coming on shore, or to aid the whites in regaining mastery over them, would be to request the Governor to violate the law of nations, and the laws of his own country. He accordingly makes no such request; but confines his demand to the detaining of the slaves *until an investigation can be had.* Now the Governor might have refused this request *in toto,* and the whole matter would have been ended by the tranquil landing of the blacks. Their liberty would thus have been secured according to any possible view of the law on this subject, and without a pretext for asserting an interference by the British government. The Governor was, however, willing to do what the Consul requested, so far as he could without a violation of his duty, without disobedience to the laws of his country. He accordingly says to the Consul, that, "*for the fulfilment of the object of your letter,*" a guard has been sent on board. But to avoid all possible misunderstanding, he again says to him in writing how far he can go. He declares first, that the courts of law there had no jurisdiction. This certainly was no interference. The Governor and Council may have been mistaken in this opinion, as plaintiff contends that they were. If so, it only evinces more thoroughly their solicitude to avoid all action in the matter, and surely does not amount to an emancipation of the slaves, against which we insured. The second point is, although, by the law of nations, we are not bound to interfere in the question of the guilt of these blacks, nor to deliver them up, yet, at your request, and in the absence of instructions from our government, we will so far interfere as to send a guard on board to prevent the landing of any of the blacks *until an investigation is had,* and we will then confine the guilty, so as to prevent their escape, until we shall be instructed by our government whether it chooses to give them up, because, on this point, our government is at perfect liberty to say yes or no, without infringing even the comity of nations. The third point is, if you use our guard as you request, only *until an investigation is made,* then the blacks must be released from further restraint; that is to say, you are not to obtain the use of our forces under pretext of conducting an investigation, but with the real view of keeping the blacks on board until you can collect strength to master them; because, if our forces are to be used in the fur-

therance of such object, we should be violating the laws of our own land.

We find that things were conducted in accordance with this understanding, fully acquiesced in by the American Consul ; for he utters not a syllable of dissent from that time till Friday, the 12th, when he complains, in a note to the Governor, that parties from the shore were about to board the Creole by force, to which the Governor answers, that, if such attempt be made, *he shall be quite ready to use every authorised means to prevent it.* His next communication is on the 14th, in which he complains that all the slaves on board the brig were liberated and put on shore by the Attorney-General, and those accompanying him.

We shall not detain the court by entering into a minute examination of the remaining evidence, showing the circumstances under which the blacks went on shore. The evidence of the witnesses on the two sides is quite contradictory. That of the plaintiff could easily be shown to abound in contradictions and exaggerations. The court will notice that the fourth decision made by the Governor and Council, on the 9th November, was " that a detailed account of what had taken place should be sent to the British minister at Washington." Accordingly, it appears, that the Attorney General, who conducted the investigation, was directed to report his proceedings to the Governor. This report is to be found in the Consul's deposition, (*ante* p.238), under date of the 13th November, and is referred to the Governor's reply on the 15th, to the Consul's letter of the 14th. It is true that one or two of the counsel for plaintiff have insinuated that this report was ante-dated, and was connected *after* the Governor's receipt of the Consul's letter of the 14th. We can make no reply to these insinuations, and may well leave it to the court to say whether they will listen for an instant to imputations so degrading against gentlemen in high and responsible official station, without a title of proof on which to sustain them.

But the main reliance of the plaintiff, as to the facts on this part of the case, is the circumstance that, on the organisation of an enterprise, by the American Consul with Captain Woodside and some other American seamen in the port, to board the Creole, and subdue the negroes by force of arms, the British authorities interfered to prevent the accomplishment of this object.

Leaving out of view the fact that this armed expedition of the Consul was directed against a vessel then occupied by an armed guard of British soldiers, placed there at his *own request*— losing sight for the moment of the agreement, fairly entered in-

to between the British authorities and the American Consul, that the guards were to be used only *until an investigation could take place*—and the obvious implied understanding that British force was not to be decoyed on board, under the pretext of employing them to guard the vessel whilst the examination was going on, but with the real object of being there as a means of preventing the landing of the blacks until measures could be taken for their subjugation, let us calmly consider whether under any fair construction of the duties and legal obligations imposed on the local authorities, they could have acted otherwise, even if slavery had existed in Nassau, as a legal municipal institution.

A vessel was lying within the jurisdiction of Great Britain, in a time of profound peace; lying within a harbor where the jurisdiction of that power, according to the law of nations, was exclusive; lying, according to Gifford's testimony, within 150 yards of the wharf. Now whether the blacks on board of the Creole were free or slaves, was a question of law; and this too, whether Nassau was subject to laws recognizing or repudiating the existence of slavery. Will the proposition bear examination for a moment, that the local authorities were bound to look on quietly and see this question determined by a resort to arms? Were the magistrates of the land to remain quiet spectators of a conflict going on in a peaceful harbor, within a stone's throw of the wharf, in which blood was to be spilt, and life to be sacrificed in determining what were the legal relations of parties? Such a state of things in a civilized country, in the nineteenth century, could not for an instant be tolerated; and would not be tolerated in this country, nor in the port of New Orleans. It is too monstrous to be thought of.

Once more we repeat, that the fact that the insurgents on the Creole were blacks can make no difference in principle. The presumption of slavery arising from color is one confined to our municipal law, and makes no part of the law of nations. Even under our municipal law, it may be rebutted. In point of fact, there are vast numbers of free blacks in the United States; and, if the black population of the world be taken in view, the vast majority are freemen. Whether the blacks on the Creole were free or slaves, was a question to be decided by the law alone, if the blacks asserted their freedom, and by no possible construction of defendants' liability can they be held responsible for a refusal by the British authorities to permit the question to be decided by battle.

*Peyton* and *I. W. Smith,* contrâ.

I. As to the question of seaworthiness. The presumption

is in favor of the seaworthiness of the vessel, in all cases where the plaintiff does not, by his testimony, trace the loss to a source beyond the perils covered by the policy, and show that its direct and proximate cause is some specified fact, which, from the usages of the trade in which the vessel is engaged, or the general rules of navigation, constitutes, *per se*, an unworthy condition of the vessel.

The defendants aver the unseaworthiness of the brig for the want of arms, and for want of precaution in embarking the slaves ; and because the brig, it is said, was of too small dimensions for the number of slaves on board.

They place their objection wholly on the peculiar nature of the property insured.

In alleging unseaworthiness on grounds peculiar to the nature of the property insured, the defendants present three subjects of inquiry, viz :

1st. By the usages of trade, were arms necessary on such a voyage, or was a larger vessel required ?

2d. Were arms or a larger vessel required by the nature of the voyage, and contrary to the usage ?

3d. Do the plaintiffs warrant the seaworthiness of the brig, after the commencement of the voyage ?

The first question is one of fact to be decided by evidence. The defendants adduced no evidence on their part, and are therefore obliged to rely wholly upon the evidence of the plaintiff. Our evidence so far from making the objection valid, totally destroys it.

The testimony shows, that so far from a violation of any of the usages of vessels bringing slaves from Richmond to New Orleans being proved, there was a strict compliance on the part of the Creole with every usage ; that the crew was more numerous than is usual ; that the vessel had been engaged in the business ever since she was constructed ; that she had safely brought out, on a previous voyage, fifteen more slaves than were shipped on the present voyage ; that the slaves as they came on board, were peaceable and obedient ; that every precaution ever used, was employed ; and that, in every respect, the brig was fitted for carrying the slaves.

But we are told, the act of Congress regulating the number of passengers, from a foreign country, according to the tonnage of the vessel, is applicable to this case. Yet that law expressly applies only to voyages from a foreign country, and leaves vessels making voyages coastwise to carry as many passengers as they choose. Thus the analogy, if any there is, is in our favor, by the very omission to make a rule for coastwise voyages!

As to the second question, the fact that four passengers, and

the captain's wife, niece and child, unhesitatingly entrusted themselves on board the brig, is stronger than the testimony of witnesses.   If arms were necessary, or if the vessel was not sufficiently capacious for the slaves, would these persons have exposed themselves on her ?

Here we have the evidence of seven disinterested persons, given in a manner stronger than upon oath—by entrusting their lives on a sea voyage, with a full knowledge of the equipments and capacity of the vessel for that voyage !

The officers and crew also readily embarked on the voyage, without requiring additional precautions, or objecting to the number of the slaves.

As to the third question, the rule which holds the owner of the cargo to warrant the seaworthiness of the vessel, has, thus far in the history of insurance, only been applied to the state of facts at the moment of the departure of the vessel on the voyage insured.

Any subsequent unseaworthinessis at the charge, and upon the responsibility of the underwriter.   It is one of the perils of the sea.

II. III. IV. The counsel for the defendants contend, that the clause as to insurrection in the Orleans Company's policy is a warranty, and that the events of Sunday night and the next day put an end to the contract ; and that those events, though the clause be considered as creating an excepted risk only, broke up the voyage insured, and thus relieved the insurers from further liability.

Finally, they say, that considering the words employed in the policy, the insurrection must be taken as the direct cause of the loss of the slaves.

McCargo took out a policy on twenty-six slaves, valued at $800 each, or $20,800 in the whole, from Norfolk to New Orleans, for the premium of two per cent.   Besides the usual risks of piracy, thieves, taking at sea. &c., as expressed in the printed part of his policy, these written clauses were inserted:  " This policy covers all risks, and provides chiefly against that of foreign interference."   " But warranted by the assured free from elopement, insurrection and natural death."

It is contended that these words formed one  of the conditions precedent of the policy, which, not being complied with during the voyage, the contract would, from that moment, be annulled.

In the technical language of insurance law, the word warranty is used in a double sense—sometimes to denote a condition precedent of the contract, and at other times a risk excepted by the insurer.

As a condition precedent, warranty is either implied or ex-

pressed; as a risk, it is always expressed. As a condition, it consists of a circumstance which the law, if the warranty is implied, and the parties, if expressed, consider as barely relating to the risks of the policy ; but not as having any necessary connexion with the loss of the property insured, nor as being in any manner material thereto. As an exception, it is regarded in itself as a substantive cause of loss. As a condition, not being complied with, there is an end to the contract ; as an exception, it does not affect the policy, unless it is the immediate and necessary cause of the loss. 1 Phillips, 346, 555. Condy's Marshall, 346.

. It is said by Marshall, that " the warranty makes the contract hypothetical ; that is, *it shall be binding, if the warranty is complied with.*" Vol. 1, p. 348.

` The proper nature of a warranty, is well stated by Mr. Justice Washington, in *Calbreath* v. *Gracy*, 1 Washington's C. C. R. 222. " What is a warranty? It is an agreement by the assured, in the nature of a condition precedent, which must be strictly and literally performed, before the assured can recover. It is of no consequence *whether it be material to the risk or not;* and it is equally unimportant to what cause the non-compliance with it is attributable."

Insurrection is itself a risk or cause of loss, not simply a circumstance relating to a risk ; and thus, from its nature, should much rather be considered as a risk excepted, than a condition of the policy. It is usually regarded as a cause of loss only, not as a circumstance which in its effects might more or less exert an influence upon the other perils of the policy.

If the parties intended to employ the word " insurrection" otherwise than as a risk, they would have added other words. It is presumed they employed the word in its ordinary and usual signification. It has no technical meaning. In common parlance, a loss by insurrection would be understood as a loss of such of the slaves as should die in the insurrection, or by wounds received therein, or who were otherwise disabled by the insurrection, so that their value would be diminished more than one-half. Are not such the consequences which the underwriters may be fairly supposed to have had in view, in inserting the clause in the question ?

No loss of slaves had ever before taken place where the British interference was preceded by an insurrection. This was an extraordinary state of things, which, it is natural to presume, was not contemplated by either of the parties. Nothing shows that the underwriters, at the making of the policy, intended to cancel their promised indemnity, in case an insurrection should happen.

The impropriety of construting this clause as a condition precedent, is well illustrated by the remarks of Judge Brecken-ridge, in the case of *Mackie* v. *Pleasants*, 2 Binney's R. p. 379. There it was contended that the words " British brig," by which the vessel was described in the policy, amounted to a warranty as a condition precedent. But Judge Breckenridge said: " The manner in which the words are introduced, strikes me as indicative of laying too little stress upon them by the parties, to construe them a warranty. It cannot reasonably be supposed, and ought not to be supposed, that the insurer, expecting a war-ranty of such extent, would rest satisfied with having it so loose-ly and uncertainly expressed. *It is his own fault not to have had it clear of all ambiguity ; and, on the principle that the instrument shall be construed most favorably for the assured in a doubtful case—*and to me this is at least doubtful—I incline for the assured."

After the general risks of pirates and restraints of princes, in-cluded in the printed form of the policy, and the special words reiterating the risk of British interference as the great danger to be apprehended, had the plaintiff been told that the promised indemnity might be frustrated by an insurrection preceding the interference, is it to be believed that he would have accepted a policy which might be totally defeated by such a state of facts ? And that, too, while other offices were making insurance at the same rate, without this restriction, since made so formidable ?

Regard the place where that word is inserted. The printed clauses first express the risks usually assumed by the under-writers. Next follows the list of the exceptions to their liabili-ty. Afterwards is inserted the clause, to obtain which the high premium is given, extending the policy to " all risks." Then follows, in its proper turn, the exceptions to the liability of the company for losses caused by " elopement, insurrection and na-tural death."

If the parties intended that one of these perils should be a condition precedent of the contract, they intended that each of the other two should also be considered similar conditions.

This rule of construction is not now invoked for the first time. It was sanctioned in the case of *De Hahn* v. *Hartley*, 1 Durnford & East's Rep. 343. The policy in that case contained the fol-lowing clause : " Sailed from Liverpool, with fourteen six-pounders, swivels, small arms, and fifty hands or upwards, cop-per-sheathed." On her departure from Liverpool, the ship had only forty-six hands on board, but six hours afterwards she took in six hands more, and always subsequently had on board more than the fifty hands mentioned in the policy. Upwards of five months had elapsed before the ship was captured on the coast of Africa, at and from which place to her port of discharge in

the West Indies, she had been insured.   The question was, whether her having sailed from Liverpool with only forty-six hands, discharged the underwriter.   It was contended, that the part of the clause relating to the number of hands, was not a warranty, because "it relates merely to the force of the ship at Liverpool, before the voyage commenced, and is totally unconnected with the risk insured."

But Lord Mansfield and his associates, thought otherwise. They considered that the different words of the clause could not be separated, so "that that part of it which relates to the copper-sheathing, should be a warranty, and not the remaining part.   But the whole forms one entire contract, and must be complied with throughout."

If the argument of our opponents is correct, that the clause is a condition as to the insurrection, it follows that it is a condition as to the "elopement," and as to the "natural death."   If the clause creates a condition as to one, it creates a condition as to each of the others.   The inference then must be, that the parties intended to annul the whole policy, if a single slave should die of disease, or escape clandestinely !

It is said the word *warranty* is used, and, therefore, the presumption is, that it was used as a condition.   The word employed is " warranted," and it is equally applied to " elopement" and " death," as to " insurrection."   It can hardly be contended that as to the two former, it is to be construed as a condition. Our opponents are driven to the necessity of maintaining, that " warranted," as applied to insurrection, denotes a condition, while, as applied to the next preceding, and to the next following word, they must admit it denotes and excepted risk !   A construction so violent as that, is entitled to little favor.   They must construe the clause as equivalent to this, viz :   *The risks of elopement and natural death are excepted, and the policy is to take effect on condition that there shall be no insurrection on board the brig.*   Is it not highly erroneous to suppose that the same word " warranted," contains these different meanings, in the same sentence ?

It is also a rule of construction, that the same word shall be taken to be used in the same sense, wherever it is employed in the same contract.   The word "warranted" is twice employed in the printed part of the policy, as follows :  " It is also agreed, that the property be *warranted* by the assured free from any charge, damage, or loss which may arise in consequence of a seizure or detention, for or on account of any illicit or prohibited trade, or any trade in articles contraband of war, at any time whatever.   It is also agreed, that bar and sheet iron," &c., "and

all other articles that are perishable in their own nature, are *warranted* by the assured free from average," &c.

These are the usual clauses in a marine policy. They have acquired a well settled and well known signification. No one ever presumes to consider them as denoting conditions of the policy. No one supposes they indicate any thing more than excepted risks. They are words inserted by the insurer to limit his liability by excepting certain risks. 1 *Phillips*, 677. 2 Ib. 467. *Hughes, pp.* 106, 211, *American edition.*

This policy being upon a peculiar species of property, it was thought necessary by the insurers to specify the risks excepted by them. Is it not natural they should employ the same word which they find used in the previous part of the policy, to indicate the excepted risks for other kinds of property?

Phillips (vol. 1, p. 712,) states that " the excepted risks are expressly specified by inserting that the insurance is to be free from, or 'warranted against' certain risks, or some other equivalent provision is inserted." See also 1 Condy's Marshall, 336.

The word " warranted" in the clause of the policy, is the only word which can be tortured into a condition. But the use of the word warranty, by no means implies a condition. "As any statement of a fact (says Phillips, 1 vol. p. 349,) " in the policy, is a warranty, though neither the word *warrant*, nor any formal expression of like import is used : so there is frequently a warranty in form, when there is none in fact. The assured often *warrants* the property free from average, free from detention or capture, or *from other losses and perils, which is no more than an agreement that those shall not be among the perils and losses insured against, and for which the underwriter is to be liable."* And see 11 Petersdorff, p. 318, 319. 2 Maule and Selwyn's R. 240. 5 Ib. 47. 5 Barnwell and Alderson, 107.

It is contended, that when the brig entered the harbor of Nassau, the underwriters had already ceased to be responsible on the policy. This can only be shown by establishing one of two things—either that the property insured has been physically destroyed by the direct and necessary effect of the insurrection, considered as the sole cause of the loss, or that the completion of the destined voyage has been inevitably prevented by the same peril.

Plaintiff's counsel do not show that a loss of life of any of the slaves insured by the policy, has been caused by any of the excepted perils. They have attempted, but most signally failed, we apprehend, to prove that the insurrection severed the tie of slavery which bound the slaves to their owners, and changed their condition to that of free men. These, it is believed, are the only

ways in which an extinction of this species of property could be effected, within the intent of a policy of insurance.

The only question is, whether they have shown that the completion of the voyage was inevitably prevented by any of the excepted perils. The excepted perils are, " elopement, insurrection, and natural death." There is no evidence of any natural death. There was no desertion, which according to Webster, means to runaway. The only remaining question is, whether the insurers have shown that the completion of the voyage was inevitably prevented by the excepted peril of insurrection.

The general rule cannot be contested, that such facts only can be considered as are the necessary and direct consequences of the risk of insurrection. To hold the insurer liable for the distant and remote consequences of the single peril he has assumed, would be to extend his liability to other perils not contemplated at the signing of the policy, and which could not be provided against. The effect would be, to make the special insurance against a single peril cover the immediate effects of other perils, and thus turn the special policy—granted for a trifling premium—into a general policy, covering all perils, and for which a large premium would be justly due.

Marshall, (vol. 2, p. 717), lays down the rule in these words: " No evidence can be given of any loss, unless it be the *immediate* consequence of some peril insured against. That which is only a remote consequence of such peril, is not within the policy. If this rule were not adhered to, it would be impossible to draw the line, and the inquiry into the remote consequences of an accident or misfortune, would be infinite."

Phillips, (vol. 1, p. 690), states the principle as follows: " It is a rule, that the insurers are liable only for the direct, and not for the remote and *consequential* losses, occasioned by any peril in the policy."

In *Thompson* v. *Whitmore*, (3 Taunton's R. p. 227), the plaintiff claimed for a loss by the perils of the sea. The ship had been laid down to be cleaned and caulked, and the tides knocked away the stores under the ship, so that several planks gave way, and, on the return of the tide, she fill with water.

Lord Mansfield held that this could not be considered as a loss by the perils of the sea, and non-suited the plaintiff.

In *Jones* v. *Schmoll*, (1 Durnford & East's R. p. 130), the policy upon a cargo of two hundred and twenty-five prime slaves, exempted the insurer from loss by mutiny under ten per cent. The slaves all revolted while the ship was on the coast of Africa. The revolt was finally suppressed, but the crew had been obliged to fire upon the slaves, and attack them with weapons. Nineteen were killed during the mutiny, or died of their wounds,

and the insurer paid for them without objection.  Thirty-six others died from hanging down in the water by the chains and ropes, or from swallowing salt water, or from fluxes and fevers, or from abstinence, or chagrin at their disappointment.

The plaintiff contended that all the thirty-six slaves had died, though not in the mutiny, or of wounds received at that time, yet in *consequence* of the mutiny, and therefore the insurer was liable for them.  But Lord Mansfield held they did not die by mutiny, and that the insurer was not liable for them.  There was also a claim for loss upon the slaves that survived, by depreciation of their value by the mutiny, but this also was held not to be a direct consequence of the mutiny.

In *Green* v. *Elmslie*, (quoted 2 Condy's Marshall, p. 719), the plaintiff claimed for a loss by perils of the sea.  The ship was driven by a gale of wind on the coast of France, and there captured.  Lord Kenyon held the loss was not the consequence of the sea perils, for had the vessel been driven elsewhere, she would have been in safety.

May we not say, on the same principle, that the loss was not the consequence of the insurrection, because, if the brig had been driven elsewhere, the slaves would not have been emancipated, and thus placed beyond the reach of their owners?

In *Delano* v. *Bedford Insurance Company*, (10 Mass. R. 354), the ship was insured from Savannah to Great Britain.  The plaintiff alleged a loss by the embargo.  That law was passed after the date of the policy, and prevented the ship from leaving Savannah on her voyage.  It was enacted to continue in force ninety days, but, before that period elapsed, war was declared, and the voyage became unlawful.

Mr. Justice Sewell, in giving the opinion of the court, says, that " the declaration of war with Great Britain, which defeated the voyage insured, by rendering it unlawful, is, in no sense, as it regards the rights of these parties, a consequence of the embargo.  The two events are unconnected and distinct.  As to the voyage insured by this policy, the *consequence* of the embargo, supposing the detention to have terminated at the time prescribed, is *unknown.*"

In the case of *Law* v. *Goddard*, (12 Mass. R. 115), the plaintiff claimed for a loss by capture, which was the only peril insured against.  The ship, bound from Copenhagen for New York, was captured by a British vessel of war, and ordered into Halifax.  On her way to Halifax, and while in possession of the prize-master, she was cast away, in consequence of the thick weather, and went to pieces.

Chief Justice Parker, in pronouncing the decision of the court, declared that the loss was not by capture, and he assigns

as a reason, "because the loss was not the immediate and necessary effect of the capture, according to the case of *Green* v. *Elmslie*, which, although a *Nisi Prius* case, has been since considered as law by the court of King's Bench, and by Marshall in his treatise. *Nor is it certain that it may be attributed to that at all.*"

It was evident, in that case, that but for the capture, the ship would not have been carried into the thick fogs of the banks which lie off Halifax, and so would not have been lost. So our opponents say, that the interference could not have taken place, if the brig had not been carried into Nassau. If this decision is respected, it cannot be said that the loss of the slaves was the effect of the insurrection, any more than the shipwreck was the effect of the capture.

See, also, the case quoted by Phillips, (vol. 1, p. 690).

Where the parties wish to extend the responsibility to the remote and consequential losses, special words to that effect are inserted in the policy.

Thus, in the case of *O'Reilly* v. *Royal Exchange Assurance*, (4 Campbell's R. 247,) the clause inserted was, "warranted free from capture and seizure, *and the consequences thereof*, in the port of La Guayra.

And in the case of *Hahn* v. *Cobbett*, (2 Bingham's R. p. 205,) the clause was, "warranted free from capture and seizure, *and the consequences* of any attempt thereat."

The only consequences which can be considered as immediately and directly flowing from the insurrection, are :

1st. The temporary control of the brig, obtained by the nineteen culprits.

2d. The departure from the line of the voyage.

3d. The going into the harbor of Nassau.

4th. The delay in that harbor.

None of these circumstances, nor all together would authorize an abandonment as for a total loss ; and, if such right ever existed, it was lost by the failure to exercise it before the interference. See *Hunt* v. *Royal Exchange Assurance*, 4 Maule and Selw, 54. *Anderson* v. *Wallis*, 2 Ibid, 254. *Murray* v. *Hatch*, 6 Mass. 465.

From these cases it may be inferred:

1st. That no retardation of the voyage, unless so great as to destroy the cargo or deprive it of value, will authorize an abandonment for a total loss:

2d. No interruption of the voyage will authorize an abandonment for a total loss, unless it be such an interruption as must inevitably defeat the voyage.

According to the evidence, if the interference had not taken place, the brig would have departed from Nassau on her voy-

age, on Friday, the 12th of November, making a delay of only four days.

But let us admit for the sake of argument, that the damage sustained as the immediate and necessary consequence of the insurrection, was sufficient to authorize a claim for a total loss.

As the property insured was not physically destroyed, the *spes recuperandi* remained, and the insured could not recover without an abandonment of it to the insurer. *Anderson* v. *Royal Exchange Assurance*, 7 East's R. 38. *Davy* v. *Milford*, 15 Ib. 559. *Mellish* v. *Andrews*, Ib. 13.

To make the abandonment effective, it is necessary that it should be made on a knowledge of the facts which would authorize it, and it is further necessary, that the same state of facts on which the abandonment is based, should continue unchanged from the time of the technical loss, up to the time the abandonment is actually made. If the property has been restored to the assured, or if, by any peril not covered by the policy, the property has been placed beyond the reach of the assured, so that he cannot abandon it to the insurer with any effect—if, in a word, by a peril not insured against, the *spes recuperandi* has been destroyed, before the abandonment is actually made, the right to make it has ceased to exist, and the underwriter is discharged from liability. See *Hamilton* v. *Mendey*, quoted 11 Petersdorff, 256. *Livie* v. *Janson*, 12 East, 650. *Bainbridge* v. *Neilson*, 10 Ib. 329.

V. The taking the vessel out of her course, from the time she left the route to New Orleans on Monday evening, to the following night when she reached Nassau, was the only way in which the revolt interfered with the direct prosecution of the voyage. The running off with the brig was, on the part of the nineteen culprits, an act for which the insurer would be responsible, as an act of pirates, thieves, etc., within the printed clause of the policy.

The slaves on board the Creole were possessed of the same capacity to commit offences, in the same manner and to the same extent, as if they had been free persons. Their *status* of slavery conferred no immunities in that respect.

The offence of piracy, by the common law of England, consists of those acts of robbery and depredation upon the high seas, which, if committed on land, would amount to felony there. But by the marine law, no taking of property is necessary to constitute the crime. And the common law was early enlarged by statute. By the act of William III, any person who shall make a revolt in a ship, is pronounced to be a pirate. By the act of George I, every person is declared to be a pirate, who shall in any way consult, combine, confederate or correspond

with any pirate upon the seas, knowing him to be guilty of pira-
cy. It was held by an eminent English judge, that a person
who stood on the shore and shot a person on board a vessel
aground in the stream, committed piracy.

In the United States, the act of Congress of 1790, pronounces
every person a pirate, who shall, upon the high seas, commit
murder or robbery, or any offence, which, if committed within
the body of a county, would be punishable with death.   4 *Black-
stone's Com. p.* 72.   2 *Chitty's Commercial Law,* 119.   13 *Pe-
tersdorf,* 349.   1 *Hawkins' Pleas of the Crown, p.* 254, sec. 16.
*Gordon's Digest, p.* 738, *No.* 2635.   10 *Encyclopædia Americana,
p.* 151, *word, Piracy.*   See also 1 *Phillips,* 648.   *Hughes,* 174.

We conclude that the defendants should be liable under the
printed words of the policy, if the insurrection be considered
as the cause of the loss.

But it is said that the insertion of the written clause provi-
ding for the excepted risk, prevents such an inference here,
although it might be legitimate if the exception were not in-
serted.

The company say to the owners: "We insure you against piracy
and theft, but not against insurrection.   If a loss occurs by acts
of pirates, we will make good the loss.   It is unnecessary to
look further, since we assume that risk by name.   If a loss is
not caused by one of the risks expressly assumed, and, if it hap-
pen by insurrection, we are discharged."

So of the other perils named in the policy—barratry of the
master, for instance.   If the master commit an act of barratry
by engaging in illicit or contraband trade, it is no defence to
the insurer to urge, that the assured has warranted against the
illicit and contraband trade which caused the seizure and loss of
the vessel.   The defence of illicit or prohibited trade would of
course prevail, if it was not also a loss by the peril of barratry
of the master, expressly assumed.

In other words, where a loss happens, the proximate cause of
which may be both a peril expressly assumed, and a peril ex-
cepted, the latter must yield to the former, in order to give that
indemnity to the assured, which is the great object of the con-
tract.

In *Lawrence* v. *Aberdeen,* (5 Barnwell & Alderson), insurance
was effected on mules and oxen, " warranted free of mortality
and jettison."   Most of them died during the voyage, by reason
of bruises occasioned by the rolling and pitching of the ship du-
ring a violent storm.   The question was, whether the insurer
was exonerated by the clause of warranty.

The court of King's Bench held, that it was a loss by sea per-
ils : " It consequently falls within the risks enumerated in the

policy, and *it seems to us* that it is not excepted ·out of those
perils by the words *warranted free from* mortality and jettison.
Independently of these words, the underwriters would undoubt-
edly have been liable as for a loss arising from a peril of the sea.
*These words were the language of the underwriters, and were in-
troduced by them to protect themselves from a particular species of
loss.* By the terms of the policy, they insured against the perils
of the sea, &c., and all other losses and misfortunes that should
come to the hurt, detriment and damage of the subject matter
insured."

" Now the exception must be considered as engrafted on these
general words of the policy, and the whole should be read to-
gether as one sentence, and then it would stand thus: 'And the
underwriters will be liable for losses by perils of the seas, and
all other losses, except losses by mortality and jettison.' The
circumstances of the parties having inserted the word jettison,
signifies to us that they did not contemplate the case of violent
death," &c. They accordingly determined, " that the word
mortality in this policy must be understood in its ordinary and
popular sense, as importing its arising from natural, and not from
violent causes ; and that, being so, there must be judgment for
the plaintiff."

We have pursued the course adopted by the court in that case.
We have first inquired whether the underwriters would be lia-
ble for the acts of the nineteen, independent of the words war-
ranted free from insurrection. We have, we think, proved that
they would be so liable, in the same manner as the insurers in
the above case would have been.

We have next placed the risks assumed in connexion with the
exception, and have argued that the same rule of construction
should be applied, viz: that the " insurrection" of the policy
should be understood in its ordinary and limited sense, so as not
to destroy the effect of the risk of piracy expressly assumed.
The court in that case so construed the exception or warranty
of " mortality," though in its general signification it clearly
would imply every kind of death, so as to limit it to that species
of death not properly falling within the perils of the sea, which
were insured against. See *Wilcocks* v. *Union Insurance Co.,*
(2 Binney, 575). *Brown* v. *Union Insurance Co.,* (5 Day).
*Suckley* v. *Delafield,* (2 Caines' R., 222). *American Insurance
Co.* v. *Dunham,* (12 Wendell, 463—15 Ib., 11).

VI. As to the argument that the revolt was caused by an
inherent vice or defect in the slaves, against which the plaintiff
warrants the insurers, see 4 *Pothier,* (*Ed. Dupin*), *p.* 465, *Traité d'-
Assurance, No.* 66. *Valin, p.* 472, 477. 1 *Emerigon, p.* 393. 1 *Phil-
lips,* 229. *Hughes,* 254, 255, 258. *Smith's Mercantile Law,* 219. 1

*Condy's Marshall*, p. 216, 217.  23 *Merlin Répertoire*, p. 414, *Verbo*, *Police et Contrat d'Assurance*.

VII.  It has been contended that the insurrection caused a deviation from the line of the voyage and enhanced the other perils, and that the insurers were thereby released.  It is readily conceded, that a deviation not justified by necessity, determines the policy from the moment the deviation actually commences. It is also conceded, that the departure of the brig from her course to New Orleans, when opposite Nassau, was a sufficient departure, and that unless justified by necessity, would relieve the company from liability for any subsequent loss.

The first inquiry is, therefore, whether the deviation in this case was justified by necessity?

The clause in the policy authorising the deviation, explains its nature and limitations.  It is as follows :  " And it shall and may be lawful for the said vessel, in her voyage, to proceed and sail to, touch and stay at any ports or places, if thereto obliged by stress of weather, or *other unaviodable accident,* without prejudice to this insurance."  Shipwreck, sea damage, necessary repairs, sickness of officers or crew, want of provisions, mutiny of crew, are the usual cases of deviation justified under this clause.

In this instance, the facts show most conclusively, that an overwhelming necessity—the menaces and commands of the criminals, with drawn knives—the eminent danger of loss of life—compelled the officers of the brig to continue her course direct to Nassau, from the point where the New Orleans route separates from the other.

The occurrences at Nassau, show that there was no unnecessary detention at that place.  It was owing to causes over which the officers of the vessel had no control, and for which the plaintiff is not responsible.

It is contended that a deviation caused by an excepted risk, avoids the policy, and several decisions are relied on.

*Roget* v. *Thruston* is quoted.  The decision is unquestionably correct.  French risks were excepted.  The ship was captured by a French privateer, recaptured by an English frigate, and the cargo was condemned as French property.  The court held it was a loss by French risks, because " the terms of the exception must mean that the insurer is not liable for any loss by the acts of Frenchmen."  The remarks of the judge— Radcliff was his name—relied on by our opponents, were *obiter dicta* entirely, made forty years ago, when insurance law was in its infancy; and, though Chancellor Kent was then on the bench, they are no where alluded to by him, nor any of the other judges, when the question was afterwards directly presented

in *Robinson* v. *Marine Insurance Company*, nor by any other judge in any other case, nor by Chancellor Kent in his Commentaries. They are, therefore, entitled to no consideration.

*Breed* v. *Eaton* is, we think, entirely misunderstood, and we are sorry to see that Mr. Phillips, (vol. 1, p. 549), has fallen into the same error. The sea-damage, which was the subject of controversy there, occurred before the deviation took place, and as the deviation leaves the underwriter responsible for previous damage, the decision would have been palpably wrong, if it had proceeded on that ground, as supposed by our opponents and Mr. Phillips. On the other hand, the policy was made while the non-intercourse act was in force, which rendered unlawful the importation of the goods insured. This point was relied on, and was, in fact, sustained by the court, though the case is very carelessly reported, and might easily lead into error.

*O'Reilly* v. *Royal Assurance Company*, is inapplicable, for the ship proceeded to sea in an unseaworthy condition, and afterwards deviated voluntarily—either of which facts distinguish that case from the one before the court.

Let us briefly examine the authorities in support of our view of the law.

Marshall, (Condy's ed., vol. 1, p. 204), lays down the rule, that deviation is justifiable, " though it proceed from a cause not insured against."

Kent, (vol. 3, p. 317), states the law in a similar manner.

Phillips, (vol. 1, p. 551 and 555), declares the law to the same effect.

In *Scott* v. *Thompson*, (4 Bosanquet & Puller, p. 81), the point was expressly decided, after full argument.

*Green* v. *Elmslie*, (Peake, p. 212), was to the same effect.

*Robinson* v. *Marine Insurance Company*, (2 Johnson's R. p. 89), decided by Chief Justice Kent, and Judges Tompkins, Spencer and Thompson—and but one judge dissenting—maintained the same principle.

It is believed that no adverse decision has ever been made, either in England or in the United States.

In each of the cases the perils were increased, but that is always regarded as one of the incidents of every policy, where the perils are divided. There is no more reason why the increase of the perils to be borne by the underwriter by the perils to be borne by the assured, should release the former, than there is that he should be held responsible, because the excepted risks have been enhanced by the perils assumed by him. Nothing will render him responsible, but a loss directly caused by a peril assumed, and nothing should discharge him except the loss is directly caused by the excepted risk. 1 Phillips, 555, 713, 716, 717.

VIII. The loss was occasioned by British interference.

The slaves of the plaintiff were carried into the port of Nassau by piracy. The will of their owners was not consulted; nay, the agent of one of them sealed his resistance with his blood.

The laws of the United States protected the rights of the owners, at the time of the departure of the brig from the limits of Virginia. Those laws followed the brig and her cargo upon the voyage. The right to this protection was secured to the owners by the flag under which the vessel sailed, and the license which she possessed. No act had been done by the owners, or by any person for whom they were answerable, to relinquish or forfeit these rights. Murder and robbery had taken place, but they increased rather than diminished the rights of the owners, as American citizens, to protection.

But the force which compelled the officers to go into that harbor, conferred no power to interfere with the rights of property on board. Such a power would be inconsistent with the duty which is imposed upon all nations to succor the citizens of each other, when their persons or property are driven into the harbors of a friendly nation by shipwreck, or other disaster of sea. All the rights of property in persons or things on board, were secured by the laws of the United States, which accompanied the vessel into the port of Nassau.

It is true, the vessel and her cargo were in possession of the culprits. But when has piracy been considered as vesting the right of property in the pirates? If the vessel and cargo were received and treated as if they were lawfully in the possession of the captors as owners, was it not rendering aid and support to the pirates, and co-operating with them to place the stolen property beyond the reach of the owners?

*See U. S. Senate Documents, vol. 3, 1838-9, Doc. No. 216, p. 8, 30, 31. U. S. Senate Documents, 1842, Doc. No. 137, p. 2, 6. U. S. Senate Documents, 1844, Doc. No. 135, p. 4, 5, 7. Ashburton Correspondence, p. 17, 18, 21, 24. Resolutions of U. S. Senate as to the Enterprise. Calhoun's Speeches, p. 380. See also the speeches of senators Benton, Rives, and Conrad on the Treaty of Washington. Mr. Levy's speech in the House of Representatives on the recent Florida case; and the correspondence accompanying the Treaty of Annexation. The Louis, 2 Dodson, 251. The Diana, 1 Ib. 97. 1 Martens, 200, 202. 1 Vattel, 314, 397.*

Let us next look at the powers which were claimed by the authorities of Nassau, over the persons and property on board the Creole.

The Attorney General testifies, that the slaves on board an

American vessel, sailing from one port of the United States to another, and driven by necessity or force into a British port, become free, and that the right of their owners ceases; that the owners would not be allowed to exercise any control over such slaves, even while on board the vessel: that if the owners should have recourse to violence to enforce their control as masters, the authorities of Nassau would interfere and punish the masters, in the same way as if the slaves were free.

Such are the doctrines of the British ministry. See *U. S. Senate Documents*, 1838–9, *Doc.* 216, *p.* 15, 26. See also *Lord Aberdeen's letter, in the correspondence of the Treaty of Annexation.* That these doctrines were applied to the slaves on the Creole, and that they were liberated by the interference of .the British authorities, is conclusively proved by the evidence.

Let us admit, for the sake of argument merely, that the plaintiff is, as owner, liable to the company for the torts of the slaves, and that the acts of piracy sprang from a natural vice of the property insured, and thus were a cause of loss not covered by the policy. Let us see whether this admission ,would lead the court to a different conclusion, as to the cause of the loss of the slaves.

When the Consul came on board, every trace of insurrection had vanished. Gifford was placed in command, without resistance; the American flag was hoisted, without obstacle; and four hours elapsed before the military guard set foot on the Creole. The American witnesses all testify that but for the British interference, the Creole, with the slaves on. board, might have been brought to New Orleans. ·

But it is contended that the witnesses are all wrong; that the interference was not the cause of the loss, and that it was the insurrection which prevented the slaves from reaching New Orleans. It is contended that this results from the legal principles of insurance. We are referred to several decisions.

In the case of *Hahn* v. *Cobbett*, it is decided that the cause of the loss was shipwreck, rather than the subsequent capture. Why? The decision informs us: "The ship is totally lost; and though the goods are afterwards recovered in a damaged state, they fall into the hands of an enemy; and, *but for that circumstance,* would also have been totally lost. It is asked, when can the goods be said to have been lost? When the ship was totally lost. *There is no statement that any other ship was at hand, or that any land was near.* The vessel and cargo were wrecked, and *a total loss incurred before the enemy interfered."* This is the turning point of the case.

*Here* it is not proved that, "but for the circumstance" of the

British interference, the slaves would have been totally lost. On the contrary, the record is full of evidence that, "but for that circumstance" the slaves would have been safely brought to New Orleans.

In *Hahn* v. *Corbett*, the two facts which controlled the decision, were these:

1st. That by the sea-damage to the greater part of the cargo, and by the stranding and breaking up of the ship on an unfrequented coast, the voyage was inevitably defeated, and an actual total loss had taken place.

2d. That the seizure by the enemy was the only means of saving anything from the wreck, and as that was an excepted risk, the total loss was equivalent to the physical destruction of the whole property.

*Patrick* v. *Commercial Insurance Company*, a case of insurance upon the vessel, is relied on. The ship was driven by a storm high upon the shore, and buried in the sand, and afterwards the wreck was burnt. The question was, whether it was a loss by sea risk—the only peril insured against in the policy. Clearly, the peril of the seas. Why? Chancellor Kent tells us, it is because the ship had been driven in a gale "high and dry two hundred feet above high water mark, and was buried in mud and sand to within three streaks of her bends. The master believed the ship to be bilged, but could not ascertain the fact. She could not have been got off without taking her to pieces, or digging a canal, *which would have cost more than the value of the ship.*"

Is it pretended that the insurrection of the nineteen had deprived the slaves insured of all value? Otherwise, this case is in our favor.

In the case cited, the fact that the ship was buried in the sand, was equivalent to being sunk in the water. It was, in other words, equivalent to the total physical destruction of the thing insured. To make that case applicable to the present, the counsel are obliged to contend that the bare fact of going into the harbor, did, *per se*, destroy the character of slaves, which they possessed before that event, and made them free men.

In another case relied on, that of *Schiefflin* v. *New York Insurance Company*, Chancellor Kent supposes a policy which covered capture only. The vessel was captured and never released, but was shipwrecked. It was held that capture was the cause of the loss, because capture was that which prevented the vessel from continuing the voyage, and of itself authorized an abandonment. The loss was total before the shipwreck.

To enable the defendants to avail themselves of this decision,

they were bound to show that the slaves were prevented by the revolt, *per se*, from being brought to New Orleans—a state of things directly contradicted by all the evidence in the cause.

In *Magoin* v. *New England Marine Insurance Company*, the same principle was settled. There was also a capture, and, during the capture, a loss by exposure in a hot climate. The court begins by stating, that the capture, *per se*, constituted a total loss within the policy—that is, that the capture of itself was a sufficient and adequate cause, without the exposure, to prevent the further prosecution of the voyage. The capture alone was a total loss. How different were the facts in that case from those in the present. See also *Barker* v. *Blakes*, 9 East, 283. And *Savage* v. *Pleasants*, 5 Binney, 403.

So in *Totten* v. *Ocean Insurance Company*, also relied on by our opponents, Judge Story puts the case of a ship burnt to the water's edge, so that she immediately filled and sunk. Surely the burning of the ship to the water's edge, so as to let in the water, was a cause adequate of itself to prevent the prosecution of the voyage.

It was in itself a total loss, by the physical destruction of the property. The loss being total, that which produced it was its proximate cause, viz., fire.

In endeavoring to apply these decisions, the counsel appear to overlook the great principle which pervades them, viz: that a loss which is once complete by the physical destruction of the property, or what is equivalent thereto, fixes the rights of the parties, and renders it unnecessary to look to any subsequent event.

They take for granted that, on Friday, the 12th of November, the voyage was inevitably defeated. But as this is a fact directly disproved by the evidence, the authorities are irrelevant, however correct they might be as applied to the facts for which they were intended. See also the cases cited in 1 Phillips, 690.

But "every loss must be imputed to its immediate, and not to any remote cause," says Marshall, (p. 418). See also, *Waters* v. *Merchants Louisville Insurance Company*, (11 Peters, 223).

Phillips, (vol. 1, p. 694,) states the law as follows: "If a loss is occasioned by different perils, it is usually to be attributed to that by which it is immediately occasioned. *Causa proxima spectatur.*"

In *Goold* v. *Shaw*, (1 Johnson's Cases, 293, and 2 Johnson's Cases, 442,) the ship met with sea-damage, and put into Martinique to repair. Before the repairs could be completed, the porter and claret, forming the greater part of the cargo, would be spoiled by the heat of the climate, and a sale was thus rendered necessary. The sale being made, the voyage was aban-

doned. The question was, whether there was a loss of the cargo by a peril of the sea. The plaintiff contended it was that peril which had compelled the vessel to come into Martinique, and to abandon the voyage; and that the same peril must be considered as the proximate cause of the loss, because if the sea-damage had not existed, the sale of the articles would not have been rendered necessary.

Is the case referred to analogous to that now before the court? In the case quoted, the plaintiff sought to trace the proximate cause to what occurred on the sea. In the present case, the defendants set up the same pretension. In that case, the plaintiff maintained that the loss could not have occurred, if the vessel had not gone into port. In this case, the defendants rely on the same argument. In that case, the plaintiff contended that the vessel would have completed her voyage, but for the sea peril. In this case, the defendants say the same thing. There the defendants contended that the loss could not have occurred, but for the *heat* of the climate. Here the plaintiff contends, that the loss could not have occurred but for the *authorities* of the island. There it was contended, that the breaking up of the voyage, was caused by the sea peril, and that the vessel insured was so connected with the cargo, that the company were liable in the same manner as if the insurance had been on the cargo. Here it is contended, that the plaintiff has assumed the peril of insurrection as to the slaves insured, that he is liable for all the consequences of the insurrection as to the slaves insured, and that it is not limited to the slaves in the policy. There the defendants were liable for a loss by sea-damage, and not for a loss by the heat of the climate. Here, as it is admitted for the sake of argument, the defendants are not liable for a loss by insurrection, but they are liable, in express terms, for a loss by interference.

What was the decision? That the loss was not caused by a peril of the sea.

*Tatham* v. *Hodgson*, (6 Durnford & East's Rep. 656,) was an insurance upon slaves. The voyage was unusually prolonged, so that the ship became short of water and provisions; and it became necessary to throw a part of the slaves overboard. The question was as to the cause of the loss: was it, or not a peril of the sea?

It was evident then, that but for the unusual prolongation of the voyage by bad weather, the provisions and water would not have given out. The want of provisions and water, under the circumstances, was a peril of the sea. It was also evident, that but for this peril of the sea, the loss would not have occurred.

But these facts were not considered sufficient by the court, which decided that the loss was not caused by a peril of the sea.

The case of *Delano* v. *Bedford Marine Insurance Company* (10 Massachusetts Rep. 347,) is directly in point. The ship Emulous and cargo were insured from the United States to Great Britain. Before the vessel departed from Savannah, she was arrested by the embargo imposed for ninety days, and during that period war was declared, and the voyage was thus made unlawful. The question was, whether the embargo was the cause of the loss.

The analogy existing between that case and the present one, is very close.

In both cases the loss is admitted, and the only question is, to ascertain the proximate cause.

In that case, the embargo was a peril covered by the policy, and the war was not covered by it. If the embargo was the cause of the loss, then the insurer was liable; but, if the war was the cause, then the insurer was discharged.

In that case, the embargo continued until the war was declared, and was only terminated by the declaration. The ship was detained in port by the embargo, when the war was declared. In other words, the ship was under the operation of one peril, when another peril intervened, and a total loss ensued. The declaration of war could not have effected the policy, but for the previous detention caused by the embargo.

In this case, according to the arguments of our opponents, a similar state of facts existed.

They say that while the slaves insured were under the operation of an excepted peril, the interference occurred, and that the excepted peril must be treated as the proximate cause of the loss. But their claims find little support from this decision.

The court held, that though the embargo had remotely occasioned the loss, yet that it could not be considered as the proximate cause.

The court say: " If the Emulous had been stranded and wrecked in the port of Savannah, while detained there under the embargo, the insurers would have been liable for the loss; but not upon the averment of a loss by detention; although it might be argued that it was entirely the consequence of the detention, and that, but for the embargo, the peril, by which the ship had been lost, would not have been incurred. In every question of loss demanded upon a policy of insurance, it is the immediate and direct, not the remote or contingent cause of the loss, which is to be regarded, in stating and maintaining the title of the assured to recover upon the contract."

In *Hodgson* v. *Malcolm*, (2 Bosanquet & Puller's New Reports, p. 236), the plaintiff declared for a loss by the perils of the sea. As they were warping the ship into port, a part of the

crew were sent ashore in the only boat of the ship, to make fast one line and cast off another. The men were instantly impressed by the king's officer, and were prevented from performing their duty, whereby the ship sprung aleak, immediately grounded, and otherwise suffered heavy damage.

The underwriters contended that the acts of the press gang in seizing the sailors, was the cause of the loss, and being an act of the public authorities, they were not liable. But the court said: " The press gang is not the necessary cause of the loss ; for, supposing all hands to be taken out of a ship at sea, still the ship might be picked up and saved. *An act of that kind, therefore, is not the inevitable cause of the loss.*"

In that case, the force exerted upon the crew, was instantly followed by the damage. Yet was the force considered the remote cause, and as not discharging the underwriters for the loss, the cause of which was a peril of the sea.

In *Smith* v. *Scott*, (4 Taunton's Rep. 126), the plaintiff declared for a loss by perils of the sea. The ship Margaret ran foul of the Helena, by the grossest neglect. There was but one man on the deck of the Margaret, and he was asleep. It was contended this was not a loss by perils of the sea, but by the gross, culpable negligence of the crew.

But the court decided otherwise. " We do not," say they, " know how to make this out not to be a peril of the sea. What drove the Margaret against the Helena ? The sea. What was the cause that the crew of the Margaret did not prevent her from running against the other ? Their gross, culpable negligence ; but still, the sea did the mischief."

Thus it was obvious, that the collision could not have happened, but for the gross negligence of the crew. Yet that was considered as the remote cause only of the loss.

In *Hadkinson* v. *Robinson*, (3 Bosanquet and Puller's R. p. 392), the court held that, in order that the loss happen from a peril insured against, it is necessary that it " be a peril acting upon the subject insured against *immediately*, and not *circuitously*."

In *Forder* v. *Christie*, (11 East. 205), there was a detention of the vessel by the king's ship in the Baltic, and afterwards a hostile embargo was laid on British vessels at St. Petersburg, the port of destination ; whereupon the ship returned to Hull, her port of departure, and the owners abandoned for a loss by detention of princes.

The Court of King's Bench held that the proximate cause of the loss was not the detention, but the embargo. " Suppose," say they, " there had been foul weather to a certain point of the voyage, and then bad weather and adverse winds, which had prevented the vessel from entering her port of destination till she had received advice of the embargo, which obliged her to

put back; could that have been declared upon as a loss by the perils of the sea? And yet that might as well be said to be the *causa remota* of the loss of the voyage, as the detention in this case; but that will not do: *the risk insured against must be the effective cause of the loss, in order to charge the underwriters.* But here there was the concurrence of another overbearing cause, namely, the hostile embargo in the destined port, which was the immediate cause of the ship's return, and of the loss of the voyage."

In *Powell* v. *Gudgeon,* (5 Maule & Selwyn's Rep. 436), the ship met with sea-damage, put into port, and it became necessary to sell part of the cargo to pay for the repairs. The plaintiff claimed as a loss by perils of the sea.

Lord Ellenborough, in pronouncing the opinion of the court said: "I am inclined to think the damage in this case is to be considered as not arising immediately from a peril of the sea, although, in a remote sense, it may be said to have been brought about by a peril of the sea; but our rule of construction is, *causa proxima, non remota spectatur.* In conformity, therefore, to the rule, that the proximate cause, and not that which is remote, is to be looked to, I think the underwriter is not liable."

There the loss was rendered necessary by the sea-damage to to the ship. Yet the court refused to recognise the peril of the sea as the proximate cause.

In *Livie* v. *Janson* (12 East's R. p. 652,) the ship Liberty, in attempting to escape at night from the port of New York, was carried ashore upon the rocks by a body of ice, and a large hole was made in the side by the ice, and another in the bottom by the rocks. The water soon rose four feet in the hold, and the ship fell down on her side as the tide left her. During the night, the captain, with his officers and crew, all abandoned the vessel. In that condition she was, on the next day, seized by the government officers for a violation of the embargo law, and was afterwards, with her cargo, condemned on that account. There was a warranty against American condemnation. The question was, whether the proximate cause of the loss was a peril of the sea, or the American condemnation: if the former, the insurer was liable; if the latter, he was discharged.

Lord Ellenborough, in pronouncing the decision, said: "It appears to me that this case falls within the general principle, that *causa proxima, non remota spectatur.* It therefore seems to me to be useless to be seeking about for odds and ends of previous and partial losses, which might have happened to a ship in the course of her voyage, when, at last, there was one overwhelming cause of loss which swallowed up the whole subject matter. It is to be recollected, that nothing is properly im-

putable to the sea-damage, but the deterioration of the ship and cargo; for, though such sea-damage might stop the progress of the voyage, *and so bring the ship and cargo within the reach and effect of some other distinct peril, which they might otherwise have escaped, yet the substantive loss by that latter peril is imputable to that latter peril only, not to the previous sea-damage.* If, for instance, a ship meet with sea-damage, which checks her rate of sailing, so that she is taken by an enemy, from which she would otherwise have escaped, though she would have arrived safe but for the sea-damage, the loss is to be ascribed to the capture, not to the sea-damage; and this upon the principle that *causa proxima, non remota spectatur.* The case of *Green* v. *Elmslie,* which was cited in the argument, proceeds upon a similar principle. There the ship would not have been captured, had she not been driven by stress of weather upon the enemy's coast; and yet the loss was held imputable to the capture, and not to the perils of the sea, which had driven the vessel within the influence of the perils of capture."

Can it be said that the situation of the Creole, when the interference took place, was more precarious than that of the Liberty when she was seized by the custom-house officers? If it be urged that there was little prospect of the brig being able to bring the slaves insured to New Orleans after the insurrection—may we not say, there was no prospect of the ship being able to complete the voyage, after she had been abandoned by every person on board—was then derelict—surrounded by the floating ice—hard upon the rocks—two holes in the hull—and her hold filling with water by each influx of the tide? Indeed it is considered that the situation of the ship would have authorised an abandonment for a total loss, if it had been made prior to the seizure. 1 Phillips, 694.

In *Barnes* v. *Maryland Insurance Company,* (5 Harris and Johnson's R. p. 139), the schooner Hawk, warranted free from seizure in port, was captured at sea and carried into port, and afterwards was taken into the public service, by order of the minister of marine, without any judicial proceedings.

If the capture at sea was the proximate cause of the loss, then the insurer would be liable, but if the seizure in port was the proximate cause, then he was relieved.

The court held, that "the taking of the Hawk into the service of the French government may be considered as an act distinct from the capture, and as a seizure within the letter of it." "That is," says Phillips, (vol. 1, p. 728), "the seizure in port for the public service, was considered to be the proximate cause of the loss."

In this case, the vessel had been captured at sea, and, there-

fore, if an abandonment had been made before the vessel was taken into public service, the plaintiff might have recovered for a total loss. Still, the capture was held not to be the proximate cause of the loss.

Can it be said that the prospects of the Creole were more desperate after the insurrection, and before the interference, than were those of the Hawk after her capture at sea, and before her seizure by the order of the minister?

In *Rice* v. *Homer*, (12 Mass. Rep. p. 337), the ship, warranted free from capture, was disabled by a storm, was injured to more than three-fourths of her value, and, in fact, was not worth repairing. While in that shattered condition, she was captured. The question was, whether the loss occurred by a peril of the sea.

Chief Justice Parker, in delivering the decision of the court, adverted to the cases of *Green* v. *Elmslie*, and *Livie* v. *Janson*, and said, that the rule which those cases lay down, "must be considered as founded on correct principles, and as a necessary branch of the law of insurance."

It had been urged, in argument, that "in the cases decided on that principle, a partial loss only was claimed. But it is said, that in this case there was a total loss of the ship by the perils of the sea, before she was captured, because she was injured to three-fourths of her value, and was not worth repairing. We have been struck with this distinction, and have not abandoned it without much hesitation, because the technical rules only seem to prevent the plaintiffs from recovering an indemnity for the multiplied disasters of the voyage. *But, on full consideration, we are of opinion that the plaintiffs cannot prevail on this ground.* The ship, although damaged, was entire as a ship, when taken possession of by the French officers. If she had not been damaged, and had arrived at the same place, the same catastrophe would have happened. It is true, the tempest obliged her to go into that port; *but the going in was not the loss.* It was the capture; and the underwriters against capture, if there be any, must make up the loss," &c.

If any doubt should exist as to the applicability of the previous cases, the facts of the last case quoted, render it entirely similar to the Creole case.

In that case, the loss under the first peril was not merely a partial loss, but it was a technical total loss, before the occurrence of the second peril. The point was expressly made in argument, and decided upon mature deliberation. However great was the loss sustained by the sea-damage, still that does not, by the well settled rule of insurance, prevent the subsequent capture from being considered as the proximate cause of the loss.

In *Knight* v. *Cambridge*, (quoted in 11 Petersdorff, p. 267), the Court of King's Bench, in speaking of an attempt by the insurer to narrow down his obligations, made this very just observation : " The end of insuring is to be safe at all events, and it would be very prejudicial if we were to be making loop-holes to get out of these policies."

From this review of the decided cases, the following rules of construction may be drawn :

1st. That a loss is occasioned by a concurrence of perils, either when they both·commence their operation at the same moment, or when one precedes the other, but before there is a physical destruction of the thing assured, or what is equivalent thereto, and before any abandonment has taken place, the other peril supervenes, and the thing insured is then either physically destroyed, or otherwise absolutely prevented from arriving at the port of destination.

2d. That where there is a concurrence of perils, the last one which operates, is considered the cause of the loss, and is termed its proximate cause.

3d. That it does not necessarily follow that, if, while the thing insured is under the operation of one peril, a second peril intervenes and a loss takes place, the former peril is to be considered the cause of the loss.

4th. That if the damage caused by the first peril amounts only to a technical loss, or more than fifty per cent, so that the thing insured remains in specie, the second peril which supervenes is to be considered as the cause of the loss.

5th. That if the thing insured, though it continue to exist in specie, yet has been rendered absolutely worthless, and of no value whatever by the operation of the first peril, this is equivalent to a physical destruction of the property, and that peril is to be deemed the cause of the loss, no matter what peril may subsequently happen.

6th. That the act or event which occasions the loss, is to be regarded as its cause, rather than the agent which is employed, *eo instanti*, to bring about the result.

7th. That in the construction of general policies, where the loss is proved, the courts lean in favor of the insured, to give effect to the indemnity which formed the consideration of the contract, and for which the *pretium periculi* was paid.

IX. Another objection is taken to the plaintiff's right of recovery. It is contended that the underwriters are discharged by the alleged omission on the part of the officers and crew, to observe the proper vigilance and police on board, prior to the insurrection. It is said that the slaves ought to have been locked up at night, and a guard placed over the hatches. It is argued

that if these precautions had been used, the revolt could not have happened.

In other words, the defendants contend that the cause of the loss is not the interference nor the insurrection, but the imprudence and negligence of the officers and crew. Although our opponents choose to consider it as one of the contingencies against which the assured warrants, it is evident that the objection can only prevail, if at all, by maintaining that the alleged negligence and imprudence are the cause of the loss.

The importance of adhering to the principle, *casua proxima, non remota spectatur*, is well illustrated by this objection.

The loss cannot be controverted. If the witnesses are believed, there is no doubt as to the cause. But the defendants contend that the witnesses are all wrong, because, they say, that if the insurrection had not occurred, there could have been no interference. *Ergo*, the insurrection caused the loss.

Having taken one wrong step, they continue, and say that if there had not been negligence and imprudence of the officers and crew, there would have been no insurrection. *Ergo*, the negligence and imprudence are the cause of the loss.

BULLARD, J. This case, together with six others, growing out of the loss of the slaves on board the brig Creole, which was carried by the mutineers into the harbor of Nassau, in November, 1841, and which has been the subject of so much diplomatic, as well as forensic discussion, was elaborately argued last, summer, before the adjournment of the court, both by brief, and *viva voce*. They are actions upon several policies of insurance, underwritten by different insurance companies in this city, upon slaves shipped on board that vessel for this port. As all the cases relate to the same voyage, and all the slaves insured were lost at the same time and by the same disaster, they have all been considered together ; and it is supposed that the opinion which we are about to pronounce in one of the cases, will be decisive of all.

The first question is, what risks did the insurers assume ? In the present case, and in three others, the terms of the policy are : " Warranted free from elopement, *insurrection*, and natural death." In one of them, to wit, *Lockett* v. *The Firemen's Insurance Company*, it is stipulated that the "insurers are not liable for suicide, *mutiny*, natural death, or desertion." In the re-

maining two cases, it is declared that the company shall not be liable for " suicide, desertion, or natural death."

In common parlance, there is little or no difference between mutiny and insurrection. In this very case, in the briefs of counsel, in the statements of witnesses, and in the official correspondence, the rising of the slaves on board is called, indiscriminately, mutiny and insurrection. The parties are supposed to have had in view, the conduct of the slaves, who formed the subject of the insurance, rather than the obedience and subordination of the crew, whose forcible resistance of the authority of the master, would be mutiny, technically speaking. The only difference, therefore, in our opinion, between that case in which the word *mutiny* is used, and those in which the policy contains the word *insurrection*, is, that in the first the *mutiny* is clearly an excepted risk, and in the others is presented the question, much discussed at the bar, whether the expressions amount to a *technical* warranty, or were only intended to exempt the insurers from the risk of insurrection. On the one hand it has been contended, that it amounts to a warranty, and that the occurring of the insurrection, whether it was the cause of the loss or not, was a breach of warranty, and put an end to the policy; while, on the other hand, it is said, that the only effect of the clause was to throw the risk of loss by insurrection upon the owners, or shippers, leaving all other sea risks to be supported by the underwriters, notwithstanding the happening of the insurrection.

The word *warranted* is used; but there is often a warranty in form, where there is none in fact; as in the familiar instances of *warranted free from average—free from detention and capture,* which mean nothing more, than that those shall not be among the perils and losses insured against, and for which the underwriter is to be liable. Although these forms of expression (says Phillips) are sometimes spoken of as warranties, it would be absurd to consider them such in their character and construction, since in an insurance *free from average,* for instance, it would be adopting the doctrine, that the occurrence of the average loss would render the policy void, and consequently the happening of a loss, which is not insured against, deprive the assured

of the right to recover for one-that is insured against.   1 Phil-
lips, 127.

We, therefore, view the terms of the policy as not creating a
warranty, but only as exempting the insurers from any liability
on account of losses which might be sustained in consequence
of a mutiny, or insurrection on board; they assuming all other
risks, and particularly restraints, arrests, and detentions by for-
eign powers, or the emancipation of the slaves by foreign in-
terference.   All the cases then, which have been argued, may
be classed in two categories.   1st, those in which the underwri-
ters assume the risk of loss from insurrection; and 2nd, those in
which they are exempted from that loss, by the terms of the
policy.   The case now under our immediate consideration, be-
longs to the latter class, the defendants not being liable for *insur-
rection*, elopement, and natural death.

The great question, therefore, upon the merits, which this
case, and the others of the same class present, is, whether the
loss of the slaves was caused by the insurrection, or by illegal
and unauthorised interference on the part of the authorities of
Nassau.

The cargo of the Creole consisted of one hundred and thirty-
five slaves, besides some tobacco.   She left Richmond on the
25th of October, and after remaining in Hampton Roads one
day, went to sea on the 31st.   Nothing occurred on board
even to create suspicion, until the evening of the 7th of Novem-
ber, when they hove-to off the Island of Abaco.   During the first
watch, about half past nine, the mate, who was on deck with
three seamen, was informed that one of the negro men was in
that part of the hold where the women were, contrary to the
regulations on board.   Merritt, one of the agents on board, who
was asleep in the cabin, was called up.   He lit a lamp, which
enabled them to see one of the slaves, by the name of Madison,
in the hold where the women were.   Merritt asked him, if he
knew the consequences of his conduct.   He replied that he did,
and sprang for the hatchway to get on deck; as he got on the
steps to come up, Merritt seized him by the legs and the mate
by the shoulders, but he got away from them, and pushed the
mate back.   At that instant, a pistol was shot, which grazed the

back of the mate's head.   He flew to the cabin to call all hands, and as they came out from the cabin, whither he was followed by four or five of the slaves, the fight commenced with pistols, a musket, and bowie knives.   Hewell, a passenger, was killed; Captain Ensor, badly wounded, sought safety in the main-top, whither the mate had already fled.   In a few minutes the mutineers were completely masters of the brig, having subdued the officers and crew.   Nineteen of them took charge, and compelled the mate and crew, by constant vigilance and threats, to navigate the brig to the port of Nassau, in New Providence. From the Hole-in-the-Wall, which they made the next morning, they compelled the crew to change the direction of the vessel from her direct course to the mouth of the Mississippi, and to steer for Nassau.   The compass was watched to prevent the course being changed, and they were compelled, by threats of instant death, to take the brig into Nassau, where they arrived on the 9th of November, in the morning.   It is beyond all question, that the insurrection was completely successful; all resistance was vain, and no attempt was made by the whites to regain their ascendency.   The brig was taken into Nassau by the slaves, in this state of successful revolt.   It is quite unnecessary to dwell upon the particulars of the contest, which took place in the darkness of the night, but was brought about so suddenly, and yet with such evident readiness of preparation at the first signal, as to leave no doubt that the arms used were already loaded, and the plot formed so as to explode on reaching the vicinity of the Bahama Islands.   The leaders of the revolt appear to have known that they were not far from those islands, and said they wished to go to Abaco.   All the arms they had, except one pistol, were thrown overboard at the mouth of the harbor, to prevent their being seen.   A black pilot came on board to take them in, and the mate went ashore in the boat of the health officer.   This officer was requested to put the mate on shore, and to watch the vessel, and to let them have no communication with the shore until he returned.   The officer watched the vessel, and the mate went with the American Consul to see the Governor; saw him at his house, and stated the case to him.

In the meantime, it appears that the pilot, a free black, was on board, in free intercourse with the slaves.

Thus it appears, and in this all the witnesses concur, that no hopes were entertained of recovering control of the brig and the slaves on board, without assistance from abroad. The insurrection had been entirely successful, the master badly wounded, one passenger killed, and the mate and crew compelled to deviate from the course of the voyage. This was the condition of things on board up to the moment the brig was moored in the port of Nassau. The mutineers appeared to have felt so secure that they they threw their arms overboard, relying for their future safety upon their physical superiority, and upon the sympathies of the people of the Bahamas, or the direct interference of the local authorities.

Here it is proper to pause, and enquire what effect has been produced, what change operated by the entrance of the Creole into the waters of a foreign, but friendly power? What new duties and relations have sprung up, as it relates to the officers and crew of the brig, to regulate their intercourse with the public authorities or the people of the island? What treatment had they a right to expect under the law of nations, when thus driven, by an overwhelming calamity, into a British port? The judge of the Commercial Court, very properly instructed the jury, that the letter of the late Secretary of State of the United States, addressed to Lord Ashburton, on the 1st of August, 1842, and the resolutions of the Senate, unanimously adopted by that body in reference to the case of the Enterprise, contains a true exposition of the law of nations on this subject. Those principles are, in substance, as follows :

· That a ship, or vessel, on the high seas, in time of peace, engaged in a lawful voyage, is under the exclusive jurisdiction of the State to which her flag belongs ; as much so, as if constituting a part of its own domain. If such ship or vessel should be forced by stress of weather, or other unavoidable cause, into the port of a friendly power, she would, under the same laws, lose none of the rights appertaining to her on the high seas ; but, on the contrary, she and her cargo, and the persons on board, with

their property, and all the rights belonging to their personal relations as established by the laws of the State to which they belong, would be placed under the protection which the laws of nations extend to the unfortunate under such circumstances. Although the jurisdiction of a nation over a vessel belonging to it, while lying in the port of another, is not wholly exclusive, and although for any unlawful acts, committed while thus situated, by her master, crew or owners, she and they may be answerable to the laws of the place, yet the local law does not supersede the laws of the country to which the vessel belongs, so far as it relates to the rights, duties, and obligations of those on board. Whatever may have been the state of the British law in relation to slavery, it did not operate on board the Creole, while lying in the port of Nassau, and before a voluntary landing of the slaves, to dissolve the relation of master and slave. That relation remained unimpaired. It is only when such slaves come under the exclusive jurisdiction of the British law, within its territorial operation, that the slave becomes free, because such relation is forbidden. To resume, in the language of Mr. Webster, in the letter above referred to : " Vessels of the United States driven by necessity into British ports, and staying there no longer than such necessity exists, violating no law, nor having intent to violate any law, will claim, and there will be claimed for them, protection and security, freedom from molestation, and from all interference with the character or condition of persons or things on board. Such vessels, so driven and so detained by necessity in a friendly port, ought to be regarded as still pursuing their original voyage, and turned out of their direct course only by disaster, or wrongful violence; they ought to receive all assistance necessary to enable them to resume that direct course ; and that interference and molestation by the local authorities, where the whole voyage is lawful, both in act and intent, is ground for just and grave complaint."

Lord Ashburton, to whom that letter was addressed, in reference to this very case of the Creole, does not pretend to combat the general principles thus expressed, but proceeds to give that pledge which the treaty making power deemed equivalent to a treaty stipulation. " In the meantime," says he, " I can engage

that instructions shall, be given to the Governors of Her Majesty's colonies on the southern borders of the United States, to execute their own laws with careful attention, to the wish of their government to maintain good neighborhood, and that there shall be no officious interference with American vessels driven by accident, or by violence into those ports. *The laws and duties of hospitality shall be executed,* and these seem neither to require, nor to justify any further inquisition into the state of persons or things on board of vessels so situated, than may be indispensable to enforce the observance of the municipal law of the colony, and the proper regulation of its harbors or waters."

With this view of the laws and comity of nations, we proceed to enquire into the occurrences in the harbor of Nassau, and the conduct of the local authorities in reference to the Creole, premising that we cannot yield our assent to the reasoning of the counsel for the defendants, who endeavored to convince us that the slaves on board the Creole became free, *de facto,* by their successful mutiny, and, *de jure,* by sailing into a British port. We regard them still as slaves while on board, though in a state of insurrection. They had not ceased to be the property of their masters, although that right of property could not have been asserted in a British court, nor enjoyed within the exclusive influence of the British law.

Let us first look at the written correspondence which took place immediately after the arrival of the Creole, between the American Consul and the Governor of the Bahamas. The official documents, letters, or correspondence which attend most transactions of any public importance, forming a part, indeed, of the *res gestæ,* afford much more satisfactory evidence of the true character of such transactions, than the statements even of the actors themselves, made afterwards from memory.

As soon as the Consul was informed of the disaster on board the Creole, he waited on the Governor, with the mate, who related the disaster on board, and then addressed him the following note:

" Sir: Having had detailed to your Excellency the particulars of the mutiny and murder on board the American brig Creole, by slaves on board said brig, I have now to request that

your Excellency will be pleased *not to suffer any of the slaves on board to land*, until further investigation can be made."

The Colonial Secretary immediately replied : "That he was instructed by the Governor, to acquaint the Consul, that, *for the fulfilment of the object of his letter*, his Excellency had ordered a military party on board the brig ; adding, however, that there would be no impediment to any of the white persons on board, landing there."

On the same day the Colonial Secretary addresses a second note to the Consul of the United States, in which he says, that, in compliance with his (the Consul's) request, he forwards to him, by direction of the Governor, a copy of the statement, communicated to him personally, in the morning, by the Governor and Council, in reference to the case of the American brig Creole, on board of which vessel a murder and certain other offences are alleged to have been committed. The statement enclosed is in the following terms :

" To JOHN F. BACON, ESQ.,
    *Consul of the United States of North America:*

" We wish to state to you, as the representative of the American government, that the circumstances detailed to the Governor this morning, in your presence, respecting the events which took place on board of the American brig Creole, on the night, and subsequently to the 7th of November, have been given all possible consideration to by the Governor and Council, by whom the following decisions have been come to :

" 1st. That the courts of law here have no jurisdiction over the alleged offences.

" 2d. But, as an information has been lodged before his Excellency the Governor, charging the crime of murder to have been committed on board of the said vessel, while on the high seas, it was expedient that the parties implicated in so grave a charge, should not be allowed to go at large ; and that an investigation ought, therefore, to be made into the charges, and examinations taken on oath ; when, if it should appear that the original information was correct, and that a murder had actually been committed, that all the parties implicated in such

crime, or in any other act of violence, should be detained here until reference could be made to the Secretary of State, to ascertain whether the parties detained should be delivered over to the American government, or not ; and if not, how otherwise to be disposed of.

" 3d. That as soon as such examination should be taken, all the persons on board the Creole, not implicated in any of the offences alleged to have been committed on board of that vessel, *must be released from further restraint.*

" 4th. That a detailed acconnt of what has taken place, should be transmitted to the British minister, at Washington.

A true copy. .            C. R. NESBITT, Colonial Secretary.

" Council Chamber, Bahamas, Nov. 9, 1841."

The military party was sent on board, and the investigation commenced in pursuance of this explicit declaration on the part of the Governor and Council, and no further correspondence took place until the 12th.   The Consul and all concerned, acquiesced in the course proposed to be pursued by the local authorities. They could not have understood the expression used in the statement, that all persons not found to be implicated, *must be released from further restraint,* to mean, as has been argued, that they must be released. from the authority and control of the master of the vessel, or the owners of the slaves, or their agents ; but only that the guard would be withdrawn, which had been placed on board, at the solicitation of the Consul, for the purpose of preventing the slaves from leaving the vessel.  If the Consul had not so understood it, he would certainly not have consented to the terms proposed.  We see in this, no disposition on the 'part of the Governor and Council, officiously to interfere.  On the contrary, they interfered, at the request of the Consul, merely for the purpose of singling out and confining the guilty, with the explicit declaration, that, after that, they would impose no further restraint upon the other persons on board.

The investigation proceeded until the 12th, at noon, when the Consul again writes to the Governor, that in proceeding on board the brig Creole, with the magistrates, that morning, he saw a large collection of persons on the shore nearest the vessel, and many in boats, and was at the same time informed,

that the moment the troops should be withdrawn from the brig, an attempt would be made to board her by force; that he was farther informed, an attempt had already been made. He, therefore, requests the Governor to take such measures as he may deem proper, for the protection of the said vessel and cargo. He adds, that he believes those statements to be true, and that he did not accompany the magistrates, that he might communicate the same to his Excellency. An immediate answer was returned by the Governor, in the following words: "Sir, In answer to your letter this moment received, I beg to state, that I cannot think it possible that any of Her Majesty's subjects would act so improperly as to board, by force, the American brig Creole, and should such an unauthorized attempt be made, I shall be quite ready to use every authorized means for preventing it." Thus the Consul did not witness the last scene on board, when the Attorney General and the magistrates who had conducted the examination, returned with the guard, carrying away the nineteen slaves, who had been identified as the guilty ones; and when all the rest of the slaves, except four or five, went on shore, and never returned. Before we notice the discordant and contradictory statements of the witnesses relative to that occurrence, it is proper to give the rest of the correspondence, consisting of the remonstrance of the Consul at the liberation of the slaves, the answer of the Governor, and the official statement or report of the Attorney General.

On the 14th of November, two or three days after the occurrence above alluded to, the Consul writes to the Governor, that he had not been enabled, from various causes, until late on Saturday evening, to obtain a detailed statement from those on board the brig, of the proceedings of the Attorney General and those accompanying him, by which all the slaves on board the said brig, with the exception of four, were *put on shore and liberated*. Against the manner of their liberation, and all the proceedings which ultimately attended it on the part of Her Majesty's officers and subjects, he deemed it his duty to enter his solemn protest; and also, on the part of the chief mate, then in command, to protest. He goes on to say, that he regards those slaves while they were under the American flag, and regularly

cleared from one slave-holding State to another, within the United States, as much a portion of the cargo of the brig as the tobacco and other articles on board, and whether on the high seas or in an English port, does not change their character; and that Her Majesty's government had not the right to interfere with or control the officers of an American vessel thus circumstanced, in such a course as might be necessary and proper to secure such property from being lost to the owners. He concludes by asking, that those who had been identified as the guilty slaves, might be forwarded to the United States by the Creole, which he expects to forward in a few days.

To this the Governor replied, as follows: " Sir, I have the honor to acknowledge the receipt of your letter of this date, and cannot withhold from you that I feel somewhat disappointed at its contents, as it has been the wish and object of myself and Council to meet your views and wishes as we were authorized, in all that has taken place respecting the American brig Creole; and as our intentions were throughout made known to you previously to being acted upon, without calling forth any objections on your part, we could not but consider that you acquiesced in them. As the statement contained in your letter, respecting what occurred while the Attorney General was on board the Creole, does not accord with the official report thereof made to me by that officer, I transmit a copy of the same for your information; and by which it distinctly appears, that neither he, nor any of the authorities here, had any thing to do, either with the negroes quitting the vessel, or their landing here."

In conclusion, the Governor declines giving up the nineteen culprits, because it had been agreed that they should remain until the will of the ministry should be known.

The official report of the Attorney General, dated on the 13th, the day after the slaves landed, states, that on the day before, he had, in accordance with the wishes of the Governor, proceeded on board the brig, in company with the police magistrate, and the Inspector General of Police, for the purpose of visiting her. That on nearing her, he found in her immediate vicinity, several boats filled with colored and black people of the island; that presuming them to be the persons alluded to

in the communication of the American Consul to the Governor, (of the 12th,) he visited each of the boats, and addressing the persons in them, informed them of the report which had been made by the Consul; explained to them the liability which would attach to them, if they acted in the way it was alleged they intended to do; and strenuously urged them to abstain even from using words or gestures, which might be considered as having a tendency to violate the peace. That, in answer, they all assured him, it was not their intention to resort to any acts of violence, and that they had assembled merely for the purpose of peaceably carrying on shore, such of the persons on board the Creole as might be permitted to quit her, and should desire their assistance. That the persons in the boats were without arms, except ten or a dozen stout cudgels, which he observed in one of the boats, and which, at his request, were immediately thrown overboard. He then proceeded on board, and the police magistrate pointed out to him eighteen persons, who were charged with the crimes committed on board; that one other was afterwards identified by two witnesses. That he then enquired of the chief mate whether he had any further witnesses to produce, and was answered in the negative. That he then requested Lieut. Hill, the officer in command of the military guard, to take charge of the accused, and he, at the same time, informed them, that they would shortly be conveyed on shore, and imprisoned until representations of their case could be made to the British government, &c. That he then informed the chief mate that, as far as the authorities of the island were concerned, all restrictions upon the movements of the other persons on board were removed; and requested him to cause all persons on board to appear on deck. That he cheerfully complied, informing him (the Attorney General), at the same time, that it was not his desire to detain on board any one of the persons (shipped as slaves) who did not wish to remain, and that they had his free permission to quit her, if they thought proper to do so; but that he apprehended that, as soon as the guard should be withdrawn, the people in the surrounding boats would board his vessel, and commit acts of robbery and other violence. To this the Attorney General states that he re-

plied, that, with respect to the first point, he had no instructions to interfere between himself and the persons alluded to ; but as to his fear of an attack, that precautions had been taken to guard against that ; and that he might rely upon being protected against any violation of law. All the persons on board being then assembled on deck, he says he told them, that, on the arrival of the Creole, information had been laid before the Governor, charging a murder, and certain attempts at murder, to have been committed on board, and that the protection of the authorities had been claimed by the American Consul ; and that a guard of soldiers had been placed on board for the purpose of preventing any person from quitting the vessel, until an examination could take place. That such examination had now terminated, and no criminating evidence had been adduced against the persons he was then addressing. That such being the case, he had to inform them that, *as far as the authorities of the island were concerned, all restrictions on their movements were removed.* He states that he had no sooner concluded, than a white man, who he was informed was a passenger by the name of Merritt, addressed the people who had been shipped as slaves, and told them that they were at perfect liberty to go on shore if they pleased —information which they appeared to receive with great pleasure, and a general intimation of their intention to avail themselves of it. That this took place in presence of the mate, who signified his acquiescence, and refused to forbid the approach of the boats, though urged to do so by the master of another American vessel, who happened to be on board. That he and the police magistrate quitted the brig before any of the slaves had left her, but he was not many yards off when he saw them crowding over the sides and getting into the boats. In conclusion, he states, that the departure of the negroes from the Creole, was their own free and voluntary act, sanctioned by the express consent of the mate ; and that neither himself, nor any other of the colony then on board, interfered in the slightest manner to induce them to take that step. In corroboration of these statements, he refers to the police magistrate, the Inspector General of Police, Mr. Justice Burnsides, Lieut. Hill, the Receiver General and Treasurer, and Mr. Hamilton, the pilot of

the bar, who were all present during the whole transaction.

This closes.the written correspondence, and brings us to consider the parol evidence touching' what occurred on the 12th of . November, when the guard was withdrawn and the slaves left the vessel. Our attention has been most particularly directed to what was said. by the Attorney General at the time in his address to the slaves, and what was said at the same time by Merritt, Gifford the mate, and Capt. Woodside.

The statement made by the Attorney General in his official report, is confirmed by his testimony on oath, and by that of all the other English witnesses who were present, They all testify that he did not tell the slaves they were free and might go where they pleased, but only, in substance, that, so far as it concerned the authorities of the island, all restraint was now removed. They all swear that Merritt, at the same time, told them, in substance, that they might either go, or stay, as they pleased. This is flatly contradicted by the American witnesses, who swear that the Attorney General stated to the slaves that they were free, and might go where they pleased. Merritt, however, admits that he requested the Attorney General to tell them, that those who were so disposed might continue the voyage, which he refused, and that thereupon he (Merritt) said to them : " Men and women, all of you *who think proper* to proceed on the voyage to New Orleans, *have the privilege* of doing so on board the Creole." That something was said or done of that kind, either by Gifford or Merritt, or both, to incur the censure of Captain Woodside, is not denied. Its precise import is not clearly shown, but it is shown, without contradiction, by the testimony of the Attorney General, that Woodside said to Gifford, that he ought to protest against what was taking place ; and he swears that Gifford expressed to him his entire willingness that the people should go on shore. Anderson, the Receiver General, swears, that Merritt told them they might go on shore, or wherever they pleased. That he is positive as to this, because Merritt had been standing on the larboard side of. the deck with him, and had asked him to tell the people there was no, wish to detain them, provided they desired to go on shore ; but not having gone on board in any official capacity, he told

Merritt that interference on his part might be injudicious, and advised him to make known his wishes to the Attorney General and magistrates, then standing on the starboard side of the poop or quarter deck, and that Mr. Merritt immediately passed over to them.

It is to be lamented that the testimony of Captain Woodside has not been taken upon this point; but notwithstanding the positive and irreconcilable contradictions in the statements of the witnesses, there are some facts clearly shown: 1st. That no violence was used on the occasion, and that not a single person from on shore, or the surrounding boats, boarded or attempted to board the Creole. 2d. That the four who voluntarily remained, were not disturbed, nor interfered with. 3d. That neither the mate Gifford, nor Merritt, gave any orders to the slaves to go below, or to remain on board when the guard should be withdrawn, nor exerted any authority to prevent the slaves from going on shore when the guard was withdrawn. 4th. That only nineteen were taken on shore by the British guard, with the consent of all concerned.

The declaration, which Merritt admits in his testimony he made to the slaves, that all of them *who thought proper* to proceed on the voyage to New Orleans, had the *privilege to do so on board the Creole*, may have been understood by the remaining slaves as leaving it to *their option* whether to go or to stay, and they were confirmed in that impression when they discovered that neither Merritt, nor the mate endeavored to prevent their going on shore, they not wishing to avail themselves of the *privilege of coming to New Orleans.*

There is another fact equally clear and well established, in our judgment, to wit, that the mutiny or insurrection, which had been successful in turning the Creole from her course and bringing her into the port of Nassau, had not been quelled and subdued until the British guard went on board, and confined the leaders. Until then, the mutineers were in the control of the brig, and of every body on board. It is true the arms which had been used to subdue the officers, passengers, and crew, had been thrown overboard; but the physical superiority of the mutineers remained, and up to the moment

when the pilot came on board, they alone exercised authority.

Upon this statement of the material facts of the case, the question arises, what was the cause of the loss, according to the law of insurance? Was it the insurrection or mutiny, or was it the interference of the authorities of Nassau? or, as it is expressed in the policy, foreign interference, or the arrests, restraints and detainments of kings, princes, or people. It is not for us to decide, whether the conduct of the local authorities of Nassau in relation to the Creole, was such a violation of international comity, as to give just cause of complaint in the diplomatic relations of the United States with Great Britain. With the case, in that respect, we have nothing to do. Whether the loss shall fall upon the owners or the underwriters, the question of redress between the two governments remains the same. Our only inquiry is, whether that interference, such as it is shown by the evidence before us, was the proximate, efficient cause of the loss, according to the settled principles of the law of insurance. It is a question between owner and insurer, all citizens of the United States, and equally entitled to the interposition of the government.

When several successive perils have been encountered, and a loss ensues, it is often difficult to determine which is, legally speaking, the true cause. The rule, *causa proxima, non remota spectatur*, is well established; but the *last*, is not necessarily the *proximate* cause. The books are full of cases illustrating this distinction. Where, for example, there had been a restraint and detainment of government within the terms of the policy, and injury to the vessel by the long delay and exposure to the climate consequent upon such detainment, it was held that that was the true cause. "All the consequences," says the court, " naturally flowing from the peril insured against, or incident thereto, are properly attributable to the peril itself. If there be a capture, and before the vessel is delivered from that peril, she is afterwards lost by fire, or accident, or negligence of the captors, I take it to be clear that the whole loss is properly attributable to the capture." 1 Story's Rep. 164.

So in the case of *Potter* v. *The Ocean Insurance Company*, it is said " if a vessel is insured against fire only, and is burnt to

the water's edge, and fills with water, and sinks, it would be difficult, in common sense, to attribute the loss to any other proximate cause than the fire, and yet the water was the principal cause of the submersion." So the barratry of the master and crew would be the proximate cause of the sinking of a vessel, in which they had bored holes fraudulently to sink her. 3 Sumner's Rep. 41.

In the case of *Schieffelin* v. *The New York Insurance Company*, as stated in 1 Phillips, 699, it was said by Ch. Just. Kent: "Suppose the policy against capture only, and the vessel was captured, and then shipwrecked while in the hands of the captors, I should think the assured might maintain, that his right to recover for a total loss attached upon the capture, and that the subsequent casualty was one with which he had no concern."

The converse of this last case would be analogous to the one now before us. Suppose the underwriters exempt from the risk of capture, and, after capture, the vessel wrecked by one of the perils assumed in the policy, the assured could not recover. "*Prima facie*," says Hughes, in his treatise, "a capture amounts to a total loss; and if the possession of the captors continues, or even, though a re-capture take place, if the ship be under a disability to complete her voyage, and the adventure be not only retarded, but in effect destroyed, the underwriters will be liable for a total loss, if notice of abandonment be given when necessary. Hughes, 170, *224. 1 Phillips, 419.

In principle it is not easy to distinguish between a successful insurrection of slaves, which form themselves the subject matter of the insurance, and capture by an enemy. If, while the slaves on board the Creole were its undisputed masters, and after the route of the original voyage had been abandoned, she had been wrecked upon one of the numerous British islands in that sea, either by the force of a tempest, or stranded intentionally by the mutineers, and they had dispersed themselves on shore, within the exclusive operation of the British law, we cannot doubt that the efficient operative cause of the loss would be the insurrection, which had been successful and unsubdued up to the moment of the stranding or the shipwreck. The escape into a British island, and the immunity promised by the

foreign law, formed a part of the original plan of the mutineers, and apparently their only motive. The emancipation of the slaves, at least so long as they remained within the dominion of Great Britain, was the immediate and natural consequence of the insurrection, and of the running of the vessel upon the British shores by the mutineers.

But it has been argued that, with the aid of Captain Woodside and others on the island, the officers and crew of the Creole might have succeeded in recovering the mastery of the vessel and slaves, and continuing the voyage to New Orleans, had it not been prevented by the interference of the local authorities.

The facts in relation to this part of the case, as stated in the New Orleans protest, signed by the two mates and six seamen, are as follows: " That about two or three hours after the brig reached Nassau, Captain Woodside of the bark Louisa came on board with the American Consul, and it was agreed that he, with as many of his crew as could be spared, and the second mate and four sailors of the brig Congress, should come on board with arms, and, with the officers and crew of the Creole, *rescue the brig from the British officers then in command*, and conduct her to Indian Key, where there was a United States vessel of war. The Louisa and the Congress were American vessels, and the arrangement was made under the control of the American Consul. The Captain was to come on board the Creole with a part of the crews of the Louisa and the Congress, as soon as the Creole was ready to leave Nassau. Frequent interviews were had every day with Captain Woodside, the American Consul, and the officers of the Congress on the subject, and the whole plan was arranged. Accordingly, on the morning of the 12th of November, Captain Woodside, with the men in a boat, rowed to to the Creole. The muskets and cutlasses were obtained from the brig Congress. Every effort had been made, in concert with the American Consul, to purchase arms of the dealers at Nassau, but they all refused to sell. The arms were wrapped in the American flag, and concealed in the bottom of the boat. As said boat approached the Creole, a negro in a boat, who had watched the loading of the boat, followed her, and gave the

alarm to the British officer in command on board the Creole ;
and as the boat came up to the Creole, the officer called out to
them, 'keep off, or I will fire.' His company of twenty-four
men, were drawn up in a line fronting Captain Woodside's boat,
and were ready, with loaded muskets and fixed bayonets, for
an engagement. Captain Woodside was thus forced to with-
draw from the Creole, and thus the plan was prevented from
being executed, the said British officer still remaining in com-
mand of the Creole."

According to this statement, if the officer in command on
board the Creole knew that the intention of Captain Woodside
and his party was forcibly to rescue the Creole from the British
guard, before the object for which it had been put on board at
the solicitation of the Consul, had been accomplished, by identi-
fying and removing the guilty, it might well be questioned whe-
ther he had not a right to prevent it, by forbidding their board-
ing the brig. Up to that moment no complaint had been made
of improper interference on the part of the local authorities.
That interference, such as it was, had been sought by the Con-
sul, and the mate of the brig. The guard had remained on board,
and even prevented the colored people of the island from coming
on board, as soon as it was requested to do so. It would hardly
have comported with the good faith to have made an attempt at
that time, by force of arms, to rescue the brig from the guard.
The officer in command that day, swears positively that he was
not notified by a negro of the approach of the American boat
with arms on board, and that he ordered off all boats, whether
American or English, except those which visited the Creole on
duty. Be this as it may, neither the failure to purchase arms on
shore, in consequence of popular prejudice, nor to rescue the
Creole from the guard before the examination had been termi-
nated, can be imputed to the authorities of the island as a
cause of the loss of the slaves.

If we consider this abortive attempt to rescue the brig, in con-
nection with the public prejudice of the place, and with the per-
suasive influence which was employed to induce a great majori-
ty of the slaves on board, who had remained apparently passive
during the mutiny, to avail themselves of that opportunity of be-

coming free, and that open demonstration which was made by the colored population, who hovered round the Creole in order to facilitate at least, as well as encourage their escape, if not forcibly to bring about that result, and which evidently intimidated and overawed the officers and crew of the brig; and if we suppose that, under the influence of such intimidation, the slaves were suffered to leave the vessel, the question arises, was that a peril against which the plaintiff was insured, and the cause of the loss?

The policy contains the usual clause of insurance against " arrests, restraints, and detainments of all kings, princes or people, of what nation, condition, or quality soever." " This clause," says Phillips, " is more generally understood to apply to captures, seizures, and detentions by the commissioned officers and agents of some lawful and acknowledged government. Accordingly, Mr. Justice Buller said, the word *people* in this clause means the supreme power, thé power of the country, whatever it may be. Thus the court considered the loss of a cargo of corn by a mob at Elly Harbour, as coming under the clause relating to piracy." 1 Phillips, 259. Hughes on Ins., 179.

But not only no force was used, as we have already remarked, but the Governor expressed to the Consul his entire willingness to use all proper means to prevent it; and it is shown that the Attorney General was sent on board the boats, which were assembled near the Creole, and filled with the colored people of the island, and cautioned them against any resort to violence, and caused them to throw overboard a number of clubs with which they had provided themselves. How far the people of the island may have been encouraged, or instigated by persons in authority to aid in the escape of the slaves, does not very clearly appear; that they met with general sympathy, is abundantly shown; but our enquiry is not so much whether the conduct of the local authorities, or people was such as comity and good neighborhood would dictate; but whether their acts and interference were, according to the law of insurance, the cause which prevented the property insured from arriving at the port of destination. Whatever act or event produced that result, is to be considered as the cause of the loss, and that is our

only enquiry.; and from the best consideration we have been able to give the whole case, we conclude that the insurrection of the slaves was the cause of breaking up the voyage, and prevented that part of the cargo, which consisted of slaves, from reaching the port of New Orleans ; and, consequently, that the defendants are not liable on the policy in this case.

It is, therefore, ordered and decreed that the judgment of the Commercial Court be reversed, and ours is for the defendants, with costs in both courts.